IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

Nos. 18-4875(L), 18-4876
18-4877, 19-4269, 19-4287, 19-4345
_____

UNITED STATES OF AMERICA,

*Appellant/Cross-Appellee,*

v.

ANTONIO SIMMONS ET AL.,

*Appellees/Cross-Appellants.*

_____

On Appeal from the United States District Court
for the Eastern District of Virginia
_____

BRIEF OF THE UNITED STATES
_____

BRIAN A. BENCZKOWSKI
Assistant Attorney General
Criminal Division

MATTHEW S. MINER
Deputy Assistant Attorney General

TERESA A.WALLBAUM
Assistant Chief
Organized Crime and Gang Section

G. ZACHARY TERWILLIGER
United States Attorney
Eastern District of Virginia

ANDREW BOSSE
Assistant United States Attorney
Eastern District of Virginia

*Attorneys for the United States of America*

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................... iii

Jurisdictional Statement ...............................................................................1

Statement of the Issue ..................................................................................1

Statement of the Case...................................................................................2

I.      Statement of Facts…………………………………………………...4

        A. Nine Trey Gangsters…………………………………………….6

        1.  The RICO Enterprise…………………………………………..6

        2.  Defendants' Roles in the Enterprise…………………………….10

        3.  December 10, 2015, Murder of Al-Tariq Tynes………………………..12

        4.  December 15, 2015, Murder of Vandelet Mercer and
            Attempted Murder of R.F.  …………………………………………...…14

        5.  December 20, 2015, Murder of Linda Lassiter and Wayne Davis…....…16

        6.  December 20, 2015, Aqua Lounge Shooting…………………….…..18

        7.  December 20, 2015, Attempted Murder of R.P.M……………………...19

        8.  December 21, 2015, Murder of Jamesha Roberts………………………20

        9.  War on Skino's Line and the December 27, 2015,
            Attempted Murders of Nino, Lanez, and Blacko………..…………….....21

        10. December 27, 2015, Attempted Murder of S.M………………………23

        11. December 27, 2015, Shooting at Other Local Residents………………25

i

12. December 27, 2015, Shell Gas Station Robbery…………………………25

13. Simmons' Drug Trafficking………………………………………………28

14. Lassiter's False Alibi Defense and Testimony…………………………29

II.    Procedural History………………………………………………………31

Summary of the Argument ...................................................................33

Argument………………………………………………………………………34

I.    The District Court Erred in Granting Simmons' and Mitchell's Post-Trial
      Motions for Acquittal on Count 30

      A. Standard of Review……………………………………….…………35

      B. Statutory Background………………………………………...……..35

      C. The Racketeering Activity that Enhanced Simmons' and Mitchell's
         Statutory Maximums for Count 1—*i.e.*, Their Participation in Several
         Actual Murders—Was an Element of Their RICO Conspiracy
         Convictions and Satisfies § 924(c)'s Elements Clause…………………38

Conclusion…………………………………………………………………...45

Statement With Respect to Oral Argument…………..…………………………...46

Certificate of Compliance……………….............…………………………...47

Certificate of Service………………………………………………………...48

ii

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)................................................... passim

*Blakely v. Washington*, 542 U.S. 296 (2004).............................................................39

*Chue v. United States*, 894 F. Supp. 2d 487 (S.D.N.Y. 2012)........................... 37, 38

*United States v. Cone*, 714 F.3d 197 (4th Cir. 2013)................................................35

*United States v. Cornell*, 780 F.3d 616 (4th Cir. 2015).................................... 36, 37

*United States v. Davis*, 139 S. Ct. 2319 (2019) .......................................................36

*United States v. Foye*, 752 Fed. Appx. 166 (4th Cir. 2019) .....................................4

*United States v. Garcia*, 474 Fed. Appx. 909 (4th Cir. 2012) .................................37

*Harris v. United States*, 536 U.S. 545 (2002)...........................................................38

*United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003) ..........................................38

*Mathis v. United States*, 136 S. Ct. 2243 (2016) ........................................ 38, 42, 43

*United States v. Mathis*, 932 F.3d 242 (4th Cir. 2019)..................................... 41, 44

*United States v. Mouzone*, 687 F.3d 207 (4th Cir. 2012) ........................................36

*United States v. Nguyen*, 255 F.3d 1335 (11th Cir. 2001).......................................40

*Ring v. Arizona*, 536 U.S. 584 (2002)......................................................................39

*Salinas v. United States*, 522 U.S. 52 (1997)................................................... 36, 42

*United States v. Warneke*, 310 F.3d 542 (7th Cir. 2002).........................................37

*United States v. Williams*, 898 F.3d 323 (3d Cir. 2018) ...........................................44

**Statutes and Rules**

18 U.S.C. § 922(g) ...........................................................................3

18 U.S.C. § 924(c) ................................................................. passim

18 U.S.C. § 924(j) .......................................................................2, 3

18 U.S.C. § 1959(a) ....................................................................2, 3

18 U.S.C. § 1961 .............................................................................36

18 U.S.C. § 1962(c) .......................................................................36

18 U.S.C. § 1962(d) ............................................................. 1, 2, 36

18 U.S.C. § 1963(a) ................................................................ passim

18 U.S.C. § 3231 ...............................................................................1

18 U.S.C. § 3731 ...............................................................................1

21 U.S.C. § 841 ................................................................................3

21 U.S.C. § 846 ................................................................................3

28 U.S.C. § 1291 ..............................................................................1

Virginia Code § 18.2-10 ......................................................... 31, 40

Virginia Code § 18.2-32 ......................................................... 31, 40

Federal Rule of Criminal Procedure 29 ...................................32

## JURISDICTIONAL STATEMENT[1]

This is a consolidated government appeal and a related, consolidated cross-appeal from final judgments in a criminal case.  The district court (Davis, C.J.) had jurisdiction under 18 U.S.C. § 3231.  A jury convicted Defendants Simmons, Mitchell, and Lassiter on all counts on March 22, 2018.  On November 16, 2018, on Defendants' post-trial motion, the district court set aside the jury's verdict as to one count.  The government filed a timely notice of appeal on November 29, 2018.  Defendants were sentenced on the remaining counts on April 12, 2019 (Mitchell), April 25, 2019 (Lassiter), and May 10, 2019 (Simmons), and all three filed timely notices of appeal. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3731.

## STATEMENT OF THE ISSUE

Whether a conviction for conspiracy to commit a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), qualifies as a "crime of violence" under 18 U.S.C. § 924(c)(3)(A), where the government charged, and the jury found, that Defendants Simmons and Mitchell committed murder as part of the RICO conspiracy, which raised the statutory maximum sentence under 18 U.S.C. § 1963(a).

---

[1] Citations are to the parties' Joint Appendix ("JA") and docket entries ("Docket No.") in Case 2:16-cr-130-MSD-LRL (E.D. Va.).

## STATEMENT OF THE CASE

This case is about a Hampton Roads "line" of the Nine Trey Gangsters, a brutally violent street gang that is a subset of the United Blood Nation. The three Defendants, along with two other members of the gang, went on a violent crime spree in December 2015. During this period, they murdered five people—most of them women who had nothing to do with the gang—shot and nearly killed four more people, shot at potential witnesses, embarked upon a mission to kill rival Nine Trey members, committed and attempted to commit robberies, and trafficked drugs throughout the Norfolk area. The crime spree ended when law enforcement arrested Mitchell and another gang member fleeing from a robbery; guns, bullets, bullet casings, and cellphones seized from that arrest allowed law enforcement to connect Mitchell and his co-conspirators to the other crimes.

Following a jury trial in the United States District Court for the Eastern District of Virginia, Defendants Simmons, Mitchell, and Lassiter were convicted of RICO conspiracy, in violation of 18 U.S.C. § 1962(d) (Count 1). Each defendant was also convicted of other gang-related crimes. Simmons was convicted of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a) (Counts 3, 5); use of a firearm resulting in death, in violation of 18 U.S.C. § 924(j) (Counts 4, 6); attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Counts 7, 22, 24, 26); assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C.

2

§ 1959(a)(3) (Counts 8, 27, 29); use or discharge of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts 9, 23, 25, 28); drug trafficking and substantive drug offenses, in violation of 21 U.S.C. §§ 841 and 846 (Counts 2, 31–33, 35); use of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts 34, 36); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (Count 37). Mitchell was convicted of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a) (Counts 5, 10, 11, 20); use of a firearm resulting in death, in violation of 18 U.S.C. § 924(j) (Counts 6, 12, 13, 21); attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Counts 7, 14, 17, 22, 24, 26); assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3) (Counts 8, 15, 18, 27, 29); and use or discharge of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts 9, 16, 19, 23, 25, 28). Lassiter was convicted of attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Counts 22, 24, 26); assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3) (Counts 27, 29); and use or discharge of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts 23, 25, 28,). The jury also found Defendants guilty of discharging a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 30), but the district court granted a post-trial motion to set aside the verdict as to that count. The court sentenced Simmons to three consecutive life

3

sentences plus 40 years in prison; Mitchell was sentenced to five consecutive life sentences plus 50 years in prison; and Lassiter was sentenced to 35 years in prison. The court also imposed five years of supervised release on each Defendant.

## I.    <u>Statement of Facts</u>[2]

Over a few weeks in December, 2015, the three Defendants, along with two other gang members charged in the same case who pleaded guilty before trial, engaged in a brutal crime spree across the Hampton Roads area on behalf of their gang, the Nine Trey Gangsters.  Antonio Simmons, also known as Murdock or Doc, was the leader of the Nine Trey Hampton Roads line; Nathaniel Mitchell, also known as Savage, was one of two primary Nine Trey shooters; and Malek Lassiter was a new recruit.  Lassiter was brought into the gang by his cousin, Anthony Foye, the other primary Nine Trey shooter.  Foye was charged in the same case, pleaded guilty to four counts of VICAR murder in return for the government's agreement not to seek the death penalty, and was sentenced to life imprisonment.[3]  Alvaughn Davis was a Nine Trey member from North Carolina who reported to Simmons' line upon his arrival in the area.  Davis pleaded guilty and entered into a cooperation agreement with the

---

[2] The government has set forth the facts in more detail than necessary to resolve the government's claim on this appeal because the government expects that Defendants will raise numerous claims, including claims as to the sufficiency of the evidence, in their principal brief on cross-appeal.

[3] This Court affirmed his conviction. *See United States v. Foye*, 752 Fed. Appx. 166 (4th Cir. 2019).

government.  Docket Nos. 86–88.[4]  At the end of the crime spree, five people were dead and four others narrowly survived nearly point-blank shootings.  In all, members of the gang carried out five murders, six attempted murders, a shooting at multiple witnesses who saw Mitchell, Lassiter, and Foye run from the scene of their final attempted murder, multiple Hobbs Act robberies or attempted robberies, and drug trafficking.

The crime spree ended on December 27, 2015, when Mitchell and Foye were arrested while fleeing from a Shell gas station they had robbed at gunpoint.  Their arrests provided the keys to solving the earlier shootings.  Law enforcement seized two cellphones, a Glock .40 handgun and a magazine with .40 bullets, a spent .380-caliber casing, and a .38 special Ruger revolver containing three spent cartridge casings (indicating that three shots had been fired).  A cellphone was later seized from Simmons when he was arrested in March 2018.  The cellphones contained text messages connecting the men to the different shootings and to each other.  Ballistics analysis showed that one or both of the seized Glock .40 and the same .380 caliber semi-automatic—which was not recovered, but which left matching bullets and shell casings at numerous crime scenes—were used in each of the charged shootings.  *See* JA 6069–70.  Multiple witnesses, including other Nine Trey members and associates,

---

[4] Davis pleaded guilty to RICO conspiracy, accessory-after-the-fact to one of the VICAR murders, and using a firearm resulting in death in connection with another murder.  Docket Nos. 86–88.

testified that Foye used the Glock .40 and Mitchell used the .380 to commit the shootings. One witness testified that Lassiter possessed, and used, the .38 revolver to shoot in the direction of eyewitnesses to their final attempted murder. One surviving shooting victim identified Mitchell as her assailant.

### A. Nine Trey Gangsters

#### 1. The RICO Enterprise

The Nine Trey Gangsters, an East Coast-based Bloods gang allied with the United Blood Nation, was founded in Rikers Island Prison in 1993. JA 1628–29, 1856, 3996. Nine Trey was the "first of [the] original Eastside set" of the Bloods. JA 3998. Nine Trey has an established hierarchy, a recorded official "world wide line-up" of leaders, rules (referred to as "Alpo" or "po," in reference to a brand of dog food), and a coded language designed to thwart law enforcement. *See, e.g.*, JA 1642–44, 1882–83, 3996–4000, 5774–812, 5823–31, 5910–46.[5] Bloods members often substitute the letter "b," "k," or "x" for the letter "c" when writing or texting, because the letter "c" is associated with their rival gang, the Crips. JA 1643–44, 1725, 1870. For example, Nine Trey members usually do not say the word "crazy"; the gang-appropriate word is "brazy." JA 1643, 1725, 2165, 4515. Members have common call-and-response phrases used to signify and test membership, such as "Eastside/all the time." JA 1883–

---

[5] A copy of key Nine Trey documents was extracted from Mitchell's cell phone. JA 5836–5948, 1645. Other documents were seized from Mitchell's home. JA 1583, 5772–5812.

6

84.  The gang also has coded "breakdowns" for different words (for example, "Bloods United Live Longer Stronger" for the word "Bulls," and "Better Look Out or Die" for "Blood").  JA 1679, 3582, 4026–27.[6]

The leader of Nine Trey is called the Godfather; in 2015, the Godfather was Pedro Gutierrez, aka "Magoo."  JA 1632–33, 1859–60, 1884, 3999–4001, 5779. Under the Godfather, the management ranks, in descending order, are: (1) the High or High-020; (2) the Low or Low-020 or Inner City Hoodlum; and (3) the Five-Star General or "Street Sweeper."  JA 1632–33, 1860–62, 5922–23.  The Five-Star General was supposed to be "rarely seen" in order to protect the gang's leadership.  JA 1692, 1864–65, 1921, 3750, 5922.  The hierarchy continues with Four-Star, Three-Star, Two-Star, and One-Star generals, all with specific responsibilities, and then "soldiers." JA 1631–33, 5922–23.  At the bottom of the hierarchy are the "scraps," new recruits attempting to gain status.[7]  JA 1631–32, 3745, 4153.

Nine Trey members are required to "breed," or recruit new scraps for the gang, often from family members.  JA 1628–29, 1666, 1686, 1856, 3747, 4004.  Scraps can "make their way home" (*i.e.*, join the gang) by "putting in work" (*i.e.*, committing

---

[6] The bull is a common Nine Trey symbol and is often displayed by members wearing a Chicago Bulls hat.  JA 4026.  One of Foye's street names was "Bulls."  JA 3940.

[7] Nine Trey members also use the term "scrap" to refer to any gang member ranked below them.  *See, e.g.*, JA 2096, 6080, 6209.

crimes or acts of violence).  JA 4004–05; *see also* JA 3579, 3746–47.  Similarly, ranked members maintain or increase their status in the gang by "putting in work." JA 1634, 1673, 1923–24, 2969, 3590.  Members are disciplined, including by violence, if they violate any of the gang's rules.  JA 1628, 1672–75, 5919–21.

Nine Trey members recognize each other through the codes, calls and responses noted above, as well as by their knowledge of the rules.  JA 1654–55, 1704.  The gang also has a "dress code," often wearing red clothing and "flagging" with a red bandana to signify membership.  JA 613, 1898, 4006, 5656, 5715.  Gang-specific tattoos also identify gang members.  Foye and Lassiter, for example, both have "Eastside" tattoos on their hands; Mitchell has a branded "dog paw" on his shoulder, and Simmons has a tattoo that includes a signifier for "Member of Blood."  JA 1670–71, 1900, 1975–76, 5066.  Gang members also use specific hand signals to show their affiliation with the gang.  JA 1680–81, 1900–01, 2108–11, 4028–30.

In addition to maintaining or gaining status within the gang, Nine Trey members commit crimes to earn money for the enterprise, which is referred to within the gang as "baby luv."  *See, e.g.*, JA 1637, 3752, 4040.  Drug trafficking and robbery are two common sources of funds.  JA 562, 1887, 3747, 6124–25, 6129.  Portions of drug proceeds are sent up the chain of command.  JA 1741, 1887.  Members are required to pay $31 a month in dues to the "kitty," a general fund remitted to higher-ranking Nine Trey members to support incarcerated members, buy drugs for resale, and purchase

weapons, among other uses.  JA 1636–38, 1700, 1875–76, 5919.  The Five-Star General normally collects the kitty money; if he were to "mess up" the dues, he would have to repay them, as dipping into the "kitty" is seen as stealing from the gang. JA 1638, 1641.

Two concepts are key for Nine Trey—respect and allegiance.  Respect is "the biggest rule" for Nine Trey members, JA 1634; "respect is everything," JA 1894.  If a Nine Trey member is disrespected by someone, the member is required to "make them respect you again."  JA 1675.  Disrespect takes many forms.  JA 1635, 1894–95. Spilling a drink on a Nine Trey member is disrespectful.  JA 1895.  Pulling a gun on a member is disrespectful, and the gang member is required to pull his own "gun out on him and use the gun" in retaliation.  JA 1635.  If the Nine Trey member cannot reach the disrespectful person, he is required to "[g]et the closest one to them."  JA 1635. There are no "personal beefs" in Nine Trey; disrespect to one member is considered an insult to all, and the Nine Trey member is expected to respond with violence or risk losing respect and position within the gang.  JA 1635, 1896.  Disrespecting a Nine Trey member normally results in violence or death.  *See, e.g.*, JA 1896.

Allegiance to fellow gang members and adherence to the chain of command are similarly important, and following orders increases a member's status in the gang. JA 1632, 1684–89.  Failure to follow orders could result in disciplinary actions or being "dubbed" (*i.e.*, being expelled from the gang).  JA 1641–42, 1644.  "Snitches,"

9

or anyone cooperating with law enforcement, can be killed, regardless of whether they are a gang member.  JA 1640–41.

Disrespecting fellow Nine Trey members—a violation of both core concepts—is particularly egregious.  One source of tension within Nine Trey is the movement of members from one line to another without permission, which is referred to as "line jumping."  JA 1665, 1872–73.  Taking another member's subordinates or scraps is disrespectful, and the aggrieved member would have to "eradicate" the line controlled by the person showing disrespect.  JA 1675.

### 2. Defendants' Roles in the Enterprise

By November 2015, Simmons had been a Nine Trey member for thirteen years, JA 5820, and had worked his way up to being the Low-020 with control over a Nine Trey line based in Hampton Roads, Virginia, primarily in the cities of Norfolk and Portsmouth, JA 2973, 3593–94, 6078.[8]  He also sold drugs for, and with, other Nine Trey members.  JA 6084–85, 6121–25.  Foye was Simmons' dedicated and violent

---

[8] Simmons claimed that he had been "busted all the way down" (*i.e.*, demoted) in May 2015, before the crime spree at issue here.  *See, e.g.*, JA 6077–78.  At other times, he claimed that, by November 2015, he had been demoted to a Five-Star General. JA 6080.  The evidence at trial contradicted that claim and confirmed that Simmons outranked and directed the men below him during the crime spree at issue.  JA 2971–77, 2094–97, 2976–77, 3587–89, 3624–27.  Regardless, Simmons admitted that Mitchell and Foye had to follow his orders since they were below him in rank. JA 6080.  Mitchell's girlfriend confirmed that Mitchell had told her he had to follow "Big Bro."  JA 3963.  She also observed Simmons chastising Foye, and Foye's subdued response.  JA 3972–73, 3975–76.

Three-Star General (the "God of War" under Nine Trey rules), and viewed Simmons as a father figure. JA 2978, 6079, 6138. Mitchell was a One-Star General who wanted to keep pace with Foye's violence. JA 6138, 4155, 5862–64. Mitchell and Foye did whatever Simmons "required them to do" with guns. JA 2987. Specifically, Simmons wanted Foye and Mitchell (as well as Davis, who was a Three-Star general in another line but who reported to Simmons once he moved to Hampton Roads) to be his "cleanup crew"—*i.e.*, to "take care" of anybody Simmons had marked for violence. JA 4066–67, 4022, 4045–46, 4175, 4280. Foye, Mitchell, and Davis thus called themselves the "Drillmob," in reference to a Chicago-based rap subgenre that celebrates gun violence, and Foye and Mitchell in particular worked to gain a reputation in the gang as prolific shooters. JA 4032–33.

By late 2015, Simmons had a problem. As he acknowledged in a letter he wrote directly to the Godfather of Nine Trey (and later confirmed during an interview with police), he had "messed up the baby love," JA 4053–55, 5820, and owed "Dido," his Nine Trey superior, $950 for a failed drug deal, JA 4057, 6084–85. In response, Dido put Simmons "on freeze," which meant Simmons was supposed to limit his supervisory role and, instead, focus on repaying the debt, either through money or guns. JA 4055–56. To generate money, Simmons sent his loyal soldiers to commit robberies, commonly referred to by members of the gang as "jugs." JA 4122–23, 4125–27.

### 3. December 10, 2015, Murder of Al-Tariq Tynes

One such robbery targeted Al-Tariq Tynes, a part-time drug dealer and Foye's erstwhile friend, who had drugs, cash, and a .380 semi-automatic handgun. JA 2581. Foye had been obsessing about Tynes for some time—he knew Tynes had cash and a gun, and he feared that Tynes was cooperating with the police. JA 2432–37, 2439–45. Foye decided to rob Tynes on December 10, 2015, in consultation with Simmons. JA 2438–39, 5956–57.

Around 7:30 p.m., Foye texted Simmons that he would call him in twenty minutes, explaining that he was "with the meal so its guaranteed." JA 5956. Under Nine Trey code, food references such as "the meal," "food," "being on a plate," indicated that someone was a target. JA 1728, 1734, 1761, 1888–90, 1914, 2967–68, 3579; *see also* JA 6077. Simmons' response, sent just seconds later, was "Faxtz." JA 5956. In the gang's code, the word "Faxtz" signals a confirmation or affirmative response. JA 1727, 5826.

Just seconds later, Foye texted Davis to arrange for Davis's help. JA 4080, 5957. When Davis arrived, he saw Tynes slumped in the passenger seat of his gold Lexus, with blood flowing from a head wound. JA 4081–84. Davis and Foye stuffed Tynes' body in the trunk of his own car. JA 4084–85. Foye also looked for, and found, Tynes' .380 Kel-Tec semi-automatic handgun. JA 4085. Cell site location information confirmed that "between 5:30 pm and 11:00 pm, the Foye phone . . . and the Tynes

12

phone . . . used the same T-Mobile antennas at the same general time." JA 6043. Later the same night, after the murder, Simmons texted Foye to tell him he needed the money Foye had stolen from Tynes: "Bro I've been up all night I need the money by 11 this morning smh [shaking my head] or we dead bro." JA 5957.

After the murder, Foye kept Tynes' gold Lexus and drove it around the Hampton Roads area for several days, with Tynes' corpse in the trunk. JA 6043. At one point, while driving the Lexus with Davis, Foye decided to show the corpse to his cousins, purportedly because his cousins were "out here doing shit," and Foye "want[ed] to show them how real shit can get." JA 4087. When Foye displayed Tynes' corpse to his cousins, one of them nearly passed out and went back to the house. JA 4088–90. The other cousin—Malek Lassiter—stayed and followed Foye's directions to rifle through Tynes' pockets. JA 4099–4100. Lassiter found a "wad of cash," which he gave to Foye, but from which he later took $100 for himself. JA 4016, 4100, 5958. Foye then riped a gold Cuban link chain necklace from Tynes' neck, JA 4099–4100, which Lassiter later pawned for $80, JA 2392, 4016, 4100, 5835. Several days later, when Tynes' brother, who suspected Foye of killing Tynes, confronted Foye about his brother's fate, Lassiter protected Foye by displaying a firearm. JA 2586–88.

After driving the Lexus for several days, with Tynes' corpse still in the trunk, Foye, with Davis' help, disposed of Tynes' body in a secluded wooded area. JA 4100, 4102–05. The body was not found until January 4, 2016, in an advanced stage of

13

decomposition. JA 2412–14. Tynes' head wound was consistent with a through-and-through gunshot. JA 2423, 2544.

Simmons admitted he instructed Foye to get rid of Tynes' Lexus, JA 6093–94, but Foye did not abandon the car until after he crashed it, JA 4104–05, 4104–05, 4116–17. In his post-arrest statements, Simmons also admitted telling Foye that he "needed kitty money" while Foye was with Tynes and preparing to kill him. JA 6090. He also admitted learning that Foye had killed Tynes and put his body in the trunk. JA 6091–92.

Mitchell also admitted knowing about the murder and being in the Lexus after the murder. JA 6143–44. According to Davis, Mitchell took the .380 Kel-Tec handgun that Foye had found in Tynes' car. JA 4108. Mitchell's girlfriend, Antanisha Rains, confirmed that Mitchell had a .380 around this time. JA 3962, 5858 ("could've at least left the 380 with me."). Donte Brehon, another Nine Trey affiliate, also testified that Mitchell had a .380. JA 2996.

### 4. December 15, 2015, Murder of Vandelet Mercer and Attempted Murder of R.F.

On December 14, 2015, Simmons dispatched Mitchell, Foye, and Davis to rob a gambling spot. Davis picked Foye and Mitchell up, and the men arranged to meet with Simmons in person. JA 4112–13, 5966–67. Simmons gave Foye the keys to Tynes' Lexus, which he had previously taken away, and instructed the men on the plan for the robbery. JA 4113–14. The men did not manage to execute that robbery. Later

14

in the evening, they made a second attempt at robbing a gambling house, but were again unsuccessful.  JA 4116.

Later that night, Simmons texted Foye that he "[m]ight have something for [him]." JA 5966.  Foye responded, "man we only have two hours.  [I]f you don't hurry up ima get out and redrum"—*i.e.*, murder—"somebody."   JA 5958, 6076.  At approximately 2:00 a.m., Foye again texted Simmons, again using the word "redrum." JA 5968.  Simmons and Foye agreed that Foye would "handle that before 7:00"—*i.e.*, commit a robbery, as the men had been discussing, before the next morning.  JA 5969. Simmons also reiterated, "that gambling spot still a go."  JA 5970.

About a minute after Foye acknowledged Simmons' text, Foye, Mitchell, and Davis attempted to rob two people they found walking on the street, Vandelet Mercer and R.F., the man Ms. Mercer was with. JA 2643–44, 4120–21.  Foye, who was texting with Simmons while Davis was driving, told Davis to stop the car.  Foye and Mitchell jumped out of the car. JA 4120–21.  One of the victims, R.F., ran before the men could reach him, at which point they started shooting, hitting him in the hand.  JA 2645.  The other victim, Mercer, stumbled as she tried to run away and was shot dead.  JA 2645– 46, 2649.  After shooting R.F. and Mercer, the men returned to the car, and Davis drove them away.  JA 4122.  According to Davis, once back in the car, Foye said to Mitchell "man, bro, you shot that bitch."  JA 4122.

Ballistics and CSLI evidence confirmed Foye's, Davis', and Mitchell's participation in the murder. Four .40 casings found at the scene matched Foye's Glock, and five .380 casings matched the gun used by Mitchell at the other crimes. JA 3521–22, 6069–70. CSLI analysis placed Davis' phone in proximity with Foye's phone that night. It also placed Mitchell's and Foye's phones together in the hours leading up to the shooting. JA 3880–86, 4563–67, 6046, 6048, 6050.

Vandelet Mercer was 27 when she was murdered. She left behind a six year-old daughter. JA 2693–94, 6869.

### 5.  December 20, 2015, Murder of Linda Lassiter and Wayne Davis

In the early morning of December 20, 2015, Foye and Mitchell shot to death Linda Lassiter[9] and Wayne Davis,[10] her boyfriend, as they were sitting in Mr. Davis' car on Loren Crescent Road in Portsmouth. JA 2038–39. Mr. Davis and Ms. Lassiter died at the scene. According to Simmons, the murders stemmed from an earlier shooting in Portsmouth. As Simmons described it, Foye "thought they was tryin' to get him, some shit that happened in Portsmouth," and so he "caught two people in the car" and shot them. JA 6099.

That earlier shooting by Foye, to which Ms. Lassiter was a witness, occurred in front of the residence of Ms. Lassiter's daughter the day before Thanksgiving—as Ms.

--------

[9] Neither Linda Lassiter nor her family is related to Defendant Malek Lassiter.

[10] Wayne Davis is not related to Nine Trey member Alvaughn Davis.

16

Lassiter was preparing for Thanksgiving dinner.  Earlier that day, November 25, 2015, a friend of Ms. Lassiter's son, who had a longstanding "beef" with Foye, had pulled a gun on Foye in the parking lot in front of the Lassiter residence.  JA 2353–59, 4067–68, 4070.  Pulling a gun on Foye constituted a sign of disrespect to Nine Trey, which, under the gang's rules, required Foye to retaliate.  JA 635.  Foye did so later that evening, by firing a number of shots from his Glock into the kitchen of the Lassiter residence, nearly striking Ms. Lassiter.[11]  When word got back to Foye that one of Ms. Lassiter's family members was trying to identify the shooter, and that people were putting his "government name"—*i.e.*, Foye—out as the shooter, Foye became enraged and decided to retaliate.  JA 4071–73.  Less than a month later, he and Mitchell found Ms. Lassiter and her boyfriend (Wayne Davis) in a car and murdered them.

Ballistics analysis of the December 20 crime scene confirmed that two Glock .40 casings and two bullets found at the scene had been fired by Foye's .40 Glock—the same gun that fired the bullets that nearly struck Ms. Lassiter on November 25.  JA 6069–70, 3525–26.  The analysis also established that two other bullets and a bullet fragment were fired from the same .380-caliber firearm used in the other shootings alongside Foye's Glock.  JA 3534–36.  In addition, CSLI data placed Mitchell's phone in the vicinity of the crime at the relevant time, JA 6069–70, 6055.

---

[11] Eight .40 casings were found at the crime scene, and ballistics analysis revealed that they were fired from Foye's gun.  JA 6069–70.  CSLI data also placed Foye's phone near the crime scene at the time of the shooting.  JA 6039.

6. <u>December 20, 2015, Aqua Lounge Shooting</u>

Two hours after gunning down Linda Lassiter and Wayne Davis, Mitchell and Foye went clubbing. JA 3002, 2038–39. Having crashed and abandoned Tynes' gold Lexus on December 17, 2015, Foye and Mitchell were driving a red Hyundai registered to Mitchell's girlfriend. JA 3003, 3960–62, 4117–18; *see also* JA 6100 (Simmons statement). As they left the nightclub, Mitchell and Foye became agitated with a man who was wearing all red, including a red Chicago Bulls hat. As they saw it, wearing such items without being a member of the Bloods could constitute "false flagging"— an offense for which the penalty was violence. *See* JA 1898–99, 4006–07. In fact, the man, R.M., was a First Class Petty Officer in the Navy, not a Bloods member. JA 2940.

After leaving the club, R.M. got into his car and prepared to pull out of the parking lot. Foye and Mitchell exited their red Hyundai, jogged up to R.M.'s car, and shot him multiple times in the right arm, right and left knee, and left thigh. JA 2943–44. Video surveillance captured the shooting:



JA 6755 (Gov't Ex. 7-9).

18

R.M. managed to restart his stalled car and exit the parking lot, driving about half a mile before pulling over. JA 2946. A nearby officer responded to an emergency call, located R.M., pulled him from the car, and applied a tourniquet to stop the most serious bleeding. JA 2846–48. A passing ambulance provided assistance and transported R.M. to the hospital. JA 2849. He suffered serious damage to his knee that required him to be medically retired from the Navy. JA 2949.

A ballistics analysis of the casings found at the crime scene established that the shots were fired by Foye's .40 Glock and Mitchell's .380. JA 6070. CSLI analysis placed the phones of Mitchell and Donte Brehon, who was with Mitchell and Foye at the nightclub, in close proximity to each other and in the vicinity of the crime scene shortly before the shooting. JA 6056, 3886–88. Mitchell showed off the video of the shooting—which had been played on the local news—to his girlfriend's stepfather and admitted he was one of the shooters. JA 3115.

### 7. December 20, 2015, Attempted Murder of R.P.M

By this point, Foye and Mitchell were competing with each other to establish their reputations as the most violent Nine Trey shooters. JA 3013, 3045–46. Shortly after shooting R.M., Foye and Mitchell found another man, R.P.M., sitting outside his parents' house in his car, watching videos on his phone. One of the men used Foye's Glock to shoot at the man, nearly striking him in the head and severing part of his ear. JA 2039, 2903–07. R.P.M.'s father, who was asleep on the living room couch, heard

19

the shots, got up, and saw his injured son come through the front door and collapse into his arms.  2906–07.

Ballistics analysis confirmed that Foye's Glock ejected the casings found at the crime scene.  JA 6070, 3530–32.  CSLI evidence again placed Mitchell's phone near the crime scene around the time of the shooting.  JA 6058, 3888–91.  When Simmons got word of Foye's and Mitchell's killing and shooting spree, he praised his men. JA 3010, 4795.

### 8.  December 21, 2015, Murder of Jamesha Roberts

On the evening of December 21, 2015, Jamesha Roberts, a twenty-five-year-old mother of two young children, was murdered as she walked down the street in Norfolk. She sustained gunshot wounds to her head, neck, and torso, and died at the scene. JA 3226–29.  Three .380 bullets and three .380 casings found at the crime scene were matched to bullets and casings fired by the .380 Mitchell used at the other shootings. JA 6070, 3527.  CSLI evidence also placed Mitchell's phone near the murder within 30 minutes of the 911 call.  JA 6059.

Shortly thereafter, Mitchell and Foye confirmed to other gang associates that Mitchell had killed Ms. Roberts.  Specifically, Foye bragged that Mitchell had killed Ms. Roberts for walking down the same side of the street as him.  JA 3013, 4154–55; *see also* JA 6105–06, 3185–86.  Mitchell responded, "fuck that bitch, but you're still

one up on me, bro." JA 3013.  According to Davis, Mitchell was "trying to prove that he could keep up with" Foye.  JA 4155.

On December 23, 2015, Simmons—who bragged about the violence his men committed—instructed them to destroy evidence in the wake of their string of shootings.  He texted Foye at 1:45 that morning and told him to "Stay off the FaceBook, Snapchat and Messenger.  As a matter of fact, deletion time ASAP.  Love you little bro."  JA 2333, 5976.

> 9.  War on Skino's Line and the December 27, 2015, Attempted Murders of Nino, Lanez, and Blacko

As Simmons was trying to repay his debt to his Nine Trey superior Dido through gang-related robberies, his problems worsened.  Dido's disciplinary action—putting Simmons on "freeze" (*i.e.*, temporary suspension)—was supposed to be kept secret. But word of Simmons' freeze got to one of his rivals within Nine Trey, a fellow Low-020 nicknamed "Skino," who ran a Nine Trey line in Virginia Beach despite being incarcerated in Colorado.  JA 3015–16, 4057.  Skino also happened to be angry with Simmons for allowing one of Skino's soldiers to "line jump" (*i.e.*, move from one chain of command to another) after Skino had expelled the soldier from the gang. JA 3016–19, 4057–58, 6220–30.  To retaliate, Skino sent out a text message to numerous Nine Trey members revealing that Simmons had been put on freeze. JA 3614–17.  In response, Simmons moved to take over Skino's Nine Trey line.  JA 6116–18, 4153–54.  Skino's line was led locally by high-ranking members known as

"Blacko," "Lanez," and "Nino," all of whom held "General" ranks under Skino.  JA 3023, 4156, 4161.

On December 27, 2015, Mitchell, Foye, Davis, and a "funny lookin' dude"—later identified as Malek Lassiter—met with Simmons at his house.  JA 6111, 6119–21.  Earlier that day, Lassiter had taken possession of a .38 revolver from Foye and was preparing to "make his way home"—*i.e.*, join the gang. JA 1856, 4004, 4149–52, 4306–07; *see also* JA 1923.  At the meeting, Simmons gave the "greenlight" for Lassiter to join the gang, JA 4152–53, 4306–07, 4312–13, and then instructed his men to "mash the gas" on Skino's line, JA 6297–99b, 6755 (Gov't Exs. 14-3g – 14-3j), except for Blacko and Lanez, who Simmons believed were going to switch to his line and leadership, JA 4152–54.  "[M]ash[ing] the gas" means to kill someone, JA 1660, or "go hard at them."  JA 2969, 3581.

After receiving Simmons' orders, Mitchell, Davis, Foye, and Lassiter got into a car together, with plans to first confront Skino's subordinate Nino. JA 4015–16.  When Mitchell connected with Nino by phone, however, it became apparent that Skino's line was aware of Simmons' plans and that Blacko had told his men to "get their guns up."  JA 4156–60.  Simmons' men surmised that Blacko was no longer off limits and set out to find him and kill him, after first searching for but failing to find Lanez (whom they also intended to kill).  JA 4160–62; *see also* JA 6160 (Mitchell's admission that they went to "pull up" on Lanez).

22

Analysis of CSLI evidence placed Mitchell's and Foye's phone together and in the vicinity of residences associated with Nino and Lanez. JA 6063, 6065. Lassiter did not have a phone at this time. JA 3893, 4958.

### 10. December 27, 2015, Attempted Murder of S.M.

Later the same evening, after failing to locate and kill Nino and Lanez, Foye directed the men to Blacko's "spot," JA 6160—a house in Portsmouth where Foye, Mitchell, and Davis had attended a Bloods party earlier in 2015. JA 4166, 5759. In fact, the house belonged to S.M., a woman who had dated Blacko in high school and remained friends with him. JA 3278–79. Once in the vicinity of S.M.'s home, Mitchell, Lassiter, and Foye got out of the red Hyundai with their guns, walked to the house, and knocked on the door. JA 4166, 3265–66. S.M. answered the door and saw the three men—two at her door and one man about 20-25 feet away, near the curb, facing away from her. JA 3266–67. One of the men—whom she later identified as Mitchell—asked her something, which she initially could not understand. JA 3266–67, 3270–71. She responded that he had the wrong house and closed the door. JA 3266–67.

S.M. heard a second, harder knock, and returned to the door. JA 3268–69. The same man resumed speaking to her, so close that she could feel him spitting on her as he spoke. JA 3268–69. She saw the second man, an African-American with a lighter skin tone (consistent with Foye's complexion), nod at the tall man; she then tried to

23

close the door, but the tall man blocked it with his foot. JA 3269. The tall man was so close, she "could feel him breathe. I could feel his chest…. I could feel his stomach like breathing on my stomach. We was touching each other, just about." JA 3269. At that point, she "couldn't hear any more—like I just couldn't hear. And I didn't know at the time that I was getting shot, but I kept getting pushed back." JA 3269. The final bullet knocked her down onto the kitchen floor. JA 3269. S.M. was shot six times, including in her abdomen, her left breast, her ribs, and her upper arm. JA 3270. The entire event took no more than 15 minutes. JA 3271–72. Once back in the car, Foye boasted that he "shot that bitch in the heart." JA 4167. At trial, S.M. made an in-court identification of Mitchell, not Foye, as her shooter. JA 3270–71.

Ballistics analysis confirmed that two .40 casings and two .40 bullets came from Foye's Glock, and that a .380 casing recovered from the street outside S.M.'s house was ejected from the same .380 gun used by Mitchell in the other shootings. JA 6070, 3534–36. CSLI analysis placed Mitchell's and Foye's phones together shortly before and after the 911 call reporting the shooting. JA 6067.

S.M. survived but, as a result of the shooting, had to endure two surgeries, had a metal rod permanently inserted into her left arm, and was hospitalized for a week. JA 3274, 3276, 3287.

## 11. December 27, 2015, Shooting at Other Local Residents

When they heard the gunshots at S.M.'s house, several local residents stepped out of their houses to try to see what had happened. JA 6170 (Mitchell's statement: "I'm like why ya'll standing' outside tryin' to see somethin'?"), JA 2037. Foye and Lassiter started shooting in the direction of these onlookers. JA 4167. In one case, after a potential witness sought safety in the house of a neighbor—B.B., a mother of two—at least one of the men fired indiscriminately into B.B.'s apartment. JA 3343–45, 3357–59. When the shooting stopped, there was a bullet hole over a crib, another bullet hole in B.B.'s bedroom, and bullet fragments in a mattress where her roommate was lying. JA 3347, 3360–65; *see also* JA 3370–74 (describing the testimony of another bystander who was also targeted).

Ballistics analysis confirmed that the .40 caliber bullet and casing found at the scene of this second shooting were fired from Foye's Glock. JA 6070, 3536. Three spent casings were recovered later the same night from inside the Ruger revolver Lassiter fired. JA 1494–96. Analysis of the CSLI data placed Foye's and Mitchell's phones together shortly before and after the 911 call. JA 6067.

## 12. December 27, 2015, Shell Gas Station Robbery

Around 10:30 p.m., Portsmouth police officers received a report of an armed robbery at a Shell gas station. JA 1318, 1335–37. On their way to the gas station, Sergeant Kevin McGee and his partner spotted a car with two men who matched the

descriptions provided by dispatch. JA 1318–20, 1337–38. (Davis and Lassiter were no longer with Mitchell and Foye, who dropped off Davis and then Lassiter after the shooting of S.M.). JA 4168. A high-speed chase ensued, which ended when Mitchell and Foye abandoned their red Hyundai and fled on foot. JA 1321–22, 1339. A police dog tracked Mitchell to a backyard shed. JA 1318–23, 1341, 1347–50. Another officer chased down Foye and arrested him. JA 1366–67. Surveillance footage from the Shell gas station showed Mitchell and Foye wearing red bandanas around their faces as Foye brandished a firearm at the lone cashier on duty.



JA 6755 (Gov't Ex. 1-1b), 1306–08, 1311. The cashier at the Shell gas station also identified Mitchell and Foye as the robbers. JA 1324–25. Both men pleaded guilty to Hobbs Act robbery and related charges in a separate federal prosecution. *United States v. Foye and Mitchell*, No. 2:16cr20 (E.D. Va.), Docket Nos. 31–32 (Mitchell); 38–39 (Foye).

Foye made several calls to Simmons after the robbery and during the car chase. JA 2332, 5986. The next day, at 11:57 a.m., Simmons texted Foye to again instruct

26

him to destroy the evidence of the crimes his men were committing: "no phones." JA 2332, 5987.

When Foye was arrested, the police seized an extended Glock magazine, two .38 special bullets, cash, and his cellphone directly from him; Foye's loaded Glock .40 handgun, which he tossed while being chased, was found in a nearby yard.  JA 1366–67, 1372, 1479, 1504.  A search of the red Hyundai also revealed a single casing from a .380 semi-automatic handgun—ejected from the same gun as the other .380 evidence in the case—and a .38 Ruger revolver containing three spent cartridges.  JA 1493–94, 1501; *see also* JA 3537–39.  A second cellphone was found near the car.  JA 1502.

After the arrest, Davis spoke with Mitchell on a recorded jail call and told Mitchell he thought "all three of you all locked up," referencing Foye, Mitchell, and Lassiter, who had still been in the red Hyundai when Davis was dropped off after the S.M. shooting on December 27.  JA 4170–71.  Mitchell and Davis continued communicating after Mitchell was arrested, either directly or through Mitchell's girlfriend.  In a letter, Mitchell instructed Davis and other gang members to appear at a state court hearing so they could see "the Bitch that will testify on us"—*i.e.*, the Shell gas station clerk who had identified him.  JA 5770.  Davis was to "follow her and catch her by herself," and then "put some fear in her heart so she wouldn't come to trial on us."  JA 5770.  Mitchell's instructions were then spelled out in more detail: "Let her know that if she shows up again that she will be dealt with.  Or just kill the bitch."

27

JA 5770.  Mitchell also told his girlfriend, Rains, that "[t]hey have EVERYTHING!" and instructed her to destroy evidence connected to other shootings and delete items from Facebook.  JA 5770.  In a recorded phone call with Rains, Mitchell stated, "Do you know how many people on them, um Jim Jays," JA 2027, which Rains understood meant "[h]ow many bodies are on the gun," JA 3963; *see also* JA 5828, 4011.

Later, after he was arrested, Simmons admitted to his cellmate that he was a Nine Trey leader and "some members of his gang were involved in … eight days of mayhem."  JA 4187.  Simmons was angry because his men were "sloppy" during a robbery and had their "flags" showing.  JA 4187.  Simmons also expressed his concern about a text message he had sent after "Ace" (*i.e.*, Foye) killed someone.  JA 4187–88.  Simmons believed, however, that law enforcement would not find his phone since it was not in his name, but in the name of "Anthony Newport."  JA 4188–89.

### 13. Simmons' Drug Trafficking

Simmons was arrested on March 22, 2018, in Chesapeake, Virginia, while driving with another Nine Trey member in the front passenger seat.  JA 1514–17, 2056, 2058–60.  A drug dog alerted on the car, resulting in the seizure of crack and powder cocaine, along with scales and plastic bags consistent with drug trafficking.  JA 1518, 1523–24, 1557, 1563, 1566–67, 1569.  Crack cocaine was later found in the back seat of the police car, after the other Nine Trey member had been detained there.  JA 1526.  A loaded Smith & Wesson .40 caliber firearm was found in the glove box.  JA 1519.

Officers also seized Simmons' cellphone, which was registered in the name of "Anthony Newport." JA 1525, 4507. Both at the scene and later, Simmons engaged in a protracted effort to convince his girlfriend, Dornice, to claim the gun was hers. JA 2063–68, 6210–15. In the interview he gave after his federal arrest, however, Simmons admitted that the gun and drugs were his. JA 6126–28. He likewise admitted to dealing drugs for, and with, other Nine Trey members. JA 6084–85, 6122–25; *see also* JA 3611–13.

In recorded jail calls, Simmons discussed his arrest, the debt he owed Dido, and his conflict with Skino. JA 2052. He told his cellmate that he had 100 men who could help him sell drugs; Simmons also admitted that the gun found when he was pulled over in a traffic stop in the spring of 2016 was his. JA 4189–90.

### 14. Lassiter's False Alibi Defense and Testimony

After Lassiter was arrested but before trial, Lassiter and his family members attempted to create a false alibi for Lassiter for the night of December 27, 2015—the night that Simmons dispatched Lassiter and his other men to wage war on Skino's line. On September 22, 2017 (nearly a month after Lassiter was arrested), Lassiter called his mother using another inmate's identification number. On the call, he repeatedly cautioned his family, "[d]on't say no names, don't, don't, tell nobody don't say no names, my name or not" while on the line. JA 6306–09. Lassiter instructed his mother

29

to contact his ex-girlfriend, Shakema Taylor, because he needed them both as "a[n] alibi." JA 6306–09. Lassiter's mother responded: "Say no more." JA 6306.

Lassiter specified that he needed an alibi from his mother and Taylor for "that whole night." JA 6307. He repeatedly emphasized that he needed an alibi for "that whole night though" and that he was "talking about the whole night." JA 6307. In a subsequent call, using his own identification number, Lassiter referenced two other potential witnesses; his mother responded: "say no more, your mother, trust and believe your mother is on it. Ok?" JA 6312. His mother repeatedly warned him to "[s]ay no more," reassuring him that "your mom could have been … [an] organizer, a leader, or something." JA 6312; *see also* JA 4972–73.

Consistent with Lassiter's instructions, members of his family reached out to Shakema Taylor, his former girlfriend, urging her to claim that she was with Lassiter and his family during the entire night of December 27, 2015, even though they knew the claim was false. JA 4881–82. At the family's request, Ms. Taylor met with Lassiter's defense counsel. The attorney asked her questions while Lassiter's mother stood behind the attorney, where he could not see her, nodding at Ms. Taylor in a manner that Ms. Taylor understood was an effort to direct her answers. JA 4882–83.

A couple of months later, the family called Ms. Taylor again and requested that she come to the house, but she did not go. JA 4884–85. Instead, at the FBI's request, she made a recorded call to Lassiter's younger brother. JA 4885, 6311. She informed

him that she could not help them because "I wasn't really with him that whole day anyways, so." JA 6311. Lassiter's brother responded: "he was there, like all you gotta say is you, you know he was home." JA 6311.

## II.   __Procedural History__

The Second Superseding Indictment, returned August 23, 2017, charged Defendants with 38 counts related to their participation in the Nine Trey Gangsters. All three defendants were charged with RICO conspiracy. JA 167–202. As part of the RICO conspiracy, Simmons and Mitchell were charged with special sentencing factors relating to multiple murders. Specifically, Simmons was charged with the December 10, 2015, murder of Altariq Tynes and the December 15, 2015, murder of Vandalet Mercer. JA 177. Mitchell was charged with the December 15, 2015, murder of Vandalet Mercer, the December 20, 2015, double homicide of Wayne Davis and Linda Lassiter, and the December 21, 2015, murder of Jamesha Roberts. JA 177–78. All murders were in violation of Virginia Code § 18.2-32, which carries a statutory maximum of life imprisonment. JA 177–78; Virginia Code §§ 18.2-32; 18.2-10.

The Defendants proceeded to trial, which began on February 6, 2018, and spanned the next seven weeks. On March 19, 2018, the district court dismissed the witness tampering charge against Simmons, JA 5161; all other counts were submitted to the jury on March 21, 2018.

On March 22, 2018, the jury returned a verdict of guilty on all counts against each Defendant.  The jury also completed a special verdict form for each Defendant, finding Simmons and Mitchell guilty of the RICO conspiracy and specifically finding both men guilty of every charged special sentencing factor as part of their participation in the racketeering conspiracy charged in Count 1.  JA 6313–14, 6321–22.

The Defendants filed post-trial motions for a judgment of acquittal under Federal Rule of Criminal Procedure 29 as to several counts.  On November 16, 2018, the district court granted Defendants' motion in part by dismissing Count 30, which charged Defendants with the possession, brandishing, and discharge of a firearm, in violation of 18 U.S.C. § 924(c), in connection with their RICO conspiracy (Count 1) and VICAR assault with a dangerous weapon (Count 29).  JA 6355–84.

As relevant here, the district court rejected the government's argument that Simmons' and Mitchell's conviction for RICO conspiracy qualified as a crime of violence.[12]  The government argued that this result flowed from *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  The indictment had charged—and the jury made special

––––––––––––––––––––––

[12] The district court separately concluded that VICAR assault with a dangerous weapon—the other predicate offense charged in the second superseding indictment and found by the jury in Count 30—is not a crime of violence under 18 U.S.C. § 924(c)(3)(A) and thus did not provide a valid predicate for the Defendants' § 924(c) convictions on Count 30.  JA 6365–82.  The government does not appeal that ruling in this appeal.  This appeal is limited to the argument that a RICO conspiracy with aggravating factors qualifies as a crime of violence when those aggravating factors are themselves crimes of violence.

findings—that Simmons and Mitchell each participated in murders as part of the RICO conspiracy charged in Count 1, and those findings subjected Simmons and Mitchell to an enhanced statutory maximum of life on the RICO conspiracy count, 18 U.S.C. § 1963(a). The district court held, however, that the jury's findings regarding the murders "do not transform the inchoate RICO conspiracy into a 'crime of violence' because the enhanced punishment that such special findings trigger is applicable under the categorical approach if the RICO conspiracy involves an agreement to engage in 'racketeering activity' involving murder—it does not require as an element that the murders actually be committed." JA 6365.

## SUMMARY OF THE ARGUMENT

Defendants Simmons and Mitchell were charged and convicted of an aggravated form of RICO conspiracy that required the jury to find them guilty of Virginia first-degree murder in order to increase their statutory maximum punishment to life imprisonment. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that, as a matter of constitutional law, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. As a result, the racketeering crimes that enhanced Simmons' and Mitchell's statutory maximums on Count 1—*i.e.*, two completed murders for Simmons, and four murders for Mitchell—were elements of the aggravated forms of RICO conspiracy

33

under which Simmons and Mitchell, respectively, were charged and convicted. Because Virginia first-degree murder has as an element the use, attempted use, or threatened use of physical force, Simmons' and Mitchell's RICO conspiracy offenses in Count 1 qualified as crimes of violence under 18 U.S.C. § 924(c)(3)(A).

## ARGUMENT

### I.    The District Court Erred in Granting Simmons' and Mitchell's Post-Trial Motions for Acquittal on Count 30

The district court erred in granting Simmons' and Mitchell's post-trial motions for acquittal on Count 30, which charged them with possessing, brandishing, and discharging a firearm, in violation of 18 U.S.C. § 924(c), in furtherance of two predicate offenses: (i) RICO conspiracy, as part of which Simmons and Mitchell each "committed, or aided, abetted, counseled, commanded, induced, or procured" murder, JA 6313–31; and (ii) VICAR assault with a dangerous weapon.  Because Simmons and Mitchell were charged with and convicted of an aggravated version of RICO conspiracy that included, as elements of the offense, their participation in murder, their RICO-conspiracy convictions had "as an element the use, attempted use, or threatened use of physical force," and therefore qualified as crimes of violence under 18 U.S.C. § 924(c)(3)(A).

### A.   Standard of Review

This Court reviews a district court's decision under Rule 29 de novo. *United States v. Cone*, 714 F.3d 197, 213 (4th Cir. 2013).

### B.   Statutory Background

1.   Section 924(c) of Title 18 makes it a crime to "use[] or carr[y]" a firearm "during and in relation to," or to "possess[]" a firearm "in furtherance of," any federal "crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1)(A).  Ordinarily, a defendant's first conviction under § 924(c) is punishable by a term of imprisonment of not less than 5 years. *Id.* at § 924(c)(1)(A)(i).  If the firearm is brandished, however, the mandatory minimum sentence is 7 years.  *Id.* at § 924(c)(1)(A)(ii).  And if the firearm is discharged, the minimum sentence is 10 years.  *Id.* at § 924(c)(1)(A)(iii).  A defendant's sentence for violating § 924(c) may not run concurrently to the sentence for any other offense, including the charged predicate offense on which the § 924(c) count is based.  *Id.* at § 924(c)(1)(D)(ii).

Section 924(c) contains its own specific definition of "crime of violence."  18 U.S.C. § 924(c)(3).  The subparagraph at issue in this case—18 U.S.C. § 924(c)(3)(A), also called the "force clause" or the "elements clause"—specifies that the term "crime of violence" includes any "offense that is a felony" and "has as an element the use,

attempted use, or threatened use of physical force against the person or property of another." *Id.* at § 924(c)(3)(A).[13]

2. RICO was enacted October 15, 1970, as Title IX of the Organized Crime Control Act of 1970. See Pub. L. No. 91-452, 84 Stat. 941 (1970). The RICO statute makes it a federal offense for an individual, who is employed by or associated with an "enterprise," to conduct or participate, directly or indirectly, in the conduct of the affairs of that enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c); *see also United States v. Cornell*, 780 F.3d 616, 620 (4th Cir. 2015). Racketeering activity is defined by statute as "acts involving" certain enumerated state crimes, including murder (18 U.S.C. § 1961(1)(A)) and acts indictable under, or offenses involving, a series of enumerated federal statutes (18 U.S.C. § 1961(1)(B)–(G)).

A defendant who conspires to violate 18 U.S.C. § 1962(c) is liable under the RICO conspiracy provision in § 1962(d). 18 U.S.C. § 1962(d); *see also Salinas v. United States*, 522 U.S. 52, 62–66 (1997); *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012). To prove a RICO conspiracy, the government must prove, beyond a reasonable doubt, that:

_____

[13] The Supreme Court struck down § 924(c)'s alternative definition of "crime of violence"—which is set forth in 18 U.S.C. § 924(c)(3)(B)—as unconstitutionally vague in *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019).

     (1)    A conspiracy or agreement existed between two or more persons to participate in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity;

     (2)    The defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise; and

     (3)    The defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two acts of racketeering of the types of racketeering activity set forth in the indictment.

*Cornell*, 780 F.3d at 620; *see also* JA 5248–49.

RICO sets different statutory maximums based on whether the government alleges and proves certain additional facts.  Ordinarily, the statutory maximum for a RICO violation (including conspiracy) is twenty years' imprisonment.  18 U.S.C. § 1963(a).  But that maximum is increased to life "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." *Ibid.*; *United States v. Warneke*, 310 F.3d 542, 549 (7th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Jan. 10, 2003) ("The maximum penalty following a RICO conviction depends on the maximum penalty for the most serious predicate offense.").  Thus, a defendant may be sentenced to up to life imprisonment for a RICO conspiracy if, for example, the racketeering activity included murder and the state murder statute in the relevant jurisdiction provides a possible sentence of life imprisonment.  *United States v. Garcia*, 474 Fed. Appx. 909, 912 (4th Cir. 2012) (unpublished); *see also Chue v. United States*, 894 F. Supp. 2d 487, 491 (S.D.N.Y.

2012) (same, where the charged racketeering activity included drug trafficking in quantities that carried a statutory maximum of life imprisonment).

> **C.**   **The Racketeering Activity that Enhanced Simmons' and Mitchell's Statutory Maximums for Count 1—*i.e.*, Their Participation in Several Actual Murders—Was an Element of Their RICO Conspiracy Convictions and Satisfies § 924(c)'s Elements Clause**

1.     The racketeering crimes that enhanced Simmons' and Mitchell's statutory maximums on Count 1—*i.e.*, two completed murders for Simmons, and four murders for Mitchell—were elements of the aggravated forms of RICO conspiracy under which Simmons and Mitchell, respectively, were charged and convicted.  In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that, as a matter of constitutional law, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Id.* at 490; *see also Mathis v. United States*, 136 S. Ct. 2243, 2256 (2016) ("If statutory alternatives carry different punishments, then under *Apprendi* they must be elements."); *United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003) ("any fact extending the defendant's sentence *beyond the maximum authorized by the jury's verdict* would have been considered an element of an aggravated crime—and thus the domain of the jury—by those who framed the Bill of Rights.") (quoting *Harris v. United States*, 536 U.S. 545, 557 (2002)).  And the Supreme Court has repeatedly emphasized that it makes no difference for *Apprendi* purposes how the legislature structures a statute, what it calls a fact that increases the

38

statutory maximum sentence, or whether it intends for that fact to be treated as an element of the offense. *See, e.g.*, *Ring v. Arizona*, 536 U.S. 584, 602 (2002) ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt."); *Blakely v. Washington*, 542 U.S. 296, 303 (2004) ("[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.") (emphasis omitted); *Apprendi*, 530 U.S. at 494 ("[T]he relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?").

The murder offenses that Simmons and Mitchell committed as part of their RICO conspiracy were elements of their respective RICO conspiracy offenses for *Apprendi* purposes. As noted, to increase the statutory maximum sentence for RICO from twenty years' to life imprisonment, the government was required to prove that the RICO "violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a). Under *Apprendi*, therefore, the government was required to charge that aggravating fact—*i.e.*, conduct (i) that constitutes racketeering activity; (ii) upon which the RICO violation was based; and (iii) that carries a possible life sentence—in the indictment, and the jury was required

39

to find it proven beyond a reasonable doubt. *See, e.g.*, *United States v. Nguyen*, 255 F.3d 1335, 1343 (11th Cir. 2001).

In this case, the RICO conspiracy count (Count 1) of the Second Superseding Indictment charged Simmons with two specific first-degree murder offenses (the homicides of Tynes and Mercer), in violation of Virginia law. The indictment alleged that each "killing was willful, deliberate, and premeditated." JA 100. The same count charged Mitchell with committing four specific first-degree murder offenses (the homicides of Mercer, Davis, Linda Lassiter, and Roberts), again in violation of Virginia law, again alleging each "killing was willful, deliberate, and premeditated." JA 100–01. These completed crimes, moreover, carried a statutory maximum of life imprisonment under state law. Virginia Code §§ 18.2-32; 18.2-10. And, in special verdicts, the jury found that Simmons and Mitchell "committed, or aided, abetted, counseled, commanded, induced, or procured" each of those murders "as part of the racketeering conspiracy." JA 6313–14, 6321–22, 5261–62. Under *Apprendi*, therefore, these penalty-enhancing murders constituted elements of the aggravated form of RICO conspiracy of which Simmons and Mitchell were convicted.

2.     The remaining question is whether, in addition to enhancing the Defendants' maximum penalties for RICO conspiracy, the murders charged in Count 1 also qualify as "crime[s] of violence" under 18 U.S.C. 924(c)(3)(A)—*i.e.*, whether Virginia first-degree murder "has as an element the use, attempted use, or threatened

40

use of physical force against the person or property of another." *Ibid.* This Court squarely considered that question earlier this year in *United States v. Mathis*, 932 F.3d 242 (4th Cir. 2019). It held that "the crime of first-degree murder under Virginia law qualifies categorically as a crime of violence under the force clause." *Id.* at 265.

In sum, because Simmons and Mitchell were charged and convicted of an aggravated form of RICO conspiracy that required the jury to find them guilty of Virginia first-degree murder in order to increase their statutory maximum punishment to life imprisonment, and because Virginia first-degree murder has as an element the use, attempted use, or threatened use of physical force, Simmons' and Mitchell's RICO conspiracy offenses in Count 1 qualified as crimes of violence under 18 U.S.C. § 924(c)(3)(A).

3.    The district court's contrary reasoning is unpersuasive. In dismissing Count 30, the district court did not grapple with the fact that the completed murders that served as penalty-enhancing "racketeering activity" under 18 U.S.C. § 1963(a) constitute elements under *Apprendi*. It concluded, instead, that RICO "'special sentencing factors'"—though charged in the indictment and "found by the jury"—can never "transform the inchoate RICO conspiracy into a 'crime of violence' because the elevated punishment that such findings trigger is applicable under the *categorical approach* if the RICO conspiracy involves *an agreement* to engage in 'racketeering activity' involving murder—it does not require *as an element* that the murders actually

41

be committed." JA 6365 (citing *Salinas v. United States*, 522 U.S. 52, 63, 65 (1997)). That reasoning misapprehends the Supreme Court's decisions in *Mathis* and *Apprendi*.

In *Mathis*, the Supreme Court defined the "'[e]lements'" relevant under the categorical approach as the "'constituent parts' of a crime's legal definition"—*i.e.*, "the things the 'prosecution must prove to sustain a conviction.'" 136 S. Ct. at 2248 (quoting Black's Law Dictionary 634 (10th ed. 2014)). As explained above, in a prosecution for the aggravated version of RICO conspiracy, those "elements" include, in addition to the usual elements of RICO conspiracy, the specific racketeering activity—itself either a federal or state crime—that the indictment charges as the trigger for the enhanced penalties. *Supra* at 38-40. Without a jury finding as to that racketeering activity, no enhanced statutory maximum could be imposed under *Apprendi*.

For violations of an aggravated form of RICO, in other words, the relevant "elements" for determining whether the RICO offense qualifies as a crime of violence are those elements of the predicate racketeering activity that the defendant is charged with having committed and that the jury was required to find beyond a reasonable doubt in order to increase the statutory maximum—here, first-degree murder in violation of Virginia law. The fact that other defendants might conceivably receive the same sentencing enhancement based on the commission of different crimes does not change the fact that the jury in this case was required to find the elements of the

specific offenses with which Simmons and Mitchell were charged—here, actual murders. *See Mathis*, 136 S. Ct. at 2248 (explaining that the categorical approach focuses on "the elements of the crime of conviction" that "the jury must find beyond a reasonable doubt to convict the defendant" or increase his maximum punishment); *see also* JA 6313–31 (special verdict form indicating that jury found, unanimously and beyond a reasonable doubt, that defendants committed murders as an element of their aggravated RICO offenses). No authority supports the district court's contrary suggestion that, because defendants who commit different offenses with different elements might also receive an enhanced sentence under § 1963(a), the elements of the specific crimes charged and proved in this case should be disregarded.

Even if this Court were to adopt the taxonomy of the categorical approach in analyzing Defendants' convictions for an aggravated form of RICO conspiracy, however, the result would be the same. By incorporating multiple potential offenses as racketeering activity, each with different elements that must be proved beyond a reasonable doubt, the RICO statute is "divisible" as to the penalty-enhancing racketeering activity. *See Mathis*, 136 S. Ct. at 2249. A divisible statute "define[s] multiple crimes" by incorporating alternative sets of elements, each of which constitutes a violation of the statute. *Id.* at 2249. In a RICO case, the indictment and jury verdict (or guilty plea) identify the relevant racketeering activity that must be proved, and thus identify which divisible alternative crimes the defendant has

43

committed for purposes of applying the categorical approach. *See United States v. Williams*, 898 F.3d 323, 333 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 1351 (2019). Here, that racketeering activity is first-degree murder in violation of Virginia law. JA 177–78, 6313–14, 6321–22. Because first-degree murder under Virginia law has as an element the use, attempted use, or threatened use of physical force, *see Mathis*, 932 F.3d at 265, the Defendants' commission of an aggravated form of RICO, for which they were charged and convicted, necessarily required proof of that element and thus constituted a crime of violence under 18 U.S.C. § 924(c)(3)(A).

The district court's remaining concern—*i.e.* that RICO conspiracy does not qualify as a crime of violence because it "does not require an overt act," JA 6364—is equally unavailing. As explained above, Simmons' and Mitchell's RICO violations qualify because Simmons and Mitchell were each convicted of an aggravated form of RICO conspiracy that required the government to prove their participation in completed first-degree murders in violation of Virginia law. It is those aggravating elements—not any aspect of non-aggravated RICO conspiracy—that made Simmons' and Mitchell's RICO conspiracy offenses "crime[s] of violence" under § 924(c)(3)(A). The government did not just charge and prove that the Defendants *conspired* to commit the murders—it charged and proved that they *committed* the murders as part of the conspiracy. The absence of an overt act requirement in the general RICO conspiracy statute is, therefore, beside the point.

44

## CONCLUSION

The district court's order dismissing Count 30 as to Simmons and Mitchell should be reversed, and this case should be remanded for resentencing.

Respectfully submitted,

BRIAN A. BENCZKOWSKI
Assistant Attorney General
Criminal Division

G. ZACHARY TERWILLIGER
United States Attorney
Eastern District of Virginia

By: _____
/s/
TERESA A. WALLBAUM
Assistant Chief
Organized Crime and Gang Section
Criminal Division
U.S. Department of Justice
1301 New York Ave, NW.; Room 700
Washington, DC 20530
(202) 616-5193
teresa.wallbaum@usdoj.gov

ANDREW BOSSE
Assistant United States Attorney
Eastern District of Virginia

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The United States respectfully suggests that oral argument would be helpful in this case, which presents an issue of first impression.

## CERTIFICATE OF COMPLIANCE

I certify that I wrote this brief using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is specifically 11,323 words) as counted by Microsoft Word, excluding the table of contents, table of citations, this certificate, and the certificate of service.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

_____/s/_____
Teresa A. Wallbaum
Assistant Chief
Organized Crime and Gang Section
Criminal Division
U.S. Department of Justice

46

**CERTIFICATE OF SERVICE**

I certify that on November 1, 2019, I filed electronically the foregoing brief with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to counsel of record for the appellant, who are registered users of the system.

                                               /s/
                                        Teresa A. Wallbaum
                                        Assistant Chief
                                        Organized Crime and Gang Section
                                        Criminal Division
                                        U.S. Department of Justice