**RECORD NO. 18-4875(L)**
**18-4876, 18-4877, 19-4269, 19-4287, 19-4345**

### IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

––––––––––––––––––––––––

### UNITED STATES OF AMERICA,

*Appellant/Cross-Appellee,*

v.

### ANTONIO SIMMONS, ET AL.,

*Appellees/Cross-Appellants.*

––––––––––––––––––––––––

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### AT NORFOLK

––––––––––––––––––––––––

## OPENING/RESPONSE BRIEF OF APPELLEES

––––––––––––––––––––––––

Laura P. Tayman
LAURA P. TAYMAN, PLLC
Suite 300
11815 Fountain Way
Newport News, VA 23606
757-926-5277
Laura@TaymanLaw.net

*Counsel for Appellee*
*Antonio Simmons*

Paul Graham Beers
GLENN, FELDMANN,
  DARBY & GOODLATTE
P. O. Box 2887
Roanoke, VA 24001
540-224-8035
pbeers@glennfeldmann.com

*Counsel for Appellee*
*Malek Lassiter*

Maureen Leigh White
ATTORNEY AT LAW
7 South 1st Street
Richmond, VA 23219
804-377-0150
mrnwhite49@gmail.com

*Counsel for Appellee*
*Nathaniel Mitchell*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF ISSUES ..................................................................1

    Opening Argument Issues...............................................................1

    Response Argument Issue................................................................2

STATEMENT OF THE CASE.............................................................2

SUPPLEMENTAL STATEMENT OF FACTS ...................................2

    December 10, 2015 - Al-Tariq Tynes ............................................6

    December 15, 2015 - Vandalet Mercer and R.F..............................9

    December 20, 2015 - Linda Lassiter and Wayne Davis ..................10

    December 27, 2015 - Lanez, Nino, S.M. and Reid Street ...............11

SUMMARY OF THE OPENING ARGUMENTS .................................13

SUMMARY OF THE ARGUMENT IN RESPONSE...........................15

OPENING ARGUMENTS ....................................................................15

I.    THE DISTRICT COURT ERRED BY FIRST, CONSTRUCTIVELY AMENDING COUNTS EIGHT, FIFTEEN, EIGHTEEN, TWENTY-SEVEN, AND TWENTY-NINE AND, SECOND, REFUSING TO VACATE APPELLANTS' CONVICTIONS ON THOSE COUNTS FOR FAILURE TO STATE OFFENSES ...............................................15

    Introduction ....................................................................................15

    Standard of Review .........................................................................18

i

A. Constructive Amendment..................................................18

B. Failure to State An Offense............................................19

ARGUMENT......................................................................20

A. The District Court Constructively Amended The VICAR Assault
Counts............................................................................20

B. The District Court Erred By Rejecting Appellants' Post-Trial,
Categorical Challenges To The VICAR Assault Counts For
Failure To State Offenses................................................27

   1. The district court misapplied Rule 12(c)(3) when it rejected
     Appellants' post-trial motions to dismiss as untimely..................30

   2. Appellants' VICAR Assault Count convictions should be
     reversed because brandishing a firearm in violation of VA.
     CODE ANN. § 18.2-282 is not a proper predicate for VICAR
     Assault with a dangerous weapon under 18 U.S.C. § 1959(a)(3)..31

II.    ARGUMENTS REGARDING SUFFICIENCY OF THE EVIDENCE ..37

    STANDARD OF REVIEW....................................................37

    A. THE DISTRICT COURT ERRED BY DENYING
     APPELLANTS' MOTIONS FOR JUDGMENT OF
     ACQUITTAL ON THE VICAR ATTEMPTED MURDERS
     CHARGED IN COUNTS TWENTY-TWO AND TWENTY-
     FOUR .........................................................................38

     1. Insufficient Evidence Supports Appellants' Convictions On
      Count Twenty-Two For VICAR Attempted Murder of Lanez......43

      i. The government failed to prove Appellants formed the
       specific intent to kill Lanez .......................................43

ii. Even assuming, arguendo, the government proved Appellants formed a specific intent to kill Lanez, Appellants did not undertake an overt act sufficient to support his attempted murder conviction on Count Twenty-Two .................................................................46

2. Insufficient Evidence Supports Appellants' Convictions On Count Twenty-Four For VICAR Attempted Murder Of Nino ......48

i. The government failed to prove beyond a reasonable doubt that Appellants intended to murder Nino..................................48

ii. Even assuming, arguendo, the government proved Appellants formed a specific intent to kill Nino, Appellants did not undertake an overt act sufficient to support his attempted murder conviction on Count Twenty-Four .............49

B. THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN SIMMONS' CONVICTIONS ON COUNTS THREE, FIVE, SEVEN, EIGHT, TWENTY-SIX AND TWENTY-SEVEN ............50

1. There was insufficient evidence to sustain Simmons' conviction for attempted murder or assault of S.M. charged in Counts Twenty-Six and Twenty-Seven .........................................53

2. The evidence was insufficient on Counts Five, Seven and Eight as the killing of Vandalet Mercer and shooting of R.F. were neither robberies nor related to the NTG ........................................59

3. There was insufficient evidence on Count Three because Foye killed Tynes for personal reasons unrelated to Simmons and the NTG........................................................................................62

C. THE DISTRICT COURT ERRED BY DENYING LASSITER'S MOTION FOR JUDGMENT OF ACQUITTAL ON THE RICO CONSPIRACY CHARGED IN COUNT ONE.................................64

D. SEVERAL SECTION 924(c) CONVICTIONS MUST BE REVERSED FOR LACK OF SUFFICIENT EVIDENCE TO SUPPORT THE PREDICATE CRIMES OF VIOLENCE CHARGED.........................................................................68

E. THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN SIMMONS' CONVICTIONS ON COUNTS THIRTY-FOUR AND THIRTY-SIX FOR POSSESSION, USE AND CARRYING A FIREARM IN RELATION TO DRUG TRAFFICKING CRIMES ......................................................................................70

III. THE DISTRICT COURT ERRED IN ADMITTING SUMMARY CHARTS UNDER RULE 1006 IN VIOLATION OF APPELLANTS' SIXTH AMENDMENT RIGHTS ...............................72

A. Standard of Review .........................................................73

B. Argument.........................................................................73

IV. THE DISTRICT COURT ERRED IN PROVIDING AN OVERLY EXPANSIVE VICARIOUS LIABILITY INSTRUCTION WHICH WAS INCONSISTENT WITH APPLICABLE VIRGINIA LAW .........75

A. Standard of Review .........................................................75

B. Argument.........................................................................75

V. THE DISTRICT COURT ERRED IN ADMITTING CONVERSATIONS THAT WERE NOT IN FURTHERANCE OF THE CONSPIRACY AND BY FAILING TO INSTRUCT ON MULTIPLE CONSPIRACIES ..................................................80

A. Standard of Review .........................................................80

B. Argument.........................................................................80

1. Error in admission of the Skino-Nino phone call .........................80

2. Error in failing to instruct on multiple conspiracies .....................83

iv

CONCLUSION ...................................................................................... 84

RESPONSE TO GOVERNMENT APPEAL ....................................... 84

VI.  THE DISTRICT COURT CORRECTLY GRANTED A
     JUDGMENT OF ACQUITTAL ON COUNT THIRTY AS THE §
     924(c) CHARGE WAS NOT PREDICATED ON A CRIME OF
     VIOLENCE .............................................................................. 84

     A. The Standard of Review ..................................................... 84

     B. Background and Argument ................................................. 84

     1. The RICO conspiracy charged in Count One is an indivisible
        offense and under the categorical approach is not a crime of
        violence ................................................................................ 87

     2. Special sentencing factors were not charged as, or found by the
        jury to be, elements of the RICO conspiracy ....................... 90

     3. The government's argument that special sentencing factors are
        elements of an aggravated RICO conspiracy is a plainly veiled
        attempt at an end-run around the categorical approach ..................... 95

CONCLUSION ...................................................................................... 99

STATEMENT REGARDING ORAL ARGUMENT ........................... 99

CERTIFICATE OF COMPLIANCE .................................................. 101

# TABLE OF AUTHORITIES

## CASES

*Alleyne v. United States*,
    570 U.S. 99 (2013) ................................................................ 93

*Apprendi v. New Jersey*,
    530 U.S. 466 (2000) .......................................................... 92, 95

*Baldwin v. Commonwealth*,
    274 Va. 276, 645 S.E.2d 433 (2007) ........................ 39, 45-46, 48, 54

*Bell v. Commonwealth*,
    220 Va. 87, 255 S.E.2d 498 (1979) .................................... 78

*Bourjaily v. United States*,
    483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987) ................ 81

*Bowman v. Commonwealth*,
    11 Va. App. 259, 397 S.E.2d 886 (1990) ........................... 78

*Boyd v. Commonwealth*,
    236 Va. 346, 374 S.E.2d 301 (1988) .................................... 78

*Brooker v. Commonwealth*,
    41 Va. App. 609, 587 S.E.2d 732 (2003) ........................... 55

*Brown v. Commonwealth*,
    130 Va. 733, 107 S.E. 809 (1921) ..................................... 53

*Callanan v. United States*,
    364 U.S. 587, 81 S. Ct. 321, 5 L. Ed. 2d 312 (1961) ................ 89

*Descamps v. United States*,
    570 U.S. 254 (2013) ...................................................... 28, 87-88

*Dezfuli v. Commonwealth*,
    58 Va. App. 1, 707 S.E.2d 1 (2011) .................................... 35

*Grant v. Commonwealth*,
    216 Va. 166, 217 S.E.2d 806 (1975) ............................... 53, 55

*Horton v. Commonwealth*,
    99 Va. 848, 38 S.E. 184 (1901) ........................................ 53

*Huffman v. Commonwealth*,
   51 Va. App. 469, 658 S.E.2d 713 (2008) ..................................................... 35, 36

*Jackson v. Virginia*,
   443 U.S. 307 (1979) ........................................................................................ 37

*Jay v. Commonwealth*,
   275 Va. 510, 659 S.E.2d 311 (2008) ............................................................... 38

*Johnson v. Commonwealth*,
   458 S.E.2d 599, 20 Va. App. 547 (1995) ........................................................ 22

*Jones v. Commonwealth*,
   70 Va. App. 307, 826 S.E.2d 908 (2019) ................................. 39, 40, 41, 47, 50

*Jones v. Commonwealth*,
   208 Va. 370, 157 S.E.2d 907 (1967) ......................................................... 54, 79

*Kotteakos v. United States*,
   328 U.S. 750 (1946) ........................................................................................ 83

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004) ........................................................................................... 87

*Mathis v. United States*,
   136 S. Ct. 2243 (2016) .................................................................................... 88

*McGhee v. Commonwealth*,
   221 Va. 422, 270 S.E.2d 729 (1980) ............................................................... 79

*Moehring v. Commonwealth*,
   223 Va. 564, 290 S.E.2d 891 (1982) ............................................................... 53

*Morris v. Commonwealth*,
   269 Va. 127, 607 S.E.2d 110 (2005) ............................................................... 35

*Murray v. Commonwealth*,
   210 Va. 282, 170 S.E.2d 3 (1969) ................................................................... 54

*Pinkerton v. United States*,
   328 U.S. 640 (1946) ............................................................................... *passim*

*Salinas v. United States*,
   522 U.S. 52 (1997) ............................................................................ 86, 89, 96

vii

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ............................................................... *passim*

*Stirone v. United States*,
    361 U.S. 212 (1960) ........................................................................ 25

*Taylor v. United States*,
    495 U.S. 575 (1990) ................................................................. 28, 88

*United States v. Allred*,
    942 F.3d 641 (4th Cir. 2019) ....................................................... 19

*United States v. Anderson*,
    59 F.3d 1323 (D.C. Cir. 1995) .................................................... 98

*United States v. Angle*,
    254 F.3d 514 (4th Cir. 2001) ....................................................... 93

*United States v. Anthony*,
    2019 U.S. Dist. LEXIS 122476 (W.D. Va. July 23, 2019) ......... 32, 36

*United States v. Ashley*,
    606 F.3d 135 (4th Cir.), *cert denied*,
    562 U.S. 987 (2010) ....................................................................... 78

*United States v. Barnett*,
    660 F. App'x 235 (4th Cir. 2016) ......................................... 66, 68

*United States v. Camps*,
    32 F.3d 102 (4th Cir. 1994) ......................................................... 98

*United States v. Carter*,
    300 F.3d 415 (4th Cir. 2002) ....................................................... 98

*United States v. Cedelle*,
    89 F.3d 181 (4th Cir. 1996) ......................................................... 75

*United States v. Chittenden*,
    896 F.3d 633 (4th Cir. 2018) ....................................................... 76

*United States v. Coward*,
    630 F.2d 229 (4th Cir. 1980) ....................................................... 83

*United States v. Davis*,
    139 S. Ct. 2319 (2019) ............................................................ *passim*

*United States v. Evans*,
848 F.3d 242 (4th Cir. 2017) ............................................................. 87

*United States v. Fiel*,
35 F.3d 997 (4th Cir. 1994) ............................................................... 20

*United States v. Floresca*,
38 F.3d 706 (4th Cir. 1994) ................................................. 19, 22, 24

*United States v. Forrest*,
429 F.3d 73 (4th Cir. 2005) ............................................................... 73

*United States v. Graham*,
711 F.3d 445 (4th Cir. 2013) ............................................................. 80

*United States v. Hackley*,
662 F.3d 671 (4th Cir. 2011) ............................................................. 37

*United States v. Hamilton*,
953 F.2d 1344 (11th Cir. 1992) ........................................................ 98

*United States v. Hampton*,
628 F.3d 654 (4th Cir. 2010) ....................................................... 34, 35

*United States v. Heater*,
63 F.3d 311 (4th Cir. 1995) ............................................................... 81

*United States v. Hedgepeth*,
418 F.3d 411 (4th Cir. 2005) ............................................................. 73

*United States v. Hines*,
717 F.2d 1481 (4th Cir. 1983) .......................................................... 83

*United States v. Janati*,
374 F.3d 263 (4th Cir. 2004) ....................................................... 73, 74

*United States v. Kingrea*,
573 F.3d 186 (4th Cir. 2009) ............................................................. 37

*United States v. Mathis*,
932 F.3d 242 (4th Cir. 2019) ..................................................... *passim*

*United States v. McCollum*,
885 F.3d 300 (4th Cir. 2018) ....................................................... 32, 86

ix

*United States v. McNeal,*
  818 F.3d 141 (4th Cir. 2016) .............................................................. 84

*United States v. Miltier,*
  882 F.3d 81 (4th Cir. 2018) ........................................................... 18-19

*United States v. Montes-Flores,*
  736 F.3d 357 (4th Cir. 2013) .............................................................. 88

*United States v. Mouzone,*
  687 F.3d 207 (4th Cir. 2012), *cert. denied,*
  568 U.S. 1110 (2013) ......................................................... 65, 66, 89-90

*United States v. Naughton,*
  621 F. App'x 170 (4th Cir. 2015) ....................................................... 86

*United States v. Nunez,*
  432 F.3d 573 (4th Cir. 2005) .............................................................. 83

*United States v. Olano,*
  507 U.S. 725 (1993) .......................................................................... 75

*United States v. Oloyede,*
  933 F.3d 302 (4th Cir. 2019) .............................................................. 73

*United States v. Palomino-Coronado,*
  805 F.3d 127 (4th Cir. 2015) .............................................................. 37

*United States v. Pinson,*
  860 F.3d 152 (4th Cir. 2017) ....................................................... 65, 83

*United States v. Price,*
  777 F.3d 700 (4th Cir.), *cert. denied,*
  135 S. Ct. 2911 (2105) ...................................................................... 88

*United States v. Randall,*
  171 F.3d 195 (4th Cir. 1999) ............................... 21-22, 23, 24, 25, 26

*United States v. Rendelman,*
  641 F.3d 36 (4th Cir. 2011) ............................................................... 19

*United States v. Reyes,*
  102 F.3d 1361 (5th Cir. 1996) ........................................................... 25

*United States v. Robinson*,
    627 F.3d 941 (4th Cir. 2010) ........................................................... 19

*United States v. Shores*,
    33 F.3d 438 (4th Cir. 1994) ............................................................. 83

*United States v. Simmons*,
    917 F.3d 312 (4th Cir. 2019) ........................................... 32-33, 36-37

*United States v. Simmons*,
    2018 U.S. Dist. LEXIS 196181 (E.D. Va. Nov. 16, 2018) ....................... *passim*

*United States v. Simms*,
    914 F.3d 229 (4th Cir. 2019) *cert. denied*,
    140 S. Ct. 304 (2019) ............................................. 69, 85, 87, 96, 97

*United States v. Smith*,
    701 F.3d 1002 (4th Cir. 2012) ........................................................ 80

*United States v. Stewart*,
    256 F.3d 231 (4th Cir. 2001) .......................................................... 93

*United States v. Strayhorn*,
    743 F.3d 917 (4th Cir.) *cert. denied*,
    134 S. Ct. 2689 (2014) ................................................................ 95

*United States v. Sturgis*,
    48 F.3d 784 (4th Cir. 1995) ........................................................... 34

*United States v. Tolliver*,
    61 F.3d 1189 (5th Cir. 1995) .......................................................... 98

*United States v. Vasquez*,
    899 F.3d 363 (5th Cir. 2018) .......................................................... 20

*United States v. Whitfield*,
    695 F.3d 288 (4th Cir. 2012) .............................................. 19, 23, 27

*United States v. Williams*,
    152 F.3d 294 (4th Cir. 1998) .......................................................... 75

*United States v. Willoughby*,
    27 F.3d 263 (7th Cir. 1994) ....................................................... 24-25

*Ward v. Commonwealth*,
    205 Va. 564, 138 S.E.2d 293 (1964) ................................................ 53

*Wiseman v. Commonwealth*,
    143 Va. 631, 130 S.E. 249 (1925) .................................................. 55

## STATUTES

18 U.S.C. § 16 ........................................................................ 29

18 U.S.C. § 113 ...................................................................... 34

18 U.S.C. § 924 .................................................................. *passim*

18 U.S.C. § 1959 ................................................................ *passim*

18 U.S.C. § 1961 ................................................................ 65, 68

18 U.S.C. § 1962 .......................................................... 33, 65, 68, 91

21 U.S.C. § 841 ................................................................. 25, 26

Model Penal Code § 211.1 ........................................................ 35

Va. Code Ann. § 16.2-22 ......................................................... 94

Va. Code Ann. § 18.2-18 ...................................................... 53, 79

Va. Code Ann. § 18.2-23.1 ....................................................... 78

Va. Code Ann. § 18.2-26 .................................................... 38, 51, 94

Va. Code Ann. § 18.2-29 ......................................................... 55

Va. Code Ann. § 18.2-32 .................................................... 38, 51, 94

Va. Code Ann. § 18.2-51 ......................................................... 22

Va. Code Ann. § 18.2-53 ...................................................... *passim*

Va. Code Ann. § 18.2-53.1 .................................................... *passim*

Va. Code Ann. § 18.2-282 .................................................... *passim*

## OTHER AUTHORITIES

Fed. R. Crim. P. 12 ..................................................... 17, 19, 29, 30, 31

Fed. R. Crim. P. 611 ............................................................. 74

Fed. R. Crim. P. 1006 ....................................................... 14, 72, 73

Fed. R. Evid. 801 ............................................................... 80

U.S. Const. amend V................................................................21, 24, 25, 27

U.S. Const amend VI .............................................................21, 72

U.S.S.G. § 4B1.2 ................................................................. 33

## JURISDICTIONAL STATEMENT

Appellants agree with the government's jurisdictional statement.

## STATEMENT OF THE ISSUES PRESENTED

### Opening Argument Issues

I.    Whether the district court erred by refusing to vacate Appellants' VICAR assault counts convictions because those counts were predicated on the Virginia misdemeanor of brandishing a firearm and constructively amended at trial.

II.    Whether the evidence at trial was insufficient to sustain Appellants' convictions in the following regards:

A.    The government failed to prove both specific intent and an overt act to support the attempted murder convictions in Counts Twenty-Two and Twenty-Four.

B.    Appellant Simmons, who was not present and did not undertake an overt act in furtherance of the substantive state law crimes, was improperly convicted of substantive VICAR crimes based on state offenses, especially since the federal principle of *Pinkerton* liability has not been adopted in Virginia.

C.    Insufficient evidence supported Appellant Lassiter's conviction for the RICO conspiracy charged in Count One.

D.    Insufficient evidence supported the state law crimes on which several Section 924(c) counts were predicated.

E.    Insufficient evidence supported Simmons' convictions on Counts Thirty-Four and Thirty-Six for possession and use of firearms in relation to drug trafficking.

1

III.   Whether the district erred in admitting pedagogical summary charts as substantive evidence in violation of Appellants' Sixth Amendment rights.

IV.   Whether the district court erroneously provided an overly expansive instruction on the *Pinkerton* theory of liability because this federal principle of vicarious liability is inconsistent with Virginia law.

V.   Whether the district court erred in admitted co-conspirator statements which were not in furtherance of the RICO conspiracy charged in Count One and erroneously failed to instruct on single versus multiple conspiracies.

### Response Argument Issue

VI.   Whether the district court correctly granted a judgment of acquittal on Count Thirty because that Section 924(c) charge was not predicated on a crime of violence.

### STATEMENT OF THE CASE

Appellants agree with the government's statement of the procedural history of the case but provide the following supplemental statement of facts.

### SUPPLEMENTAL STATEMENT OF FACTS

The government's theory of the case is that Antonio Simmons ("Simmons") was a ringleader of the Nine Trey Gangsters (NTG), a subset of the Bloods, in the Hampton Roads area. As such, the government held him responsible for the violence that occurred in Hampton Roads in December of 2015.  But the evidence established

that Simmons was an ineffective leader who could not handle money. (J.A. Vol. X, 4371.) For example, he could not repay a debt of $950.00 owed to his supervisor, "Dido," for marijuana. When offered the opportunity to repay the debt by getting guns, Simmons could not obtain the guns. Because of the outstanding debt, Dido placed Simmons on freeze in 2015. Because he was on freeze, Simmons was not supposed to conduct gang business. (J.A. Vol. IX, 4055.)

The government portrayed a co-defendant, Anthony Foye, known as "Bulls," as the man who was committing these crimes on behalf, or at the direction, of, Simmons. The evidence however, showed that Foye, while primarily responsible for the violent crimes charged in the Second Superseding Indictment, acted independently. The witness who most illuminated the fact that Foye was the violent actor and not Simmons, was Alvaughn Davis, known as "LB," who was also charged in the case. On September 27, 2016, Davis gave a statement to the authorities which identified Foye, not Simmons, as the moving force behind the violence. At trial Davis retreated from his prior statements that inculpated Foye as acting alone. The striking inconsistencies between Davis's statements and testimony coincided with the dramatic change in status of the defendants. By trial Foye had pled guilty and was serving a life sentence, all that remained was to convict the others. Accordingly, blaming Simmons became Davis' path forward for a reduced sentence. (J.A. Vol. IX, 3990).

In his statements to agents, Davis insisted that Simmons had not promoted violence, rather Foye got angry and would just go off in defiance of Simmons' directives not to use violence. At one point he said to the agents, "I told you, the little MF be going rogue." The MF was Foye. (J.A. Vol. X, 4414.) Davis provided the agents with examples of Simmons' ire at the violence and complained that the whole crew was getting pulled in because of Foye's violence. (J.A. Vol. X, 4415-16.) The government defined going "rogue" to mean engaging in conduct not sanctioned and subjecting oneself to possible violations. (J.A. Vol. XIII, 1943.)

Davis' statements about Foye being a renegade and acting by his own set of rules carried a stronger ring of truth than his trial testimony, particularly when viewed in the context of Davis' fear of Foye. His trial testimony demonstrated that fear clearly during an emotional response to a question posed by Lassiter's attorney as follow:

Q: Foye forced you to do that?

A: Yes. Because looking at like –all right, this man right here, this is his best friend. He been knowing this man since he was 11 years old. Ain't no way -- I just met him about a month ago. Ain't no way this little red piece of cloth is keeping him from killing me. He killed him, supposedly in relation to some murders that they did together. Here it is now I know about a murder that you done did, I didn't want to know about it, you just called me up and I just popped up on it. Here it is, all right, now I got to keep him trusting me in order for him not to do anything to me. Then on top of it, he also knows where my girlfriend stay at with her two children. They were her two children. He don't care nothing about that at all. And they looking at it like, you know, this is, Vaughn's friend right here, this

4

is Vaughn's friend, so if he come knock on the door they not going to think twice about it, they going to open the door, and the whole time he can come in and do whatever he gonna do to 'em because he think that I'm going to tell on him.  So of course I got to do what I got to do to keep him to trust me.

Q: So –

A:  My life is on the line too, to be honest with you.

(J.A. Vol. X, 4296-4297.)

The government's gang expert, Detective Parker, testified about the common practices, trends and vocabulary of the NTG. For example, he identified "dub," as a versatile word in NTG slang, being both a noun and a verb.  He testified "dubbed" means to be kicked out or assaulted. (J.A. Vol. VI, 1762.)  Theodore Vann, a gang member called to explain gang culture and terms, defined being "dubbed" as having rank stripped.  He also said it could mean being beaten, killed or violated.  (J.A. Vol. VI, 1725, 1644.)

The investigation of these crimes was prompted by the apprehension of Nathaniel Mitchell, known as "Savage", and Foye for the robbery of a Shell gas station on December 27, 2015. Soon after the robbery, the police quickly located and apprehended the two men.  In the car, the police found a .38 caliber gun underneath the passenger seat and a .380 caliber bullet on the front passenger floorboard of the car.  Police seized a .40 caliber gun near the area in which Foye was apprehended and two .380 bullets from Foye's front pocket. (J.A. Vol. IV, 1493, 1501, 1509.)

Foye and Mitchell both pled guilty to the robbery of the store in a separate proceeding in 2016.

Foye's .40 caliber firearm matched the ballistics from other crime scenes in the case. The .380 caliber firearm was never located although the government introduced evidence that certain .380 caliber casings found at crime scenes matched casings found at the other crime scenes. (J.A. Vol. XIII, 6069-6070.)

**December 10, 2015 - Al-Tariq Tynes**

Foye and Tynes grew up together and were best friends until shortly before Foye murdered Tynes on December 10, 2015. In fall of 2015, Tynes was incarcerated for a child support matter for approximately 3 weeks. During this time Foye started hanging out with Alvaughn Davis. Davis was from an NTG line that originated in Lynchburg, Virginia and Greensboro, North Carolina. When released from prison in 2015, Davis moved to the Portsmouth area. Davis testified that he reported to a North Carolina leader named "Teflon Red" and not to Simmons, but they were both under Dido. (J.A. Vol. IX, 4024-4025.) Davis met Nathaniel Mitchell, who was under a different leader that also reported to Dido. Mitchell later switched lines so that he was underneath Davis. (J.A. Vol. IX, 4037.) Davis testified that he promoted Mitchell, giving him rank in the NTG. In August of 2015, Davis started hanging out with both Mitchell and Foye, but Mitchell and Davis were still in Teflon Red's line up. (J.A. Vol. IX, 4039.)

6

Foye spoke with Tynes frequently while he was in jail for child support and became suspicious that Tynes would cooperate with police and tell them about murders Foye and Tynes had committed together. Foye obsessed over this idea. He repeatedly raised his concern to Davis, telling Davis that he intended to kill Tynes. (J.A. Vol. IX, 4074-4076.) Foye also disclosed to Davis that Tynes had recently obtained a school grant and used the funds to buy a firearm and four ounces of marijuana which he intended to sell for a profit. (J.A. Vol. VI, 4074.) On November 28, 2015, Foye toyed with the idea of robbing Tynes. He contacted Davis and told Davis he was in a hotel room with Tynes who was asleep. Foye and Davis planned to rob Tynes, but they aborted the plan when Tynes woke up. (J.A. Vol. VI, 4078-4080.) Davis testified at length, but did not testify that the Foye's concerns about Tynes' cooperating or his plan to kill or rob Tynes was conveyed to Simmons.

The government brief accurately states the sequence of events and many of the circumstances surrounding the murder and the disposal of evidence and Tynes' body. *See generally* Government's Brief pp. 12-14. But the Government overstates Simmons' role in these events and takes liberty with the record. For example, the government argues Foye decided to rob Tynes on December 10, 2015 "in consultation with Simmons," and supports that contention with citations to J.A. Vol. V, 2438-2439, and Vol. VIII, 5956-5957, which refers to a single text message from Foye to Simmons "im with the meal so its guarenteed." The message never

7

mentioned Tynes or any specific plan for a robbery or murder. The government argues that in context "meal" meant "to kill." But "meal" in NTG slang had many different meanings. The government's lexicon defined "meal" as target, and Vann testified the phrase meant I'm with the target of a robbery, assault or murder. (J.A. Vol. X, 5829, Vol. IV, 1734.) Another gang member, Donte Brehon known as "Dog Nuts," said being a meal on a plate, means harm will be done. (J.A. Vol. VII, 2968.) Parker defined "meal" simply as "food" and indicated the phrase would mean taking some type of action. (J.A. Vol. IV, 1890.)

The government's CSLI summary charts indicate that when that text message was sent Foye's phone was in close proximity to Tynes' phone. (J.A. Vol. XIII, 6043.) However, at approximately 9:30 p.m., Foye sent Tynes text messages indicating that Foye did not know where Tynes was located and complaining that Tynes was ignoring his calls. (J.A. Vol. XIII, 5957.) The government elected to omit these text messages as well as other relevant CSLI data between 8:58 p.m. and 10:36 p.m. from their CSLI summary chart, although Foye's phone records indicate that his phone was in use during that period.   (J.A. Vol. XIII. 5957, 6043.) While Foye sent Korey a text message and photo at 10:54 p.m. "I just bought a car," he did not contact Simmons for assistance or update Simmons on the successful killing of Tynes.  (J.A. Vol. XIII, 5956-57.)

The government argues that Simmons' conduct after the fact should serve as a basis for imputing knowledge. Of course, Simmons wanted Foye to get rid of Tynes' car. Simmons was angry that Foye had killed Tynes and even angrier that Foye was driving Tynes' car. Davis heard Simmons yell at Foye about it, but he refused to help Foye dispose of the car. (J.A. Vol. IX, 4113.) The government also argues that Foye killed Tynes to obtain money for the NTG but does not point to any evidence that Tynes gave Simmons anything from the robbery. Rather, the government's witness Davis helped to plan the crime and provided Foye with assistance afterward. Davis testified that Foye gave Mitchell, not Simmons, the .380 caliber firearm stolen from Tynes. (J.A. Vol. IX, 4108.)

**December 15, 2015 - Vandalet Mercer and R.F.**

On December 14, 2015, Simmons met with Foye, Mitchell and LB. The four devised a plan to rob a gambling house. All four men rode to the proposed site in the Huntersville area of Norfolk. They waited there for almost an hour during which time Foye became increasingly agitated. He urged Simmons to go forward with the robbery, but Simmons refused. (J.A. Vol. X, 4448-4450.) The men went their separate ways and but met again later to try again. The robbery was again scratched. By this time Foye was extremely worked up and so in order to give Foye an opportunity to let off steam, Davis took Foye to the residence of a man who had snitched on Davis. Foye shot his house up. (J.A. Vol. X, 4451- 4456, 4469.)

As they were returning home to Portsmouth, Foye directed Davis to stop the car. Foye tapped Mitchell's shoulder, alerting him to get out of the car. Mitchell and Foye got out and started shooting. Davis said that he heard six shots from two different caliber guns but never saw the targets of the shooting. When the two men got back in, Foye said to Mitchell, "Man, bro, you shot that b___h.," Mitchell did not respond. (J.A. Vol. IX, 4122, 4454-56.) The victim R.F. testified that only one person got out of the car from the front passenger seat. While R.F. thought it may be a robbery no one said anything to him or demanded money. (J.A. Vol. VI, 2644-45, 2653-56.)

R.F. was shot in the hand and Vandalet Mercer was killed. Cell tower records and text messages were used to corroborate Davis's testimony. (J.A. Vol. XIII, 6049-51.) The casings at the scene matched the .380 caliber casings from other scenes and the .40 caliber weapon that was seized at Foye's arrest. (J.A. Vol. II, 646-647.)

**December 20, 2015 - Linda Lassiter and Wayne Davis**

In its brief the government accurately describes the events preceding the deaths of Linda Lassiter and Wayne Davis, as well as the ballistic evidence found at the scene. *See generally*, Government's Brief, pp. 16-17. However, in its rendition of those facts the government ascribes the motive as retaliation. But Foye has given up his rank in NTG and is acting on personal motives unrelated to the NTG. (J.A.

10

Vol. X, 4377.) There was no evidence that Foye's longstanding beef with Lassiter's son had anything to do with NTG business.

**December 27, 2015 - Lanez, Nino, S.M. and Reid Street**

There was a great deal of evidence at trial regarding a conflict between Simmons and Timothy Williams, known as "Skino." Skino had a dispute with "Shottaz" and kicked him out of his line, eventually putting a "hit" out on him. Hassell, who was best friends with Shottaz, prevented Skino from having Shottaz killed. (J.A. Vol. VII, 3595, 3597-3598.) Simmons felt that NTG rules prohibited violence on other NTG members and took Shottaz "under his wing." (J.A. Vol. VII, 3018.) Skino then exacerbated the conflict by publishing details of Simmons' debt to Dido and the fact that Simmons was on "freeze" on Facebook. (J.A. Vol. IX, 4053-4055.) On December 23, 2015, the conflict increased as Skino's call to Nino was overheard by Mitchell. (J.A. Vol. XIV, 6220-31.)

On December 27, 2015, Mitchell and Davis picked up Foye at his home in Portsmouth. Malek Lassiter followed Foye to the car, and Davis was surprised to see Lassiter wore red. When the men arrived at Simmons home in Norfolk, Simmons asked about Lassiter and Foye explained Lassiter was coming home to the gang that night. (J.A. Vol. IX, 4150.) Brehon was present that evening but did not recall seeing Malek Lassiter or anyone matching his description at the meeting. (J.A. Vol. VII, 3020.) Contrary to the government's assertion that Simmons gave the order to "mash

11

the gas on Skino's line," Davis testified that if Skino's scraps weren't going to flip lines, they were supposed to "mash the gas" on Skino's scraps. (J.A. Vol. IX, 4153.)

The group traveled to the areas where they thought Nino and Lanez each lived. At approximately 9:00 p.m. the men arrived at the home of Blacko's girlfriend, S.M. As Foye, Mitchell and Lassiter approached the house, Davis testified that he moved the car further down the street. Davis heard several gunshots, pulled the car up and the men ran down Reid Street towards him while shooting. Once in the car Foye excitedly stated that he thought he had shot the woman in the heart. (J.A. Vol. IX, 4165-4168.) S.M. answered the door believing the man at her door had the wrong residence. When they knocked again, she opened the door and was shot. S.M. testified that saw another man just behind the man at the door and a third man, further away. (J.A. Vol. VII, 3268-3271.) Only .40 caliber casings were found at the scene. Although she identified Mitchell as the man who shot her, Davis testified that when the group left Simmons' house Foye was carrying his .40 caliber firearm and Mitchell "didn't have any bullets." (J.A. Vol. IX, 4151-52.).

When Simmons found out what they had done, Davis testified that Simmons called him "just screaming at the top of his lungs, talking bout yo, I heard you, Bull and Savage went and shot, shot that girl. He done pulled the gun out on a girl, this, that and the third." (J.A. Vol. IX, 4171.)

12

## SUMMARY OF THE OPENING ARGUMENTS

1.    The district court constructively amended Appellant's VICAR assault counts at trial and erred by rejecting Appellants' post-trial motion to challenge the offenses. The counts should be reversed because brandishing a firearm in violation of Virginia law is a misdemeanor offense which is not a proper state law predicate crime under 18 U.S.C. § 1959(a)(3).

2.    There was insufficient evidence to sustain Appellants' convictions in several regards; but most importantly, the evidence as to Appellants' VICAR attempted murder convictions in Counts Twenty-Two and Twenty-Four was insufficient as a matter of law because there was a lack of both specific intent and an overt act as required under Virginia law. With respect to Simmons, who was not present at any of the VICAR crimes and did not commit an overt act as required under Virginia law, there was insufficient evidence to sustain his substantive VICAR convictions on Counts Three, Five, Seven, Eight, Twenty-Six and Twenty-Seven. There was insufficient evidence that Appellant Lassiter was a member of the RICO conspiracy charged in Count One because he did not commit a racketeering act and did not agree that two acts would be committed by fellow members of the conspiracy. Certain of the Section 924(c) offenses must be reversed for lack of sufficient evidence because there was insufficient evidence to support the underlying state law crimes charged as VICAR offenses which serve as the predicate for the

13

Section 924(c) offenses. There was insufficient evidence to sustain Appellant Simmons' two separate Section 924(c) offenses in Counts Thirty-Four and Thirty-Six which were allegedly in relation to drug trafficking.

3.     The government cherry-picked evidence from voluminous records to compile pedagogical summary charts which interwove data from cell site location information, telephone records from seized phones and historical records, evidence of 911 calls, ballistics reports, license plate readers and Facebook records. These summary charts were not admissible under Rule 1006 but were improperly admitted into evidence and given the same weight as other substantive evidence in the case.

4.     In analyzing substantive VICAR crimes this Court uses Virginia statutes and legal principles. The government's reliance on a *Pinkerton* theory of liability was misplaced as *Pinkerton* liability is a federal principle that has not been adopted by Virginia. Appellants were substantially prejudiced when the jury was instructed to find them guilty based on vicarious liability for the acts of co-conspirators.

5.     The district court improperly admitted statements which were not in furtherance of the charged RICO conspiracy but rather set off a war between rival NTG lines. The district court then compounded the error by refusing to instruct the jury on single versus multiple conspiracies where the evidence strongly supported the instruction.

14

## SUMMARY OF THE ARGUMENT IN RESPONSE

6.      In the wake of *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018) the district court properly considered and granted Appellants' motion for judgment of acquittal on the Section 924(c) offense charged in Count Thirty because the predicate offense of brandishing a firearm under VA. CODE ANN. § 18.2-282 is not categorically a crime of violence. The government's argument here that the Notice of Special Sentencing Factors which follows Count One should be substituted for the missing element of force as to the RICO conspiracy charged in Count One is without merit. This is a plainly veiled attempt at an end-run around the categorical approach and the government's appeal should be rejected.

## OPENING ARGUMENTS

I. **THE DISTRICT COURT ERRED BY FIRST, CONSTRUCTIVELY AMENDING COUNTS EIGHT, FIFTEEN, EIGHTEEN, TWENTY-SEVEN, AND TWENTY-NINE AND, SECOND, REFUSING TO VACATE APPELLANTS' CONVICTIONS ON THOSE COUNTS FOR FAILURE TO STATE OFFENSES.**

### <u>Introduction</u>

In Counts Eight, Fifteen, Eighteen, Twenty-Seven, and Twenty-Nine of the Second Superseding Indictment the grand jury charged Appellants under 18 U.S.C. § 1959, which proscribes violent acts in aid of racketeering and is commonly known as the federal VICAR statue.   Specifically, each of these five counts (collectively, the "VICAR Assault Counts") charged that all or some combination of Appellants

15

committed assaults with a dangerous weapon under 18 U.S.C. § 1959(a)(3), which

is quoted below in relevant part:

> Whoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, . . . assaults with a dangerous weapon, . . . in violation of the laws of any State or the United States, or attempts or conspires to do so, shall be punished –
>
> . . . (3) for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years or a fine under this title, or both; . . .

While Section 1959(a)(3) was the federal basis for the VICAR Assault

Counts, these counts were expressly predicated upon violations of two state statutes:

VA. CODE ANN. § 18.2-53.1 (use of a firearm in the commission of specified

violent felonies) and VA. CODE ANN. § 18.2-282 (brandishing a firearm).   The

trial court, however, urged by the government, instructed jurors on the elements of

only one of these two state predicates, Virginia brandishing under VA. CODE ANN.

§ 18.2-282. Instead of delivering instructions on the other predicate offense cited in

the Second Superseding Indictment, VA. CODE ANN. § 18.2-53.1, the court

inexplicably instructed on the broader elements of a different Virginia criminal

statute, VA. CODE ANN. § 18.2-53 (shooting, cutting, stabbing, or wounding in the

commission of a felony).

The jury returned verdicts of guilty on all charges, including the VICAR

Assault Counts. The Special Verdict Form did not ask jurors to specify whether one

or both of the two state predicates served as the basis for the findings of guilt on the VICAR Assault Counts. (J.A. Vol XIV, 6313-35.)

Following trial, Appellants attacked the facial validity of two groups of charges in the Second Superseding Indictment. In one of these groups were the VICAR Assault Counts. The other group of challenged charges consisted of counts in which Appellants were indicted for using firearms in furtherance of crimes of violence in violation of 18 U.S.C. § 924(c) (collectively, "the Section 924(c) Counts").

In a Memorandum Opinion dated November 16, 2018, the district court addressed Appellants' post-trial challenges to both the Section 924(c) Counts and VICAR Assault Counts.  The court dismissed one of the Section 924(c) Counts (Count 30) for failure to state an offense. The court upheld the remainder of convictions on the Section 924(c) Counts. *United States v. Simmons*, 2018 U.S. Dist. LEXIS 196181, at *27-*28 (Nov. 16, 2018, E.D. Va.).

The district court declined to consider the merits of Appellants' motions for dismissal of any of the VICAR Assault Counts. The court found those challenges to the legal sufficiency of the VICAR Assault Counts should have been raised prior to trial in the form of motions to dismiss under Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure. Appellants' post-trial challenges were "untimely" and

unsupported by "good cause" to excuse that default under Rule 12(c)(3), the court declared. *Simmons*, 2018 U.S. Dist. LEXIS 196181 at *8-*9.

Appellants' convictions on the five VICAR Assault Counts should be reversed on two independent, alternative grounds. First, all five VICAR Assault Count convictions are unconstitutional under the Fifth Amendment Grand Jury Clause. Through its jury instructions, the court constructively amended the VICAR Assault Counts in galloping disregard for the Fifth Amendment. This *per se*, structural error during trial voids the five VICAR Assault Count convictions.

Second, in addition to constructively amending the Second Superseding Indictment at the close of the evidence, the district court erred post-trial by refusing to consider and grant Appellants' motions to dismiss the VICAR Assault Counts for failure to state cognizable offenses. In concluding those post-trial challenges to the legal sufficiency of the VICAR Assault Counts were untimely, the court misapplied Rule 12(b)(3) and (c)(3) of the Federal Rules of Criminal Procedure.

**Standard of Review**

A.    **Constructive Amendment**.

Whether Appellants' convictions on Counts Eight, Fifteen, Eighteen, Twenty-Seven, and Twenty-Nine must be vacated because the district court through jury instructions constructively amended those VICAR Assault Counts in violation of the Fifth Amendment is reviewed *de novo*.   *United States v. Miltier*, 882 F.3d 81, 92

18

(4th Cir. 2018). Appellants' failure below to object to the amendment of the Second Superseding Indictment does not trigger the plain error standard applicable to unpreserved, nonstructural errors.

> An appellate contention that was not preserved in the trial court is reviewed for plain error only. The constructive amendment of an indictment, however – as opposed to a variance between the allegations of the charge and the proof at trial – constitutes error per se and must be corrected on appeal, regardless of whether the issue is preserved.

*United States v. Rendelman*, 641 F.3d 36, 42 (4th Cir. 2011).

Prejudice is conclusively presumed to result from constructive amendments. The harmless error doctrine does not apply. *United States v. Whitfield*, 695 F.3d 288, 309 (4th Cir. 2012).

*Accord, United States v. Floresca*, 38 F.3d 706, 712-14 (4th Cir. 1994) (*en banc*); *United States v. Robinson*, 627 F.3d 941, 958 (4th Cir. 2010).

## B.    <u>Failure to State An Offense</u>.

Whether the VICAR Assault Counts state cognizable offenses under a categorical approach to 18 U.S.C. § 1959(a)(3) is purely a question of statutory interpretation, *United States v. Davis,* 139 S. Ct. 2319, 2327 (2019), which is reviewed *de novo* on appeal. *See United States v. Allred,* 942 F.3d 641, 647 (4th Cir. 2019); *United States v. Rendelman*, 641 F.3d 36, 42 (4th Cir. 2011).

Alternatively, if the Court were to reject Appellants' position that their post-trial categorical challenges were timely under Rule 12(b)(3)-(c)(3), the merits of

those dismissal motions would be reviewable nonetheless for plain error. A defendant's neglect to raise a timely objection to the legal sufficiency of an indictment does not waive his right to have the merits of that objection reviewed on appeal for plain error. *United States v. Vasquez*, 899 F.3d 363, 372-73 (5th Cir. 2018).

## ARGUMENT

### A.    The District Court Constructively Amended The VICAR Assault Counts.

To establish a VICAR violation, the government must prove five elements beyond a reasonable doubt.

> . . . To establish a § 1959 claim, the government must prove beyond a reasonable doubt,
>
>> (1)    that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise.

*United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994).

In its Instruction 80, delivered at the request of the prosecution, the trial court defined for jurors the fourth element of these VICAR Assault Counts, i.e., "the alleged crime of violence." *Fiel*, 35 F.3d at 1003. Each of the VICAR Assault Counts, the trial judge instructed,

20

> . . . charge defendant with assault with a dangerous weapon, in violation of Virginia Code Sections 18.2-53 and 18.2-282.
>
> Section 18.2-53 provides that this is a felony if any person, in the commission of or attempt to commit a felony, unlawfully shoots, stabs, cuts or wounds another person.

(J.A. Vol. XII, 5298.)[1]

Instruction 80 was a constructive amendment of the Second Superseding Indictment. None of the VICAR Assault Counts was predicated on VA. CODE ANN. § 18.2-53. The VICAR Assault Counts were predicated instead on VA. CODE ANN. § 18.2-53.1, as well as VA. CODE ANN. § 18.2-282.

The Grand Jury Clause of the Fifth Amendment prohibits a trial court from altering any elements of the offenses charged in the indictment. The grand jury retains exclusive authority to alter or broaden charges in an indictment. "The Fifth Amendment . . . guarantees that a criminal defendant will be tried only on charges in a grand jury indictment. Therefore, only the grand jury may broaden or alter the charges in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir.

---

[1] Instruction 80 must be read together with Instruction 42, which allowed jurors to read "and" in the disjunctive. (J.A. Vol. XII, 5244-45.) Thus some or all jurors may have found the elements of Section 18.2-53 proven beyond a reasonable doubt but not those of Section 18.2-282. *See Simmons*, 2018 U.S. Dist. LEXIS 196181, at *21 and note 10 (discussing effect of Instruction 42 upon Instruction 80). The Special Verdict Form does not disclose whether the jury found Appellants guilty of both state law predicates. (J.A. Vol. XIV, 6313-35.)

1999) [internal quotations omitted]; *United States v. Floresca*, 38 F.3d 706, 710 (4th Cir. 1994) (*en banc*).

Instruction 80 altered the VICAR Assault Counts by allowing Appellants to be convicted on the basis of a state predicate for which they were never indicted. The trial court instructed jurors to find Appellants guilty on the VICAR Assault Counts if the government proved the elements of Section 18.2-53 beyond a reasonable doubt. The instruction was a structural error. The grand jury did not charge Appellants with violating those predicate elements.

Instruction 80 also broadened the VICAR Assault Counts. In multiple respects Section 18.2-53 is broader than the statutory offense charged by the grand jury, Section 18.2-53.1. For instance, the scope of Section 18.2-53.1 is limited to use or display of a firearm in the commission of only the felonies listed in that statute. Section 18.2-53, as the district court explained in Instruction 80, criminalizes shooting or wounding in the commission of *any* felony. Unlike Section 18.2-53.1, Section 18.2-53 is not confined to only certain felonies. For instance, a defendant who shoots and unlawfully wounds his victim in violation of VA. CODE ANN. § 18.2-51, could be charged and convicted under Section 18.2-53 but not under Section 18.2-53.1 because unlawful wounding (a Class 6 felony) is not listed in Section 18.2-53.1. *See Johnson v. Commonwealth*, 458 S.E.2d 599, 602, 20 Va. App. 547, 553-54 (1995).

Jury instructions, such as Instruction 80, which alter a statutory predicate or

other essential element of the offense charged in the indictment, necessarily result

in a quintessential constructive amendment.

> A constructive amendment is a fatal variance because the indictment is
> altered to change the elements of the offense charged, such that the
> defendant is actually convicted of a crime other than that charged in the
> indictment.

*United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) [internal quotations

omitted]. *See United States v. Whitfield*, 695 F.3d, 288, 308-09 (4th Cir. 2012) (when

district court instructed on an element of an uncharged offense, "[T]he result was an

archetypal constructive amendment.").

Dispositive of the instant appeal is the United States Court of Appeals for the

Fourth Circuit's constructive amendment analysis in *Randall*, 171 F.3d at 195.  The

defendants there were charged in Count Six under 18 U.S.C. § 924(c) with using a

firearm during and in relation to a drug trafficking crime, ". . . specifically,

distribution of a narcotic controlled substance." *Randall*, 171 F.3d at 203. Upon the

government's request, however, the trial court instructed jurors that the defendants

could be found guilty on that Section 924(c) count based on a very similar but

distinct predicate offense: possession with intent to distribute a narcotic controlled

substance. *Randall*, 171 F.3d at 204. The defendants failed to object that the

predicate specified in the instruction (possession with intent to distribute) differed

from the predicate specified in Count Six (distribution).  The jury found them guilty

23

on the Section 924(c) charge in Count Six. The defendants then appealed, arguing for the first time that the trial court's instruction, coupled with the government's closing argument, constituted a constructive amendment such that their convictions on Count Six must be reversed.

The Fourth Circuit began its analysis of the Defendants' unpreserved constructive amendment claim by making quick work of the government's threshold response that this Fifth Amendment issue should be reviewed on appeal for plain error rather than *de novo*. *Id.* at 19 (*citing United States v. Floresca*, 38 F.3d 706, 712-13 (4th Cir. 1994) (*en banc*)).    Turning to the merits of the Defendants' constructive amendment claim, the Court emphasized that a predicate offense specified by the grand jury is an essential element of a Section 924(c) count. *Randall*, 171 F.3d at 24 (observing that "proof of a predicate offense is an essential element of a § 924(c) violation."). Pointing to Fifth and Seventh Circuit precedent applying the Supreme Court's constructive amendment jurisprudence, the *Randall* Court held that a conviction which, as a result of erroneous jury instructions, rests on a predicate offense other than the predicate specified in the indictment must be reversed. *Randall*, 171 F.3d at 205 (joining Fifth and Seventh Circuits in concluding "that if the government specifies in the indictment the § 924(c) predicate offense on which it is relying, '[a] conviction that rests, no matter how comfortably, on proof of another [predicate] offense cannot stand.") (*quoting United States v. Willoughby*, 27

24

F.3d 263, 266 (7th Cir. 1994)); *see United States v. Reyes*, 102 F.3d 1361, 1365 (5th Cir. 1996) ("Proof of the defendant's guilt of a predicate offense is an essential element of a conviction under § 924(c)(1)"); *see also Stirone v. United States*, 361 U.S. 212, 217 (1960).

The *Randall* Court held that through instructions the trial court had unconstitutionally altered the predicate offense upon which the Section 924(c) count rested. Distribution of controlled substances and possession with intent to distribute those substances are criminalized in two, closely related clauses of the same statute, 21 U.S.C. § 841(a), the Court acknowledged. *Randall*, 171 F.3d at 209. But the two clauses of this statute create two distinct offenses. Reversing the Defendants' convictions on Count Six, the Court held that the trial judge's instruction on a different predicate than the predicate offense specified by the grand jury violated the Fifth Amendment. Because the grand jury

> . . . did indeed specify in the indictment that it was relying on the predicate offense of distribution, it was not allowed through the presentation of its evidence and its argument, and the district court was not allowed through its jury instructions, to broaden the bases of conviction to include the different § 924(c) predicate offense of possession with intent to distribute. Such a constructive amendment must be corrected on appeal, even though [defendants] failed to preserve the issue by objection.

*Randall*, 171 F.3d at 210 [internal citation omitted].

These constitutional principles make clear that the five VICAR Assault Count convictions must be reversed. The structure of the federal VICAR statute is similar

to that of Section 924(c). Offenses arising under both statutes must be predicated on underlying crimes. The predicate offenses alleged by the grand jury are essential elements of VICAR charges under Section 1959(a), just as predicate offenses are essential elements under Section 924(c). The government must prove all the elements of the charged state law predicates under Section 1959(a). *See United States v. Mathis*, 932 F.3d 242, 264 (4th Cir. 2019) (examining elements of state law predicate offenses underlying Section 1959(a) charges). Moreover, as discussed *supra*, here the trial court's instructions permitted jurors to return guilty verdicts if they found the government had proven beyond a reasonable doubt all the elements of either (or both) the two state law predicates underlying the VICAR Assault Counts. (J.A. Vol. XII, 5244-45.)

In *Randall*, the Fourth Circuit found a constructive amendment because the district court erroneously instructed jurors that the predicate offense in issue was possession with intent to distribute under one clause of 21 U.S.C. § 841(a) rather than outright distribution under another clause of 21 U.S.C. § 841(a). The constructive amendment in the case at bar was at least as pronounced. Instruction 80 substituted an entire statute (VA. CODE ANN. § 18.2-53) for the statute charged in the VICAR Assault Counts. (VA. CODE ANN. § 18.2-53.1).

Finally, Fourth Circuit precedent forecloses any effort by the government to invoke the harmless error doctrine to excuse this structural error. *United States v. Whitfield*, 695 F.3d 288, 309 (4th Cir. 2012).

In sum, Appellants' convictions on the VICAR Assault Counts must be reversed for structural error under the Grand Jury Clause of the Fifth Amendment.

**B.     The District Court Erred By Rejecting Appellants' Post-Trial, Categorical Challenges To The VICAR Assault Counts For Failure To State Offenses.**

In addition to undergoing constructive amendment at the end of trial, the VICAR Assault Counts failed to state cognizable offenses.

Following trial, Appellants moved to set aside their convictions on both the Section 924(c) Counts and the VICAR Assault Counts. Citing *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) and other recent Supreme Court precedent applying the "categorical approach" to statutory interpretation, Appellants argued that none of the Section 924(c) Counts or the VICAR Assault Counts stated cognizable offenses.

The district court disposed of these post-trial, categorical challenges to the Section 924(c) and VICAR Assault Counts in a Memorandum Opinion on November 16, 2018. The court began by acknowledging that its Instruction 80 had defined for jurors the elements of VA. CODE ANN. § 18.2-53, rather than the state predicate specified in the VICAR Assault Counts, VA. CODE ANN. § 18.2-53.1. As a consequence, with the government's acquiescence (or implicit endorsement),

27

the district court framed the question presented by Appellants' post-trial challenges to be whether the other state statutory offense specified by the grand jury, VA. CODE ANN. § 18.2-282, was a proper predicate for the Section 924(c) Counts and VICAR Assault Counts. *United States v. Simmons*, 2018 U.S. Dist. LEXIS 196181 at *21 (Nov. 16, 2018, E.D. Va.) ("The Government contests Defendants' characterization of the elements of Code § 18.2-282, but it fails to alternatively argue/demonstrate that § 18.2-53 is both applicable and sufficient . . . . Accordingly, the Court limits its analysis to the § 18.2-282 issue briefed by the parties.").

The district court correctly recognized that Appellants' motions for acquittal on their VICAR Assault Count convictions were governed by the modified categorical approach enunciated in *Taylor v. United States*, 495 U.S. 575, 602 (1990) and refined more recently in decisions such as *Descamps v. United States*, 570 U.S. 254, 257 (2013). *Simmons*, 2018 U.S. Dist. LEXIS 196181 at *7-*8.

Undertaking this categorical inquiry with respect to the Section 924(c) Counts, the court dismissed Count 30, which, like the VICAR Assault Counts, was ultimately predicated upon misdemeanor brandishing as criminalized in VA. CODE ANN. § 18.2-282. The district court soundly reasoned that Section 18.2-282 is not a proper predicate for VICAR assault with a dangerous weapon under 18 U.S.C. § 1959(a)(3), at least in Section 924(c) context. The court categorically compared the elements of generic assault with a dangerous weapon listed in 18 U.S.C. § 1959(a)(3)

28

to Virginia brandishing, which the grand jury charged as a Section 924(c) predicate (through Section 1959(a)(3)) in Count 30, and found no categorical match. *Simmons*, 2018 U.S. Dist. LEXIS 196181 at *5.

In dismissing Count 30, the court excused Defendants' failure to challenge the Section 924(c) Counts prior to trial by way of a motion to dismiss pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure.  Rule 12(b)(3) requires that facial challenges to an indictment be raised pre-trial, the court observed.  But prior to trial, the court aptly noted, the defendants did not have the benefit of intervening precedent such as *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) (applying categorical approach and holding residual clause of 18 U.S.C. § 16(b) unconstitutionally vague).

In contrast to its analysis of Count 30 and the other Section 924(c) Counts, the court concluded that Rule 12(b)(3) foreclosed Defendants' post-trial motions for dismissal of the VICAR Assault Counts. *Dimaya* and other intervening case law was not controlling with respect to the VICAR Assault Counts, the court wrote. Therefore, it declined to consider Appellants' categorical challenges to the VICAR Assault Counts. *Simmons*, 2018 U.S. Dist. LEXIS 196181 at *8-*9.

The court abused its discretion in rejecting Appellants' post-trial, categorical challenges to the VICAR Assault Counts. Those post-trial motions to dismiss were

29

both timely and meritorious under Rule 12 of the Federal Rules of Criminal Procedure.

### 1. The district court misapplied Rule 12(c)(3) when it rejected Appellants' post-trial motions to dismiss as untimely.

In deeming untimely Appellants' post-trial motions to dismiss the VICAR Assault Counts for failure to state offenses, the district court reasoned that those motions turned entirely upon questions of statutory interpretation that could have been resolved without trial on the merits. Rule 12(b)(3) requires defendants to file facial challenges to an indictment prior to trial, the court observed as it refused to consider Appellants' motions. *Simmons*, 2018 U.S. Dist. LEXIS 196181 at *7.

The district court's refusal to consider Appellants' post-trial, categorical challenges to the VICAR Assault Counts was a misapplication of Rule 12 of the Federal Rules of Criminal Procedure and therefore a plain abuse of discretion. In the wake of the district court's constructive amendment of the VICAR Assault Counts, Appellants should have been afforded a fresh opportunity to challenge the legal sufficiency of those charges.

The VICAR Assault Counts as returned by the grand jury were predicated on two Virginia criminal statutes. One of these, VA. CODE ANN. § 18.2-53.1, was a valid VICAR predicate under 18 U.S.C. § 1959(a)(3). The other, VA. CODE ANN. § 18.2-282, was an invalid VICAR predicate. At trial, however, the government succeeded in having the district court dispense with Section 18.2-53.1 and charge

30

jurors on the elements of Section 18.2-53 instead, as discussed *supra*. Both the government and the district court during post-trial motions recognized that as a result of this instructional error neither Section 18.2-53.1 (the charged predicate) nor Section 18.2-53 (the amended predicate) could lawfully co-anchor the VICAR Assault Counts with Section 18.2-282. "Accordingly," the district court wrote in its Memorandum Opinion, "the Court limits its analysis to the § 18.2-282 issue briefed by the parties." *Simmons*, 2018 U.S. Dist. LEXIS 196181 at *21; *see also id.* at note 10. Because the district court post-trial unconstitutionally excised Section 18.2-53.1 (and Section 18.2-53) from the VICAR Assault Counts, these counts for *the first time* rested exclusively upon VA. CODE ANN. § 18.2-282.

In the wake of the district court's constructive amendment of the VICAR Assault Counts, followed by its post-trial excision of 18.2-53 as a predicate, Rule 12(b)(3) did not pose a procedural bar to Appellants' challenges. Those counts now rested on a single invalid predicate, VA. CODE ANN. § 18.2-282. The district court misapplied Rule 12(b)(3) by refusing to afford Appellants an opportunity to assail the materially altered VICAR Assault Counts. Alternatively, the court abused its discretion by finding Appellants lacked "good cause" within the meaning of Rule 12(c)(3) to challenge the revised VICAR Assault Counts following trial.

> **2.    Appellants' VICAR Assault Count convictions should be reversed because brandishing a firearm in violation of VA. CODE ANN. § 18.2-282 is not a proper predicate for VICAR**

31

**Assault with a dangerous weapon under 18 U.S.C. § 1959(a)(3).**

The district court was correct that were it to consider the merits of Appellants' objections to the VICAR Assault Counts it would be required to apply the modified categorical approach.

> Here, the legal test governing a legal challenge to the § 1959(a) charges would require the Court to consider the scope/elements of the "generic" definition of the charged violent crime (here "assault with a dangerous weapon") and determine whether the cross-referenced Virginia state-law crime falls within such generic definition, and it therefore does not turn on the litigated facts of the case.

*Simmons*, 2018 U.S. Dist. LEXIS 196181 at *7-*8. *Accord, United States v. Anthony*, 2019 U.S. Dist. LEXIS 122476, at *21 (W.D. Va. July 23, 2019) (comparing elements of generic assault with dangerous weapon listed in Section 1959(a)(3) to Virginia brandishing under modified categorical approach and finding no categorical match) (*appeal pending*, 4th Cir. Rec. No. 19-4609(L)); *see United States v. McCollum*, 885 F.3d 300, 304 (4th Cir. 2018) (holding that categorical approach applies to VICAR conspiracy charges under Section 1959(a)(5*)); see also United States v. Mathis*, 932 F.3d 242, 264-67 (4th Cir. 2019) (analyzing Section 924(c) convictions based on VICAR crimes of violence by comparing categorically elements of enumerated VICAR offenses of first-degree murder and kidnapping as generically listed in Section 1959(a)(1) to elements of Virginia statutes specified as VICAR predicates in indictment); *United States v. Simmons*, 917 F.3d 312, 318 (4th

Cir. 2019) (applying categorical approach to determine if state assault with deadly weapon on a government official categorically matches generic enumerated offense of "aggravated assault" under U.S.S.G. § 4B1.2(a)(2)).

While it erroneously refused to rule upon Appellants' motions to dismiss the VICAR Assault Counts, the district court applied the modified categorical approach to the Section 924(c) Counts. The most relevant of the Section 924(c) Counts for the issue presented here is Count 30.

In Count 30, Appellants were charged with using a firearm in furtherance of two "crimes of violence," specifically VICAR assault with a dangerous weapon as criminalized in Section 1959(a)(3) and charged in Count 29 and RICO conspiracy under 18 U.S.C. § 1962(d) as charged in Count 1. Conducting an element-by-element comparison, the district court correctly held that Virginia brandishing under Section 18.2-282 could not serve as a predicate for generic assault with a dangerous weapon under Section 1959(a)(3). Count 29 was not a proper predicate for Count 30, the court ruled, because Virginia brandishing is not a proper predicate for VICAR assault with a dangerous weapon. (Count 1 also could not serve as a predicate for the Section 924(c) charges because RICO conspiracy is not a "crime of violence" under the force clause of Section 924(c).) Therefore, the court dismissed Count 30 for failure to state an offense under Section 924(c). *Simmons*, 2018 U.S. Dist. LEXIS

196181, at *27-*28.[2]  For essentially the same reasons, the district court should have dismissed as well Count 29 and the other four VICAR Assault Counts.  They too fail to state offenses.

In enacting the federal VICAR statute in 1984, Congress did not define "assault with a dangerous weapon."   An "assault," in the generic, contemporary sense of that crime is an attack by an assailant upon his intended victim. *United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010) (surveying contemporary dictionary definitions of "assault" and declaring, "These definitions reveal that in common usage, 'assault' is synonymous with 'attack'").   In addition to this dictionary definition, 18 U.S.C. § 113(a)(3) provides guidance as to the generic elements of "assault with a dangerous weapon."  The Court has long defined 'assault with a dangerous weapon" under 18 U.S.C. § 113(c) (now codified as 113(a)(3)) to consist of three elements:

> Conviction for assault with a dangerous weapon under 18 U.S.C. § 113(c) requires proof of (1) an assault, (2) with a dangerous weapon, (3) with intent to do bodily harm.

*United States v. Sturgis*, 48 F.3d 784, 786 (4th Cir. 1995).

---

[2] The government does not appeal the district court's ruling that a Section 1959(a)(3) charge predicated on Virginia brandishing under 18.2-282 is not a crime of violence under 18 U.S.C. § 924(c)(3)(A).  The government's ". . . appeal is limited to the argument that a RICO conspiracy with aggravating factors qualifies as a crime of violence when those aggravating factors are themselves crimes of violence." (Govt. Brief, p. 32 and note 12.)  Those "aggravating factors" in Count 1 are alleged against Mitchell and Simmons, but not Lassiter.

*See also* Model Penal Code § 211.1(2)(b) (defining elements of "aggravated assault" as an attempt to cause or purposefully inflict bodily injury with a deadly weapon).

In contrast to generic assault with a dangerous weapon, which is universally punished as a felony, the misdemeanor codified in VA. CODE ANN. § 18.2-282 does *not* require either an intentional infliction of bodily injury or any purposeful attempt to inflict bodily injury, the court below emphasized in dismissing the Section 924(c) charge predicated on VICAR assault with a dangerous weapon and Virginia brandishing. *Simmons*, 2018 U.S. Dist. LEXIS 196181 at *20-*21. The Commonwealth need not even prove a threat to inflict bodily harm to secure a conviction for this misdemeanor. *Dezfuli v. Commonwealth*, 58 Va. App. 1, 11, 707 S.E.2d 1, 11 (2011) (holding that Commonwealth need not "prove the defendant displayed his firearm 'in a threatening manner' to obtain a conviction for brandishing a firearm under Code § 18.2-282."). To "brandish" a firearm means to exhibit, hold or otherwise display the gun in "an ostentatious, shameless, *or* aggressive manner." *Morris v. Commonwealth*, 269 Va. 127, 135, 607 S.E.2d 110, 114 (2005) [emphasis added]. *Cf. Hampton*, 628 F.3d at 660 (the essence of "assault" is an "attack").

The Court of Appeals of Virginia's application of VA. CODE ANN. § 18.2-282 in *Huffman v. Commonwealth*, 51 Va. App. at 469, 658 S.E.2d at 713, underscores fundamental differences between misdemeanor brandishing under this Virginia statute and generic assault with a dangerous weapon under VICAR. The

35

defendant in *Huffman* was found guilty of brandishing in violation of VA. CODE ANN. § 18.2-282, even though he neither attempted to inflict bodily injury nor threatened to harm the victim. *Huffman*, 51 Va. App. at 474, 658 S.E.2d at 715. The victim merely spotted the defendant waving the firearm in the air ostentatiously. *Id.*

Section 18.2-282 thus does not categorically match the elements of generic assault with a dangerous weapon. Virginia brandishing criminalizes conduct that is outside the range of misconduct necessary to render one guilty of assault with a deadly weapon. Because Virginia's brandishing statute

> . . . does not require proof of an intent to threaten or cause harm to another, it is broader than, and does not correspond in substantial part to, generic assault. As such, Va. Code § 18.2-282 cannot serve as a VICAR predicate.

*United States v. Anthony*, 2019 U.S. Dist. LEXIS 122476, at *21 (W.D. Va. July 23, 2019).

The least culpable conduct under Section 18.2-282 does not amount to criminal conduct under 18 U.S.C. § 1959(a)(3). The elements of the two offenses do not match. The putative predicate sweeps too broadly to support the VICAR Assault Counts. *See United States v. Simmons*, 917 F.3d 312, 317 (4th Cir. 2019) ("We will

find a categorical match if the least culpable conduct punished by the state criminal statute falls within the scope of the generic offense.").[3]

In sum, the Court should reverse Appellants' VICAR Assault Count convictions on the constitutional and statutory grounds outlined above.

## II.  ARGUMENTS REGARDING SUFFICIENCY OF THE EVIDENCE

### STANDARD OF REVIEW

This court reviews a challenge to the sufficiency of evidence *de novo*, but will sustain the jury's verdict if there is substantial evidence, taking the view most favorable to the government, to support it. *United States v. Hackley*, 662 F.3d 671, 683 (4th Cir. 2011); *United States v. Kingrea*, 573 F.3d 186, 194 (4th Cir. 2009). The question is whether, viewing the evidence most favorably to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979): *United States v. Palomino-Coronado*, 805 F.3d 127, 130-32 (4th Cir. 2015).

---

[3] In addition to lacking any threat element, brandishing in Virginia does not require a dangerous weapon. VA. CODE ANN. § 18.2-282 applies to ". . . any firearm or any air or gas operated weapon or any object similar in appearance, whether capable of being fired or not, . . . ." *Id.*  Thus a person could be found guilty if he held or brandished a toy gun or an inoperable firearm.  Section 1959(a)(3), in contrast, requires an assault with a dangerous weapon, such as an operable firearm or a dagger.

37

**A.  THE DISTRICT COURT ERRED BY DENYING APPELLANTS'
MOTIONS FOR JUDGMENT OF ACQUITTAL ON THE VICAR
ATTEMPTED MURDERS CHARGED IN COUNTS TWENTY-TWO
AND TWENTY-FOUR.**

In Counts Twenty-Two and Twenty-Four of the Second Superseding

Indictment, Lassiter, Mitchell and Simmons are charged with attempted murder in

violation of Section 1959(a)(5) of VICAR. Both Counts Twenty-Two and Twenty-

Four are predicated on Virginia's homicide statutes, VA. CODE ANN. §§ 18.2-32

and 18.2-26. Appellants' convictions on these VICAR counts should be reversed.

The government failed to prove the elements of attempted murder under Virginia

law.

The substantive law of Virginia applies. *See United States v. Mathis*, 932 F.3d

242, 264 (4th Cir. 2019) (applying Virginia law of homicide in VICAR prosecution

under Section 1959(a) predicated on VA. CODE ANN. § 18.2-32).  The trial court

accordingly instructed jurors on the elements of attempted murder under VA. CODE

ANN. §§ 18.2-32 and 18.2-26 and Virginia common law. (J.A. Vol.  XII, 5297.)

The crime of attempt in Virginia consists of two elements: (1) the specific

intent to commit the substantive offense and (2) a direct, overt act done towards

consummation or commission but which falls short of completion of that offense.

*Jay v. Commonwealth*, 275 Va. 510, 525, 659 S.E.2d 311, 319 (2008).

To meet the *mens rea* element, the prosecution must prove the defendant

formed a specific intent. Proof of general intent is not enough. Thus in the attempted

38

homicide context a defendant must have formed the specific, actual intent to kill his victim. *Baldwin v. Commonwealth*, 274 Va. 276, 280, 645 S.E.2d 433, 435 (2007) ("While a person may be guilty of murder though there was no actual intent to kill, he cannot be guilty of an attempt to commit murder unless he has a specific intent to kill.") [internal quotations omitted].

The Court of Appeals of Virginia recently clarified the type of overt act which will subject a defendant to prosecution for attempt under the law of the Commonwealth. *Jones v. Commonwealth*, 70 Va. App. 307, 311, 826 S.E.2d 908, 910 (2019) (*en banc*) ("This appeal permits us to review and clarify our jurisprudence with respect to the quantum of evidence sufficient to constitute an attempt to commit a crime in the Commonwealth.") The Court of Appeals of Virginia observed that an overt act must have four characteristics to serve as the basis for an attempt conviction.

> . . . [T]he common law generally informs us that to constitute an act of attempt, the act must possess four characteristics: first, it must be a step toward a punishable offense; second, it must be apparently (but not necessarily in reality) adapted to the purpose intended; third, it must come dangerously near to success; fourth, it must not succeed.

*Jones*, 70 Va. App. at 317-18, 826 S.E.2d at 913 [internal quotations omitted].

The defendant in *Jones* conceded the Commonwealth had presented sufficient evidence of his intent to commit the substantive crime (armed robbery). The focus

of the defendant's appeal was whether he had undertaken an overt act towards successful completion of the substantive offense.

To satisfy the overt act element, the prosecution must prove the defendant took a direct and substantial but ineffectual step towards consummation of the intended offense, the Court of Appeals of Virginia held. *Jones*, 70 Va. App. at 323, 826 S.E.2d at 916. An act in mere preparation for consummation of the crime is insufficient. The defendant's overt act must be directly linked to commission of an essential element of the offense. *Jones*, 70 Va. App. at 329, 826 S.E.2d at 919 ("The difference between preparation and attempt lies between an act in preparation of a crime–one yet to take place or commence–and an act in the commission of a crime."). To render the defendant criminally liable for attempt, then, his "overt act" must constitute one or more elements of the substantive offense.

> . . . It seems axiomatic to us that preparation is every act, slight or not, that serves as a *prelude* to the commission of the crime. Thus, preparation necessarily ceases when the commission of that crime actually begins through the commencement of *an* act—not the last proximate act as asserted by our colleagues—that constitutes one or more elements of the crime.

*Jones*, 70 Va. App. at 330, 826 S.E.2d at 920 [emphasis in the original].

The Court of Appeals of Virginia explained that the Attorney General of Virginia's far more expansive view of culpable attempt erroneously swept in many precedent acts that actually amounted to no more than preparation. "While erroneous in our view," the *Jones* Court remarked,

40

> . . . in the Attorney General's view, acts triggering criminal attempt
> liability would include actions that were historically considered mere
> preparation, such as acquiring a weapon or a mask, driving to the
> location of the crime, parking a vehicle to facilitate a quick getaway,
> and walking toward the entrance of the location of the robbery with a
> gun and/or mask in a pocket.

*Jones*, 70 Va. App. at 330, 826 S.E.2d at 920.

Applied here, these common law principles demonstrate the government failed to prove Appellants guilty of attempting to murder the alleged victims identified in Counts Twenty-Two (Lanez) and Twenty-Four (Nino). Both Counts Twenty-Two and Twenty-Four relate to events on December 27, 2015. Their liability on those two VICAR counts hinged almost entirely on the testimony of Alvaughn Davis ("Davis"). Davis is a former member of NTG who pleaded guilty to several racketeering offenses. (J.A. Vol. IX, 3988-4180; Vol X, 4278-4492.)

Davis testified he drove Foye, Mitchell, and Lassiter to Simmons's Tidewater Park residence in Norfolk on December 27, 2015. Simmons announced at this meeting that he had a disagreement (or "beef"), with "Skino," an incarcerated leader of another "line" of NTG in the Tidewater area of eastern Virginia. Simmons directed Foye, Mitchell, and Lassiter to "mash the gas" on any members of Skino's line who refused to switch (or "flip") to Simmons's line. (J.A. Vol. IX, 4153-54.) At the same time, however, Simmons specifically ordered the men not to harm two of Skino's "five-stars," Blacko and Lanez. Simmons was convinced Blacko and Lanez were poised to switch their allegiance to his line. Simmons declared Lanez

41

and Blacko had "a vest on." Davis testified the vested status of Blacko and Lanez meant they were ". . . like bulletproof, like don't do nothing to them." (J.A. Vol. IX, 4154.)

After this conversation with Simmons, Davis drove Foye, Mitchell, and Lassiter to a Norfolk apartment complex in search of Nino, another "5-star under Skino." (J.A. Vol. IX, 4156.) When Nino did not open his apartment door, the men walked back to the car. Davis then drove the men towards Portsmouth.

While they were in transit, Nino called Mitchell. Because Mitchell activated a speaker phone feature, all four men in the car could hear this conversation. Nino said he heard from Blacko that Simmons "was pushing the button" on Skino's line. (J.A. Vol. IX, 4159.) Nino relayed to Mitchell from Blacko's declaration that Skino's men should ". . . fall back from you all and get our guns up." (J.A. Vol. IX, 4159.) Mitchell responded by assuring Nino that their intent in knocking on his door was not at all to "push the button on him." Mitchell explained to Nino that he understood Blacko was switching to Simmons's line. Their purpose in visiting Nino, Mitchell explained to Nino over the telephone, was to ascertain whether Nino too planned to join Simmons's line. Mitchell told Nino that he and the others in the car were

> . . . just coming to see what's up with you. [Simmons] said, you know, Blacko supposed to be falling up under him, we were trying to see if you all were trying to make the same move.

42

(J.A. Vol. IX, 4159.)

After Mitchell concluded his conversation with Nino, Davis recounted, Foye exclaimed,

. . . f__k that vest, f__k Blacko and that vest

(J.A. Vol. IX, 4160.)

After several unsuccessful attempts to reach Simmons by telephone, Mitchell directed Davis to drive to Lanez's home in Virginia Beach. They never found Lanez. The house Mitchell thought was Lanez's residence looked ". . . like it was empty," Davis testified. (J.A. Vol. IX, 4162.) Without stopping to knock on the door of the abandoned residence, the foursome drove away. (J.A. Vol. IX, 4162.)

## 1. Insufficient Evidence Supports Appellants' Convictions On Count Twenty-Two For VICAR Attempted Murder of Lanez.

### i. The government failed to prove Appellants formed the specific intent to kill Lanez.

Davis's testimony exculpated Appellants on the charge in Count Twenty-Two that he attempted to murder Lanez. Wielding his authority as local NTG leader, Simmons unambiguously directed Foye, Mitchell, Davis, and Lassiter to refrain from "mashing the gas" on Blacko and Lanez. Those two members of Skino's line had "vests on," Simmons stressed. (J.A. Vol. IX, 4154.) No evidence exists Foye, Mitchell, or Lassiter intended to kill the vested Lanez or Blacko when they departed Simmons's apartment on December 27, 2015.

43

The government's theory at trial was that Appellants formed the specific intent to kill Lanez and Blacko despite their metaphorical "vests" when Mitchell received the telephone call from Nino recounted above. Significantly, during that telephone conversation Nino never mentioned Lanez. Nino reported that Blacko had said Skino's men should ". . . get our guns up" because Simmons had "pushed the button" on their line. (J.A. Vol. IX, 4159.)  At no point did any of the four men in the car driven by Davis express an intention to kill Lanez.  While immediately after the call from Nino, Foye sputtered, "f__k that vest, f__k Blacko and that vest." (J.A. Vol. IX, 4160),  Davis testified this declaration signaled that at least in Foye's mind Blacko had lost his exemption from Simmons's order to "mash the gas." Davis testified unequivocally that Blacko alone lost his bulletproof vest in the wake of Nino's report.

> Q.          . . . [Y]ou said that Nino reported that Blacko had said someone pushed a button, right?
>
> A. Davis.   Yes.
>
> Q.          And the idea that you guys were supposed to not hurt anyone goes out the window, right?
>
> A. Davis.   No. The idea that we not hurt Blacko goes out the window. Because he didn't put the vest on everybody, he put the vest on Blacko and Lanez alone.

(J.A. Vol. X, 4427.)

44

Only during the following exchange on direct examination did Davis suggest he thought Appellants might have decided to kill Lanez.

> Q.          So you all are driving out to the beach now to find Lanez after hearing this call from Nino?
>
> A. Davis.    Yes.
>
> Q.          Do you have an understanding by that point of what the men in the car were going to do if they found Lanez?
>
> A. Davis.    Yes.
>
> Q.          What was that?
>
> A. Davis.    I mean, they was gonna, they was gonna kill him. *More than likely*.

(J.A. Vol. IX, 4161-62) [emphasis added].

This speculative statement by Davis is not proof beyond a reasonable doubt that Appellants intended to murder Lanez. (Simmons was not even in contact with the men in the car.) Davis was not qualified to testify as to Appellants' states of mind. He couched his response to the prosecutor's question by stating he thought it was "more than likely" Appellants intended to kill Lanez. (J.A. Vol. IX, 4162.) Most importantly, on cross examination Davis testified Nino's report that Blacko said "get the guns up" led Appellants to divest Blacko, but not Lanez. (J.A. Vol. IX, 4161-62.)

The evidence at trial, then, did not establish Appellants formed the specific, actual intent to murder Lanez. *Baldwin v. Commonwealth*, 274 Va. 276, 280, 645

45

S.E.2d 433, 435 (2007) (attempted murder requires specific, actual intent to kill). The government pointed to no admission by Appellants along those lines. Through Davis, the government proved that Simmons ordered Appellants not to harm Lanez. Davis testified that Lanez never lost the vest of protection with which Simmons clothed him earlier in the day. (J.A. Vol. X, 4427.)    Simmons instructed his subalterns to "mash the gas" only on those in Skino's line who refused to switch their allegiance to Simmons. Appellants received no information from Nino or Blacko that Lanez had changed his mind about joining Simmons's line.    The government failed to prove beyond a reasonable doubt that Lassiter, Mitchell, or Simmons intended to violate Simmons's direct and emphatic order to refrain from harming Lanez.

> **ii.    Even assuming, *arguendo*, the government proved Appellants formed a specific intent to kill Lanez, Appellants did not undertake an overt act sufficient to support his attempted murder conviction on Count Twenty-Two.**

Even assuming, *arguendo*, Appellants specifically intended to kill Lanez (they did not), the district court nonetheless should have entered judgment of acquittal on Count Twenty-Two. The government failed to present evidence of an overt act on Appellants' part sufficient to render them guilty of attempting to murder Lanez.

Davis testified that Mitchell directed him to drive to Lanez's last known address in Virginia Beach on December 27, 2015.   When they neared this address, they could see the house Mitchell thought was Lanez's residence was vacant.

46

Neither Lassiter nor any of the others got out of the car near this empty dwelling. Instead, they drove to Portsmouth without resuming their search for Lanez. (J.A. Vol. IX, 4162.)

Even aside from the threshold question of <u>mens</u> <u>rea</u>, Davis's testimony at most established Lassiter and his fellow travelers took steps in *preparation* for commission of a crime against Lanez. They undertook no overt acts directly related to an element of homicide under Virginia law.

Driving by the vacant home Mitchell thought Lanez occupied was not an overt act ". . . that constitutes one or more elements of the crime." *Jones*, 70 Va. App. at 330, 826 S.E.2d at 920.    In *Jones*, the Court of Appeals of Virginia specifically rejected the Commonwealth's argument that driving or walking to the intended site of an offense with a weapon in one's pocket were overt acts sufficient to uphold an attempt conviction.  Such steps constituted "mere preparation," the *Jones* Court held. *Jones*, 70 Va. App. at 329, 826 S.E.2d at 920 (characterizing as preparatory actions "such as acquiring a weapon or mask, driving to the location of the crime, parking a vehicle to facilitate a quick getaway, and walking toward the entrance of the location of the robbery with a gun and/or mask in a pocket.").

In sum, the district court should have granted Appellants' motions for judgment of acquittal on Count Twenty-Two. Insufficient evidence exists in the trial record that they intended to kill Lanez. But even were there sufficient evidence of

homicidal intent, Appellants did not take an overt act that constituted commission of any of the elements of murder under Virginia law.

### 2. Insufficient Evidence Supports Appellants' Convictions On Count Twenty-Four For VICAR Attempted Murder Of Nino.

Appellants' convictions on Count Twenty-Four for the attempted murder of Nino in violation of 18 U.S.C. § 1959(a)(5) is unsupported by sufficient evidence of either a specific intent to commit murder or an overt act directly related to an element of the crime of homicide.

### i. The government failed to prove beyond a reasonable doubt that Appellants intended to murder Nino.

Davis testified Foye, Mitchell and Lassiter drove with him from Simmons's house to Nino's on December 27, 2015. But the government did not prove their specific, actual purpose in driving to Nino's and knocking on his door was to murder him. *Baldwin*, 274 Va. at 280, 645 S.E.2d at 435. In its closing argument, the government urged jurors to conclude that their intent was to kill Nino because Simmons ordered them to "mash the gas" on "scraps" in Skino's line, except for the vested Lanez and Blacko. (J.A. IX, 4153.) The government's closing mischaracterized Davis's testimony.

On direct examination, Davis made clear Simmons wanted them to "mash the gas" only on those members of Skino's line who declined to "flip" to Simmons's line.

48

Q.          What did Murdock [Simmons] say to the best of your recollection?

A. Davis.   Best of my recollection, well, we was talking about the Skino, you know, him beefing with Skino . . . so he was like, yo, can't none of his scraps bang out here no more. Blacko and Lanez got a vest on because they about to come up under him, anybody else they a green light on them. *If they ain't trying to flip, if they ain't trying to flip, mash the gas on them.*

. . .

Q.          And the phrase green light or mash the gas, who did that apply to?

A. Davis.   Anybody. Anyone of Skino's scraps *that wasn't trying to come under Murdock.*

(J.A. Vol. IX, 4153-54) [emphasis added].

On cross-examination, Davis confirmed that Simmons's "mash the gas" order applied only to Skino's men who refused to "flip." (J.A. Vol X, 4461.)

When Foye, Mitchell, and Lassiter knocked on Nino's door, they did not know whether he intended to "flip" to Simmons's line or remain within Skino's fold. They were bound by Simmons's unambiguous instruction to "mash the gas" only on Skino's men who refused to abandon Skino. Thus the government failed to prove Appellants formed the specific, actual intent to kill Nino.

**ii.    Even assuming, *arguendo*, the government proved Appellants formed a specific intent to kill Nino, Appellants did not undertake an overt act sufficient to support his attempted murder conviction on Count Twenty-Four.**

49

Assuming for the sake of argument that sufficient evidence exists Appellants had the specific intent to murder Nino, their convictions on Twenty-Four must be reversed. Appellants did not undertake an overt act directly related to consummation of the crime of murder.

As Davis waited in the car, Foye, Mitchell, and Lassiter knocked on Nino's door. When Nino did not respond, they left. These events do not satisfy the overt act requirement for a criminal attempt conviction under Virginia law. *Jones*, 70 Va. App. at 330, 826 S.E.2d at 920 (rejecting Commonwealth's argument that driving or walking to the location of contemplated crime is more than "mere preparation" for the commission of the offense). Appellants' convictions on the VICAR attempted murder charge in Count Twenty-Four therefore should be reversed.

## B.    THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN SIMMONS' CONVICTIONS ON COUNTS THREE, FIVE, SEVEN, EIGHT, TWENTY-SIX AND TWENTY-SEVEN.

Simmons was not present and did not personally commit an overt act in furtherance of any of the substantive VICAR crimes. His VICAR convictions rested solely on vicarious liability for substantive crimes committed by others. He did not participate in planning or directing any of the crimes; nor did he provide firearms, ammunition or tools for any of the substantive crimes committed by others.

As explained *supra,* Virginia law applies with respect to substantive violent crimes prosecuted under the VICAR statute. *Mathis*, 932 F.3d at 164-66. The

50

VICAR crimes charged as violations of 18 U.S.C. § 1959 are as follows: Counts Three and Five charge a violation by committing murder in violation of Virginia law, VA. CODE ANN. § 18.2-32; Counts Seven and Twenty-Six charge a violation by committing attempted murder in violation of Virginia law, VA. CODE ANN. §§ 18.2-32 and 18.2-26; and Counts Eight and Twenty-Seven charge a violation by committing assault with a dangerous weapon, in violation of Virginia law, VA. CODE ANN. §§ 18.2-53.1 and 18.2-282.[4] None of the counts are predicated on violations of federal laws. Accordingly, the district court instructed the jury with respect to Virginia law as to each of these counts, although it improperly defined the elements of VA. CODE ANN. § 18.2-53, as discussed *supra*.[5]

At the government's request the district court provided expansive instructions on principles of aiding and abetting as a basis for liability, the admissibility of co-conspirator statements and co-conspirator liability. (J.A. Vol. XII, 5239-42.) Immediately after instructing on co-conspirator liability, and among the general instructions which pertain to all counts, as argued *supra* the district court also provided an extraordinarily broad instruction on *Pinkerton* liability. After

---

[4] Simmons relies on all of the factual recitations and arguments made *supra* with respect to the constructive amendment of the counts charging VICAR assault with a dangerous weapon but makes these additional arguments with respect to the sufficiency of the evidence and the unavailability of Pinkerton liability to sustain the verdict on these counts.

[5] Aside from the obvious failure to instruct on VA. CODE ANN. § 18.2-53.1 which caused the constructive amendment of the indictment.

51

requesting the lengthy and overly broad instruction, the government upon hearing the court read the instructions to the jury acknowledged that the instruction was overly broad. (J.A. Vol. XII, 5334-36.) After a short recess, the government requested that the district court provide a second equally erroneous instruction on *Pinkerton* liability which highlighted the issue to the prejudice of Simmons. In response to the government's request the district court provided a second instruction on *Pinkerton* liability. (J.A. Vol. XII, 5343-45.)

The Pinkerton liability instruction given by the district court allowed the jury to convict Simmons for acts by his co-conspirators when he was not present and did not aid or abet the crimes if the crimes were both reasonably foreseeable and in furtherance of the RICO conspiracy charged in Count One. This vicarious liability for substantive crimes committed by others is not consistent with Virginia law and it was error to provide an instruction which allowed Simmons' conviction for the substantive VICAR crimes committed by others on this legal basis.

The corrected instruction contained the same fundamental error with respect to a theory of *Pinkerton* liability for substantive crimes committed by co-conspirators. Federally co-conspirators can be held vicariously liable for substantive offenses committed by co-conspirators if the substantive crimes were reasonably foreseeable and in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946). But this theory of liability has not been adopted by

Virginia. Virginia permits criminal liability for a substantive crime committed by another only for a principal in the second degree or an accessory before the fact. VA. CODE ANN. § 18.2-18.

A principal in the second degree in Virginia is not the perpetrator, but is present, aiding and abetting the act done or with shared intent is keeping watch or guard at some convenient location such that he is available to assist. *Brown v. Commonwealth*, 130 Va. 733, 107 S.E. 809 (1921); *Ward v. Commonwealth*, 205 Va. 564, 138 S.E.2d 293 (1964); *Grant v. Commonwealth*, 216 Va. 166, 217 S.E.2d 806 (1975). Principals in the second degree under Virginia law are those participants who did not personally commit the act, but were present, aiding and abetting it. The test is whether or not the accomplice was encouraging, inciting, or in some manner offering aid or consent to the crime. *Horton v. Commonwealth*, 99 Va. 848, 38 S.E. 184 (1901); *Moehring v. Commonwealth*, 223 Va. 564, 290 S.E.2d 891 (1982). Simmons was not a principal in either the first degree or the second degree with respect to the substantive VICAR crimes and there is insufficient evidence to sustain his convictions.

The district court erred in denying Simmons' motion for judgment of acquittal as to the substantive VICAR offenses committed by others.

**1.    There was insufficient evidence to sustain Simmons' conviction for attempted murder or assault of S.M. charged in Counts Twenty-Six and Twenty-Seven.**

Simmons was convicted in Counts Twenty-Six and Twenty-Seven with VICAR violations for the attempted murder and assault with a dangerous weapon of S.M. on December 27, 2015. The arguments with respect to Counts Twenty-Two and Twenty-Four (the VICAR attempted murders of Nino and Lanez) apply with equal force to Simmons' convictions for attempted murder of S.M. as charged in Count Twenty-Six. As discussed *supra*, Virginia law applies with respect to the violent crimes under the VICAR statute charged in the Second Superseding Indictment.

Attempted murder in Virginia is an inchoate form of murder which requires specific intent. In Virginia, the specific intent to kill an individual is an element of attempted murder. See, *Baldwin*, 274 Va. at 280. Simmons did not conspire and agree for S.M. to be shot. Rather he gave the express instruction that Blacko's people, which would necessarily include his girlfriend, should not be harmed.

It is axiomatic that a principal in the first degree is the actual perpetrator of the crime. *Jones v. Commonwealth*, 208 Va. 370, 157 S.E.2d 907 (1967). A principal in the second degree is one who is not only present at a crime's commission, but one who also commits some overt act, such as inciting, encouraging, advising, or assisting in the commission of the crime or shares the perpetrator's criminal intent. *Murray v. Commonwealth*, 210 Va. 282, 170 S.E.2d 3 (1969).

54

Under Virginia law, mere presence during the commission of a crime and subsequent flight are not legally sufficient to convict a person as a principal in the second degree. *Grant v. Commonwealth*, 216 Va. 166, 217 S.E.2d 806 (1975). In Virginia solicitation of murder is a separate crime from attempted murder. *See*, VA. CODE ANN. § 18.2-29. Solicitation of murder may be completed before any attempt is made to commit the solicited crime and does not make one guilty of attempted murder. *Wiseman v. Commonwealth*, 143 Va. 631, 638; 130 S.E. 249, 251 (1925); *Brooker v. Commonwealth*, 41 Va. App. 609, 614; 587 S.E.2d 732, 734 (2003). Simmons undertook no act to aid or abet the crime of attempted murder of S.M., he was not present inciting or encouraging others and under Virginia law Simmons is not criminally liable for the attempted murder of S.M.

In November 2015, Davis, Foye and Mitchell attended a party hosted by Blacko's girlfriend S.M. (J.A. Vol. X, 4419.) Simmons was not with them, and they posted photos of themselves at the party under the separate moniker "Drill Mobb." (J.A. Vol. X, 4423.) On December 27, 2015, Davis and his associates traveled from Portsmouth over to Tidewater Park in Norfolk to see Simmons. Davis asserted that Lassiter was with them when they met with Simmons and Brehon, but Brehon observed only Foye and Mitchell meet with Simmons.  (J.A. Vol. VII, 3020-21.) Brehon testified that they were in Mitchell's girlfriend's car, which was the same car they used during the shooting at the Aqua Lounge. Brehon testified that Foye asked

Simmons if he could do something when he walked up to Simmons, which caused Brehon to head inside the apartment. (J.A. Vol. VII, 3020.) When Simmons heard the following day that a female had been shot, Simmons told Brehon in no uncertain terms that Simmons had instructed Foye and Mitchell "not to mess with Blacko and his people." (J.A. Vol. VII, 3021-22.) Like Davis, Brehon acknowledged that putting a proverbial "vest" on someone meant they were protected.

Davis testified that their purpose in going to Simmons was to discuss an argument with Skino. There was conversation about finding out if, as Simmons thought, the low-level people in Skino's line were ready to flip and come under Simmons. Davis testified that Simmons gave explicit orders that "Blacko and Lanes got a vest on," and *if* anyone else didn't want to flip to come under Simmons they could "mash the gas" on them. (J.A. Vol. IX, 4153). Gang members and detectives all interpreted slang expressions during trial and the terms were often susceptible to multiple meanings. But everyone interpreted placing a "vest" on someone to mean they are protected.  That was not the case with "mash the gas" which was interpreted to mean everything from assault to beat to kill or even just to go hard at someone. (J.A. Vol. IV, 1735-36, 1740.)

Davis testified that they were in Tidewater Park with Simmons for about twenty minutes. When they left, Davis was driving and they were planned to "pull-up" on people associated with Skino, which Davis interpreted as having a face-to-

face conversations about their loyalties. (J.A. Vol. IX, 4015, Vol. X, 4463.) The group headed from downtown Norfolk out to the Sewell's Point area looking for Nino, and then out to Virginia Beach looking for Lanez. (J.A. Vo. IX, 4155-56.) While they were driving Mitchell had an extended conversation with Nino and Foye spoke with Blacko, but Davis testified that Foye was not able to reach Simmons or speak to Simmons. (J.A. Vo. X, 4160-62, 4164-65.) Telephone records introduced by the government bear that out.

The government also introduced text messages which established that Simmons actively avoided speaking to Foye and that Foye was angry with Simmons. On December 27, 2015, at 8:08 p.m., Foye sends Doc's phone a text message, "u an asshole man." (J.A. Vol. XIII, 5983). It was during this time that Davis testified everything changed and Foye said "f__k that vest, f__k Blacko and that vest." (J.A. Vol X, 4427.) At 8:31 p.m., the car crossed from the Norfolk/Virginia Beach side of Hampton Roads through the downtown tunnel into Portsmouth.[6] (J.A. Vol. XIII, 6066.) Simmons refused to accept calls from Foye as the evening progressed. At 9:06 p.m. and 9:08 p.m., 911 calls are received for the shooting at S.M.'s residence and shots fired on Reid Street. At 9:10 p.m., Foye was frustrated that Simmons

---

[6] A license plate reader documented Rains' vehicle traveled on December 27, 2015 from Norfolk through the downtown tunnel into Portsmouth at 8:31 pm., presumably when the group discontinued looking for Lanez and traveled to the area of S.M.'s house in Portsmouth.

57

would not take his calls and sent Doc's phone a text message "man ignore me" followed by another text at 9:11 p.m., "don't do that dad its urgent." (J.A. Vol. XIII, 5984-85.) Foye was so desperate to speak to Simmons that he sent a text message to Cyse. Cyse responded that Simmons answered Cyse's call but claimed he was asleep. Foye sent Cyse a text message at 9:48 p.m. telling Cyse that Foye was so angry with Simmons he was going to "whoop his ass." (J.A. Vol. XIII, 5985.) Shortly after this Foye and Mitchell robbed the Shell gas station.

In February 2016, the FBI used a paid informant to purchase small quantities of heroin from Simmons. The informant, who was surreptitiously recording the conversation, was instructed by agents to draw out from Simmons an admission that he instructed Foye and Mitchell to "mash the gas" for him. On the video recording Simmons denied over fifteen times giving that instruction and insisted that Foye, Davis and Mitchell "ain't supposed to do that." (J.A. Vol. VIII, 3798). When asked by the prosecutor what Simmons meant when he said "mash the gas on everything with the exception of Blacko's people" the informant explained that when Simmons' said Blacko had a "vest" on, it meant they were protected, "don't touch 'em." (J.A. Vol. VIII, 3770). The informant admitted that Simmons was not one to resort to violence, but instead preferred to resolve things by talking them out face-to-face. (J.A. Vol. VIII, 3799). Despite the informant's best efforts at obtaining an admission,

Simmons was adamant that they were not supposed to have done anything to Blacko's people.

Multiple witnesses agreed that Simmons "did not push violence" preferring to talk out problems "face-to-face." (J.A. Vol. VII, 3702, Vol. X, 4412.) Violence drew the attention of law enforcement which was counterproductive for the NTG as an enterprise. When Simmons found out that Foye had engaged in violence he was extremely angry about it. (J.A. Vol. IX 3972, Vol. X, 4412.) The shooting of Blacko's girlfriend was not in furtherance of the RICO conspiracy charged in Count One, quite the opposite, it operated to further fracture the enterprise. Appellant Simmons did not share a specific intent to kill S.M., as evidenced by his specific direction not to hurt Blacko's people which was ignored. The district court erred in failing to acquit Simmons on Counts Twenty-Six and Twenty-Seven.

**2.    The evidence was insufficient on Counts Five, Seven and Eight as the killing of Vandalet Mercer and shooting of R.F. were neither robberies nor related to the NTG.**

Simmons' conviction on Count Five was predicated on murder under Virginia law as it pertained to the killing of Vandalet Mercer. The individual with her, identified as R.F., was shot in the hand. The shooting of R.F. served as the predicate for the VICAR crimes of attempted murder as charged in Count Seven and assault with a dangerous weapon as charged in Count Eight. There was insufficient evidence to sustain Simmons' convictions on Counts Five, Seven and Eight.

On the evening of December 14, 2015, Davis testified that he, Foye and Mitchell traveled to Norfolk to meet with Simmons about robbing a "gambling spot" in the Huntersville area of Norfolk. (J.A. Vol. X, 4113-14.) Simmons went inside the spot and was supposed to text them when the time was right, but Davis had to pick up his girlfriend in North Carolina. (J.A. Vol. X, 4114.) Foye was frustrated that things didn't go as planned. (J.A. Vol. X, 4413.) Davis took Foye back to Portsmouth and then went to North Carolina. In the early morning hours of December 15, 2015, Davis picked Foye up again and they made another attempt at the robbery, but it still doesn't go. (J.A. Vol. X, 4115.) Davis on direct examination testified that Simmons stayed at the dice game in the Huntersville area of Norfolk while he, Foye and Mitchell return to Portsmouth. (J.A. Vol. X, 4116.) When Davis and Foye returned to Tidewater Park, Foye acted out shooting into someone's door and into the air. (J.A. Vol. X, 4117.) Davis, Foye and Mitchell left Norfolk traveling through the downtown tunnel headed home to Portsmouth. Simmons was not with them.

R.F. testified that he and Vandalet Mercer had been using crack cocaine and drinking beer together in his truck in Portsmouth. (J.A. Vol. VI, 2640.) When Mercer wanted more drugs, R.F. gave her $15.00 and they walked together to a house where drugs were sold. Mercer went into the house while R.F. stayed outside. (J.A. Vol. VI, 2641.) While they were walking back to his truck, R.F. noticed a car travel down

the street and park. When they were about twenty-five feet from the truck, R.F. saw

someone exit the front passenger-side seat. When R.F. saw a gun, he began running.

R.F. was struck in the hand and Vandalet Mercer was killed. (J.A. Vol. VI, 2644-

46.) At 2:15 a.m., R.F. called 911. Neither the shooter or anyone else demanded

money or said anything to R.F. or Mercer.

Davis testified that when they returned to Portsmouth, Foye provided

directions telling Davis where to drive until he asked Davis to stop. (J.A. Vol. X,

4120.) There was no conversation or discussion about a robbery between Davis and

the others. When Davis stopped the car, Foye tapped Mitchell and said "like yo,

come on bro." (J.A. Vol. X, 4120.) Foye and Mitchell got out of the car, Davis

testified that he heard Foye say "what's up, Unc." (J.A. Vol. X, 4121.) Davis testified

he heard two guns firing before they reentered the car. He described Foye as

"extremely hyped." (J.A. Vol. X, 4122.)

In the light most favorable to the government, Simmons remained at the dice

game in Huntersville for several hours before he sent Foye a text message indicating

that the gambling house might still be a go. There is no evidence that Simmons knew

Davis and his group had lost interest and were roaming the streets of Portsmouth

looking for someone to shoot. Nor is there any evidence that this random act of

violence was committed by Foye for the purpose of gaining entrance to or

maintaining or increasing his position in the NTG. Rather, it was a rogue act of

61

violence committed by Foye which was designed by Davis to keep Foye under his control by allowing Foye to blow off steam.[7]

There was no evidence that Davis, Foye and Mitchell planned to rob Vandalet Mercer or R. F. or that the group attempted to rob them. Nor was there any evidence that Simmons had knowledge that Vandalet Mercer or R.F. would be shot. There was no evidence that the VICAR crimes charged in Counts Five, Seven and Eight were done to maintain or increase anyone's position in the NTG. The crimes were entirely random and did not in any way further the objectives of the NTG enterprise. Simmons was not an accessory before the fact, he did not act to plan, direct or procure the crimes. He was not present during the commission of the crimes and he did not participate as an accessory after the fact. There was insufficient evidence for Simmons to be found guilty under Virginia law as an accessory before the fact or as a  principal in the second degree. His motion for judgment of acquittal on Counts Five, Seven and Eight should have been granted.

**3.    There was insufficient evidence on Count Three because Foye killed Tynes for personal reasons unrelated to Simmons and the NTG.**

---

[7] Similar incidents directed by Davis include: Davis sending Foye to rob someone to get a gun for Davis, Davis using Foye to shoot up the house of someone that had "snitched" on Davis, and Davis using Foye to rob a house in Suffolk for him. (J.A. Vol. X, 4063, 4469.)

There was insufficient evidence to sustain Simmons' conviction on Count Three for a VICAR offense predicated on the killing of Altariq Tynes under Virginia law. Foye killed Tynes for personal reasons unrelated to the NTG and the government's reliance on one text message, "im with the meal so its guarenteed" which was sent from Foye phone to Simmons' phone was not sufficient evidence under Virginia law for Simmons to be guilty of Tynes' murder.

In November 2015, Davis and Foye spent time together in part because Foye's best friend, Altariq Tynes, was in jail. During their time together, Foye confided to Davis that he and Tynes had killed people together in the Lincoln Park area of Portsmouth. Foye was worried that Tynes would turn on him and provide information about their crimes to authorities in Portsmouth. (J.A. Vol. IX, 4074-76.) Davis tried to dissuade Foye from killing Tynes, and instead they planned to rob Tynes. (J.A. Vol. IX, 4077.) While Davis's testimony spans 400 pages of the transcript, Davis did not testify that he or anyone else discussed Foye's plan to kill or rob Tynes with Simmons. There was no overt act by Simmons that aided the crime and it is mere conjecture that Simmons knew Foye's cryptic text message about a "meal" referred to Tynes, or Foye's plan to kill Tynes.

When Foye anticipated needing help with the murder of Tynes, he sent a text message to Davis, not Simmons, asking Davis to confirm that he was "on deck." (J.A. Vol. IX, 4080.) Davis, not Simmons, met Foye, who was driving Tynes' Lexus.

63

Davis provided directions and had Foye follow him to a remote location in Suffolk where Davis and Foye moved Tynes' body from the front passenger seat to the trunk of Tynes' Lexus. (J.A. Vol. IX, 4082-84.) Davis then provided Foye with bleach and stood watch, illuminating the area with the flashlight on his phone as Foye cleaned up the blood. The pair took Tynes' jewelry and property, including his gun. (J.A. Vol. IX, 4085-86.) Davis did not testify that Simmons participated in planning the murder or assisted them in any way after the fact. Despite Davis's lengthy and detailed testimony Davis did not testify that Simmons received any of the proceeds of their crime. Instead, after a few days when Davis became concerned that Foye still had Tynes' body in the trunk of the Lexus he sought help from Simmons, but Simmons told them he didn't "want nothing to do with it. (J.A. Vol. IX, 4133.)

Foye gave up his rank in the NTG before Tynes was killed because he did not want responsibility. (J.A. Vol. X, 4360-61.)  The killing of Tynes was done by Foye for personal reasons and was not done to maintain or increase Foye's position in the NTG. Simmons was not an accessory before the fact and did not commit any act to aid and abet Foye's killing of Tynes. There was insufficient evidence to sustain Simmons' conviction on Count Three and his motion for judgment of acquittal should have been granted.

## C.   THE DISTRICT COURT ERRED BY DENYING LASSITER'S MOTION FOR JUDGMENT OF ACQUITTAL ON THE RICO CONSPIRACY CHARGED IN COUNT ONE.

The Court should reverse Lassiter's conviction on the RICO conspiracy charged in Count One. The government failed to prove beyond a reasonable doubt that he participated in the "enterprise" alleged in the Second Superseding Indictment. Lassiter was not a member of the charged enterprise when his co-defendants allegedly engaged in racketeering activity.

To convict Lassiter of the RICO conspiracy charged in Count One under 18 U.S.C. 1962(c)-(d), the government had to prove (1) an "enterprise" existed in which he conspired to participate and (2) Lassiter agreed that either he or another member of the enterprise would perform at least two racketeering acts which taken together formed a pattern of racketeering activity. *United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017). A "pattern of racketeering activity," must involve at least two "racketeering acts." Qualifying racketeering acts include several offenses under state law, such as acts "involving murder," as well as a litany of federal crimes. 18 U.S.C. § 1961(1).

While Lassiter need not have played a managerial role in the enterprise for conspiracy liability to attach, he must at a minimum have been a participant in the enterprise. Merely associating with the enterprise is insufficient to support a defendant's conviction for RICO conspiracy. *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) ("We caution that the RICO conspiracy statute does not

65

criminalize mere association with the enterprise.") [internal quotations omitted]; *United States v. Barnett*, 660 Fed. Appx. 235, 249 (4th Cir. 2016).

Lassiter's RICO conspiracy conviction rests only on evidence he associated with NTG.  In paragraphs 1-3 of the Second Superseding Indictment, the grand jury charged Lassiter with joining Mitchell, Simmons, and others in committing several racketeering acts on December 27, 2015. (J.A. Vol. I, 169-70.)  But these alleged racketeering acts occurred *before* Lassiter became a member of NTG, if he ever joined the gang. The government presented evidence of Lassiter's association with gang members as they drove to and from Simmons's residence in Virginia Beach that day.  Mere association with the enterprise, however, does not render Lassiter guilty of RICO conspiracy.  *Mouzone*, 687 F.3d at 218; *Barnett*, 660 Fed. Appx. at 249.

Government witnesses testified that a person may become a member of NTG through either of two initiation rites: a person may be "beaten" into NTG or "blessed" into the gang. (J.A. Vol. IV, 1790-91; 1925; 1934-35.)  No evidence exists Lassiter was beaten or blessed into NTG.  Indeed, Simmons, the ranking NTG leader in the area, had neither seen nor heard of Lassiter until December 27, 2015, when Foye introduced him as a cousin who was "about to make his way home" to the gang. (J.A. Vol. IX, 4152-53.)

66

The only witness to suggest Lassiter *ever* became a member of NTG was Davis. According to Davis, a person who has neither been beaten into NTG nor blessed into the gang can become a member by "putting in work," i.e., committing often violent acts which benefit the gang. (J.A. Vol. IX, 4003-04.)  Lassiter "made his way home" to NTG on December 27, 2015, by "putting in work" on Reid Street in Portsmouth near the home of Sparkle Morris, Davis testified. (J.A. Vol. X, 4306.)

Davis was very precise in his testimony concerning the date, time, and place Lassiter became an NTG member by "putting in work" so as to "make his way home."  At the moment Lassiter discharged a firearm on December 27, 2015, Davis testified, Lassiter became a member of NTG.   Foye and Mitchell on December 27, 2015, shot Ms. Morris at her front door in Portsmouth. As Foye and Mitchell ran back to the car driven by Davis, Lassiter allegedly fired a .38 caliber handgun toward an apartment complex at 1 Reid Street.   When he fired that weapon, Lassiter became a member of NTG.

| | |
|---|---|
| Davis. | On the night that they shot Sparkle, yeah, [Lassiter] made his way home that night. |
| Q. | It's your testimony that made him a gang member? |
| Davis. | Yeah. That a [sic] made him a gang member. . . . So as soon as he fired that gun off, that made him a member. |
| Q. | So that happened on December 27th of 2015. |
| Davis. | Yes. |

67

(J.A. Vol. X, 4306-07.)

If, as Davis testified, Lassiter became a member of NTG when he discharged a firearm on Reid Street on December 27, 2015, he cannot be guilty of the RICO conspiracy charged in Count One. Discharging a firearm in the direction of an apartment house is not a racketeering act defined in 18 U.S.C. § 1961(1). But even if this reckless use of a firearm qualified as a racketeering act, Lassiter would nonetheless not be guilty of RICO conspiracy under 18 U.S.C. § 1962(d). Lassiter is not charged with any racketeering acts following his alleged use of a firearm on Reid Street. No evidence exists Lassiter agreed that either he or another NTG member would commit a subsequent racketeering act. Because a person's agreement that either he or a fellow member of the enterprise would commit at least two racketeering acts is an essential element of RICO conspiracy under 18 U.S.C. § 1962(d), the Court should reverse Lassiter's conviction on Count One. *United States v. Barnett*, 660 Fed. Appx. 235, 249 (4th Cir. 2016).

### D. SEVERAL SECTION 924(c) CONVICTIONS MUST BE REVERSED FOR LACK OF SUFFICIENT EVIDENCE TO SUPPORT THE PREDICATE CRIMES OF VIOLENCE CHARGED.

For the reasons outlined *supra*, Appellants' Section 924(c) convictions premised on Count One, the RICO conspiracy, and a substantive VICAR crime, must be reversed for insufficient evidence. The RICO conspiracy charged in Count One is an inchoate offense that is not a crime of violence with respect to Lassiter.

68

As argued *supra*, with respect to Simmons and Mitchell Count One is not an aggravated form of a RICO conspiracy because the Special Sentencing Factors cannot be substituted for the missing element of force. Accordingly, none of the specified Section 924(c) counts can survive to the extent they are premised on the RICO conspiracy charged in Count One. *United States v. Davis*, 139 S. Ct. 2319, 2328 (2019); *United States v. Simms*, 914 F.3d 229 (4th Cir.) *(en banc)*, 140 S. Ct. 304 (2019)(conspiracy to commit Hobbs Act robbery categorically not a crime of violence).

Because Count Twenty-Two, the VICAR attempted murder of Lanez, must be reversed for insufficient evidence, this Court should also reverse Appellants' Section 924(c) convictions on Count Twenty-Three. Similarly, because Count Twenty-Four, (the VICAR attempted murder of Nino) must be reversed for insufficient evidence, this Court must also reverse Appellants' convictions under Section 924(c) on Count Twenty-Five.

As discussed supra, insufficient evidence supported Simmons' conviction for the VICAR attempted murder of S.M. charged in Count Twenty-Six and the VICAR assault charged in Count Twenty-Seven. Accordingly Simmons' Section 924(c) conviction on Count Twenty-Eight must be reversed.

Simmons' Section 924(c) conviction on Count Four should be reversed because there was insufficient evidence Simmons killed Tynes as alleged in Count

Three. There was also insufficient evidence that Simmons killed Vandalet Mercer as alleged in Count Five and his Section 924(c) conviction on Count Six must be reversed. There was insufficient evidence that Simmons attempted to murder R.F. as charged in Count Seven, the VICAR assault with a dangerous weapon charged in Count Eight must be reversed on legal grounds as well as sufficiency, such that Simmons' Section 924(c) offense charged in Count Nine must also be reversed.

Because the district court erred in declining to grant Appellants' motions for judgment of acquittal as to these counts, the respective Section 924(c) Counts must also be reversed.

### E. THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN SIMMONS' CONVICTIONS ON COUNTS THIRTY-FOUR AND THIRTY-SIX FOR POSSESSION, USE AND CARRYING A FIREARM IN RELATION TO DRUG TRAFFICKING CRIMES.

The government's evidence demonstrated Simmons was minimally involved in distributing marijuana and heroin from 2015 until March 2016. It was undisputed that Simmons was not able to repay a $950 debt for marijuana and was equally unable to obtain firearms to repay the debt. (J.A. Vol. VII, 3039, VIII, 3688-89, Vol. IX, 4057, Vol. X, 4377.) Donte Brehon didn't even consider him a drug dealer. (J.A. Vol. VII, 3059.) Gary Hassell described Simmons as having no respect, no trust, and no money. (J.A. Vol. VII, 3707.) Simmons stipulated that he sold small quantities of heroin on three occasions in early 2016 to an informant that was paid by the FBI.

Generally, the informant negotiated and paid for small quantities of heroin, but Simmons was unable to deliver the agreed amounts. (J.A. Vol. VIII, 3788.) The informant described Simmons as only able to "middle-man" a transaction. (J.A. Vol. VIII, 3789.) While the government sought to portray Simmons as a substantial drug dealer, the evidence painted a different portrait.

In March 2016, Simmons was operating a vehicle owned by his girlfriend when it was stopped by Chesapeake officers for having an "out passenger-side tag light." Daeron Wright was in the front passenger seat of the vehicle. (J.A. Vol. III, 1516-17.) Officers located a Smith & Wesson .40 caliber handgun, a small quantity of crack cocaine and a small scale in the locked glovebox in front of Daeron Wright, empty sandwich baggies and a bud of marijuana were found on the passenger side of the car. (J.A. Vol. III, 1521-22, 1551.) Additional crack cocaine was found in the police vehicle that transported Daeron Wright. (J.A. Vol. III, 1526.) Hassell thought that the crack cocaine seized that day belonged to Daeron Wright. (J.A. Vol. VIII, 3709.) Officers seized a cellular telephone from Simmons, but records from the phone were not offered as evidence.

The only witness that described Simmons as a substantial drug dealer was his cellmate, Deric Twitty. Twitty had a lengthy criminal history including a prior federal drug conviction and was trying to earn a reduction of his 324-month sentence. Twitty's own offense involved drug proceeds of over three million dollars

71

and his incredible allegations about Simmons were contradicted by the government's evidence. (J.A. Vol. IX, 4182, 4195, 4198). Gary Hassell described Simmons as "not really a drug dealer" and someone who never had money. (J.A. Vol. VIII, 3699, 3696.) Donte Brehon when asked by the government if Simmons sold drugs, responded "he ain't never really have it." (J.A. Vol. VII, 2997.) Adding to Twitty's credibility problems, he also claimed he was a sovereign citizen to whom the laws of the United States did not apply. (J.A. Vol. IX, 4226-27.)

Simmons was charged with two Section 924(c) offenses in relation to drug trafficking. Count Thirty-Four charged possession, use and carriage of a firearm in relation to the drug trafficking conspiracy charged in Count Two, and Count Thirty-Six charged possession, use and carrying a firearm in relation to possession of crack cocaine on March 22, 2016, as charged in Count Thirty-Five. There was no evidence that Simmons possessed the firearm found in the glovebox in front of Daeron Wright in furtherance of or in relation to the drug trafficking crimes charged in either Count Two or Count Thirty-Five. While this Court has permitted multiple Section 924(c) convictions based on multiple separate acts, there was insufficient evidence that Simmons possessed a firearm in furtherance of the charged drug trafficking offenses, or that he used or carried a firearm in relation to the offenses.

### III. THE DISTRICT COURT ERRED IN ADMITTING SUMMARY CHARTS UNDER RULE 1006 IN VIOLATION OF APPELLANTS' SIXTH AMENDMENT RIGHTS.

72

**A.    Standard of Review**

This Court reviews decisions to admit evidence for abuse of discretion. *United States v. Forrest*, 429 F.3d 73, 79 (4th Cir. 2005); *United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir. 2005).

**B.    Argument**

The government extensively used summary charts for ballistics comparisons, cell site location information (CSLI), and telephone records. The data in these charts did not accurately summarize voluminous records such that the summary was admissible under Rule 1006. *United States v. Oloyede*, 933 F.3d 302, 310 (4th Cir. 2019); *United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004). The charts were pedagogical devices that wove together data from multiple different sources. For example, historical cell site analysis charts included not simply CSLI from multiple phones, but also text messages recovered from seized cellular telephone, and in some instances data from license plate readers at tunnel crossings and CCTV. (J.A. Vol. XIII, 6046, 6051, 6052, 6061, 6066-67.) Over objection, the government was permitted mid-trial to amend and modify charts that were already admitted in evidence when they realized that CSLI data from Davis' phone was not included in the charts already admitted. (J.A. Vol. IX, 4134-36; 4141-42.) Despite Appellants' objections these charts were substituted for the earlier summaries and also erroneously admitted as substantive evidence. *Id.* Compounding the error, the jury

was instructed to give the charts and summaries the same weight or importance as they would "any other evidence admitted during the trial." (J.A. Vol. XII, 5226.)

The government then utilized the summary CSLI charts and incorporated evidence from multiple additional sources, including Facebook records and forensic evidence from the scenes, for the case agent's final summary charts. (J.A. Vol X, 4519, 4551, 4567-68, 4587, 4590-91.) There were multiple objections during the presentation of this evidence, to the case agent testifying as an expert, unauthenticated calls and records, and the repetitive nature of the evidence. (J.A. Vol X, 4505-05, 4561, 4592.) The district court overruled Appellants' objections and the agent's summaries were admitted into evidence and provided to the jury to be considered as substantive evidence during deliberations.

While the court has discretion under Rule 611(a) to permit the use of these pedagogical aids, it was improper for the charts to be admitted as substantive evidence. *Id.* The district court clearly erred by instructing the jury that "you may consider the charts and summaries as you would any other evidence admitted during the trial and give them such weight or importance, if any, as you feel they deserve." (J.A. Vol XII, 5226.) Rather, the court should have made clear to the jury that the charts were not evidence themselves but were simply displayed to assist the jury's understanding of the evidence. *Janati*, 374 F.3d at 273. Appellants' objections to this evidence on various grounds were all overruled.

The district court erred in admitting these pedagogical aids as substantive evidence, the error was harmful and affected Appellants' substantial rights.

## IV. THE DISTRICT COURT ERRED IN PROVIDING AN OVERLY EXPANSIVE VICARIOUS LIABILITY INSTRUCTION WHICH WAS INCONSISTENT WITH APPLICABLE VIRGINIA LAW.

### A. Standard of Review

Appellants did not object below to the trial court's Instruction No. 39. This erroneous instruction with respect to *Pinkerton* liability was plain, it affected Appellants' substantial rights, and seriously affects the fairness, integrity and public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Williams*, 152 F.3d 294, 300 (4th Cir. 1998). The Court should notice the error because when viewed against the record as a whole the error led to the conviction of Appellants. In particular, Simmons was convicted when he was actually innocent of certain of the substantive VICAR offenses. *United States v. Cedelle*, 89 F.3d 181, 184-85 (4th Cir. 1996).

### B. Argument

At the conclusion of trial, all counsel worked diligently to attempt to resolve issues with respect to the applicable jury instructions. This resulted in instructions which comprise over 120 pages of the transcript and took several hours to read to the jury. At the time of the charge conference, counsel fully litigated but was unsuccessful in obtaining an instruction even with respect to multiple conspiracies.

(J.A. Vol. 12, 5285.) Post-trial litigation in the wake of *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) demonstrated that the parties strongly contested whether the district court should utilize a "generic definition" of the substantive crimes, which was the government's position, or the specific elements of the cross-referenced Virginia statutes, which was the defendants' position. (J.A. Vol. XIV, 6367.) The district court noted post-trial that the law was unsettled, but ultimately ruled that Appellants' position was correct.

This Court subsequently provided clarity on the point and established that VICAR crimes predicated on state law offenses should be analyzed based on the elements of the state statute. See, *Mathis*, 932 F.3d at 264 (applying Virginia law with regard to VICAR crimes predicated on state law violations). Because of this intervening change or clarification of controlling precedent that recognized an issue not previously available, this Court should notice the error, particularly when the error, as it does here, clearly affected Appellants' substantial rights. *United States v. Chittenden*, 896 F.3d 633, 639 (4th Cir. 2018).

The district court placed general instructions designed to apply to all Appellants and counts at the beginning of the instructions provided to the jury. At the government's request the court gave the jury an erroneous instruction on *Pinkerton* liability. (J.A. Vol. XII, 5242-44.) Inexplicably after specifically proposing the instruction and seeing it provided to the jury, the government took the

76

position that the instruction was overly broad. (J.A. Vol. XII, 5334-36.) The government requested that the district court provide a second equally erroneous instruction on *Pinkerton* liability which highlighted the issue to the prejudice of Appellants. In response to the government's request the district court reinstructed on *Pinkerton* liability as follows:

> I'm going to read the instruction as it has been corrected and then address it just a bit more with you.
>
> Instruction No. 39. There are two ways that the government can prove a particular defendant guilty of the substantive crimes charged in the second superseding indictment. The first is by proving that a particular defendant personally committed, participated in or aided and abetted the individual crime. Second is based on the legal rule that all members of a conspiracy are responsible for the acts committed by the other members, as long as those acts are committed to help advance the conspiracy and are within the reasonably foreseeable scope of the agreement. In other words, under certain circumstances, the act of one conspirator may be treated as the act of all. This means that all the conspirators may be convicted of a crime committed by only one of them, even though they did not all personally participate in that crime themselves. In other words, a member of a conspiracy who commits a crime during the existence or life of the conspiracy and commits the crime in order to further or somehow advance the goals or objectives of the conspiracy may be considered by you to be acting as the agent of the other members of the conspiracy. The illegal actions of this conspirator in committing the substantive crime may be attributed to other individuals who are at the time members of the conspiracy, so long as the commission of that substantive crime was reasonably foreseeable to those other individuals. Under certain conditions, therefore, a defendant may be found guilty of a substantive crime even though he did not participate directly in the acts constituting that offense.
>
> Now ladies and gentlemen, when I originally read Instruction 39, I had, at that time, instructed you on a broader basis of liability, but now

> I am telling you not to consider the broader basis of liability that I read
> to you previously, and I'm instructing you that you should consider each
> count on its own. Each count should be considered on its own. And so
> the instruction I just read to you will be what goes back with you.

(J.A. Vol. XII, 5343-45.)

The corrected instruction contained the same fundamental error with respect to the federal *Pinkerton* principle of liability for substantive crimes committed by co-conspirators. Federally co-conspirators can be held vicariously liable for substantive offenses committed by co-conspirators if the substantive crimes were reasonably foreseeable and in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946); *United States v. Ashley*, 606 F.3d 135,142-43 (4th Cir.), *cert. denied*, 562 U.S. 987 (2010). But this theory of liability has not been adopted by Virginia. The only time the Virginia Supreme Court cites to *Pinkerton* is *Bell v. Commonwealth,* 220 Va. 87, 89, 255 S.E. 2d 498, 499 (1979), but it is cited only with respect to Virginia's common law theory that upon completion of the conspiracy, the inchoate offense of conspiracy merges with the completed substantive felony. Six years after *Bell* was decided, the legislature in Virginia abrogated *Bell* by enacting Virginia Code § 18.2-23.1. *Boyd v. Commonwealth*, 236 Va. 346, 348, 374 S.E. 2d 301, 302 (1988); *accord Bowman v. Commonwealth*, 11 Va. App. 259, 263-64, 397 S.E. 2d 886, 888-89 (1990). As further evidence that Pinkerton liability has not been adopted in Virginia, there is no Virginia Model Jury Instruction on the federal principle.

78

Virginia law permits criminal liability for a substantive crime committed by another only for a principal in the second degree or accessory before the fact. VA. CODE ANN. § 18.2-18. The sole distinction between an accessory before the fact and a principal in the second degree is that an accessory must be absent when the crime is committed and a principal in the second degree must be present, either actually or constructively. One present at the commission of an offense may be found guilty as a principal in the second degree if he "was encouraging, inciting, or in some manner offering aid in the commission of the crime." *Jones v. Commonwealth*, 208 Va. 370, 373, 157 S.E.2d 907, 909 (1967); *McGhee v. Commonwealth*, 221 Va. 422, 426, 270 S.E.2d 729, 732 (1980). Virginia has not extended co-conspirator liability to allow for the conviction of someone not physically present and in some manner offering aid, who has not undertaken an overt act to further the crime.

While all Appellants were prejudiced by Instruction 39, Simmons experienced the most harm. Simmons' conduct, particularly with respect to Counts Five, Seven and Eight (substantive VICAR offense related to the killing of Vandalet Mercer and shooting of R.F.) and Counts Twenty-Six and Twenty-Seven (related to the shooting of S.M.) did not constitute an offense under the Virginia Code. Because Simmons could not have been convicted of the predicate state law crimes under Virginia law, he was actually innocent of the crimes and the error affected his substantial rights.

The crucially important *Pinkerton* liability instruction was in error. Appellants, especially Simmons, were substantially prejudiced by the error.

## V. THE DISTRICT COURT ERRED IN ADMITTING CONVERSATIONS THAT WERE NOT IN FURTHERANCE OF THE CONSPIRACY AND BY FAILING TO INSTRUCT ON MULTIPLE CONSPIRACIES.

### A. Standard of Review

This Court reviews decisions to admit co-conspirator's statements for abuse of discretion. *United States v. Graham,* 711 F.3d 445, 453 (4th Cir. 2013). Whether a single overall RICO conspiracy existed was a question of fact which should have been determined by the jury and the district court's failure to give a multiple conspiracy instruction is also reviewed for abuse of discretion. *United States v. Smith*, 701 F.3d 1002, 1011 (4th Cir. 2012).

### B. Argument

### 1. Error in admission of the Skino-Nino phone call

Statements by a co-conspirator may be admitted pursuant to Federal Rule of Evidence 801(d)(2)(E), when the government has proven by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included both the declarants and the defendants against whom the statements were offered, and (3) the statements were made during the course of and in furtherance of the conspiracy.

*Bourjaily v. United States,* 483 U.S. 171, 175, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987); *United States v. Heater*, 63 F.3d 311, 324 (4th Cir. 1995).

The government introduced 11 separate audio clips from a December 23, 2015 telephone conversation which were synchronized with transcripts and played for the jury. The call was between Timothy Williams, known as Skino and Dashede Keen, known as Nino. (J.A. Vol. V, 2162.)[8] Skino, who was incarcerated in Colorado, ran a rival Hampton Roads NTG line of which Blacko, Lanez and Nino were members. Neither Skino nor Nino testified at trial, but the district ruled the recordings were admissible as co-conspirator statements.[9] (JA Vol. XII, 4648-49.)

During the conversation, Skino initially thought that Nino was with Shottaz, who was dubbed by Skino. Nino clarified to Skino that he was with Mitchell. (J.A. Vol. V, 2163, Vol. XIV, 6221.) Skino asked Nino to find out from Mitchell "who put Shottaz in the whip?" (J.A. Vol. XIV, 6222.) When Nino told Skino that Simmons (Doc) was responsible, Skino tells him to "tell Doc he trippin." (J.A. Vol. XIV, 6222.) Detective Hall testified that trippin" referred to a disagreement. (J.A. Vol. VI, 2163.) Skino then told Nino to tell Mitchell:

---

[8] Initially the clips were admitted without objection because it was represented by the government that Dashede Keen would be called as a government witness. When it became clear that Mr. Keen would not testify the district court overruled a defense motion to strike the evidence. (J.A. Vol XII, 4593.)

[9] Appellants stipulated to the authenticity of the recording which was made by prison officials in Colorado where Williams was incarcerated but did not stipulate the call was admissible.

. . . tell him when he pop with Doc, tell him, just because he put him, put that n__a up under him don't mean I ain't gone stop drivin' at him.

. . .

Tell them it ain't got nothin' to do with they line.

(J.A. Vol 14, 6223.) Nino then told Skino that Mitchell could hear him because Nino was using the speaker phone feature on his phone.

Skino asserted that Simmons knew better than to take Shottaz into his line which prompted Mitchell to call Simmons. (J.A. Vol. V, 2164, Vol. XIV, 6225.) Neither Mitchell nor Simmons were parties to the Skino-Nino phone call but instead were parties to a separate conversation on Mitchell's phone. After Mitchell and Simmons hung up, Skino continued on

. . . the button's pushed on that n__a. It been pushed, na 'mean? If Bro, if Bro wanna beef with the Billion Dollar whip, na 'mean, over inheritin' some shit? Then it is what it is.

. . . you can't just G a n__a that they kicked out the whip, Bro. . . . because of that nigga, we part ways. . . . And then it just starts the whole bunch of different shit, because now if that's what he gone do, that what I'm a do, na 'mean? . . . Eye for an eye, my n__a.

(J.A. Vol. XIV, 6226-28.) Detective Hall asserted that the "billion dollar whip" referred to Skino's line and that he interviewed Nino about the call. (J.A. Vol. V, 2164-65.)

The government argued this conversation triggered the events of December 27, 2015, which resulted in Appellants' convictions related to attempted murders of

Nino, Lanez, and S.M., and the shooting on Reid Street. Skino and Nino were not members of the conspiracy charged in Count One when the statements were made and the statements did not in any way advance or promote the goals and objectives of the conspiracy. *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994). It was error for the statements to be admitted under the co-conspirator exception to the hearsay rule and the motion to strike should have been granted. This call established instead that Skino and the members of his line were engaged in a competing rival conspiracy by at least December 23, 2015, which warranted a multiple conspiracy instruction.

## 2.    Error in failing to instruct on multiple conspiracies

Whether the government has proven a single overarching conspiracy among co-conspirators that share a "single-mindedness to achieve a particular goal" or multiple conspiracies is a question of fact for the jury. See, *United States v. Pinson*, 860 F.3d 152, 162 (4th Cir. 2017) *quoting United States v. Nunez*, 432 F.3d 573, 578 (4th Cir. 2005). When there is an evidentiary basis to support it, as there was here, a trial judge should instruct the jury on single versus multiple conspiracies. *Kotteakos v. United States,* 328 U.S. 750 (1946); *United States v. Hines*, 717 F.2d 1481, 1489–90 (4th Cir. 1983); *United States v. Coward*, 630 F.2d 229, 231 (4th Cir. 1980).

The Skino-Nino telephone conversation and the events between December 23, 2015 and December 27, 2015 established that Skino's line, including Blacko, Lanez

and Nino, were a separate enterprise with competing objectives from the RICO conspiracy charged in Count One. (J.A. Vol. XII, 5169.) There was an evidentiary basis which warranted a multiple conspiracy instruction and Appellants were substantially prejudiced by the district court's refusal to instruct on their theory of multiple conspiracies.

## CONCLUSION

It is respectfully requested that this Honorable Court vacate Appellants' convictions and remand this matter to the district court for further proceedings.

## RESPONSE TO GOVERNMENT APPEAL

## VI. THE DISTRICT COURT CORRECTLY GRANTED A JUDGMENT OF ACQUITTAL ON COUNT THIRTY AS THE § 924(c) CHARGE WAS NOT PREDICATED ON A CRIME OF VIOLENCE.

### A.    The Standard of Review

Whether the Section 924(c) offense charged in Count Thirty is predicated on a crime of violence is a question of law reviewed de novo. *United States v. Mathis,* 932 F.3d 242 (4th Cir. 2019); *United States v. McNeal*, 818 F.3d 141 (4th Cir. 2016).

### B.    Background and Argument

Count Thirty of the Second Superseding Indictment charged Appellants with possession, brandishing and discharge of a firearm on December 27, 2015, in furtherance of a crime of violence. Count Thirty enumerated two possible predicate

84

crimes of violence as follows: first, the RICO conspiracy charged in Count One; and second, the VICAR assault with a dangerous weapon charged in Count Twenty-Nine. The jury found Appellants guilty of the Section 924(c) offense charged in Count Thirty and checked both enumerated offenses as the predicate crimes of violence for all Appellants.

For purposes of Section 924(c), "crime of violence" means an offense that is a felony and has <u>as an element</u> the use, attempted use, or threatened use of physical force against the person or property of another, commonly referred to as the "force clause." 18 U.S.C. § 924(c)(3)(A). The residual clause of Section 924(c)(3)(B) is now unconstitutionally vague and cannot serve as a basis to find that either the RICO conspiracy or VICAR assault with a dangerous weapon constitute a crime of violence. *United States v. Davis*, 139 S. Ct. 2319 (2019); *United States v. Simms*, 914 F. 3d 229 (4th Cir. 2019) (4th Cir.) (*en banc*), *cert. denied*, 140 S. Ct. 304 (2019). Any predicate crime of violence must satisfy the force clause. Based on *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), which represented a substantial change in the law that would likely extend to the residual clause of Section 924(c), the district court properly entertained a post-trial motion and ruled that neither of the predicate crimes enumerated in support of Count Thirty qualified as a crime of violence and granted Appellants' post-trial motion for judgment of acquittal. (J.A. Vol. XIV, 6355-6383.) The government's appeal followed.

It is well-settled that the inchoate RICO conspiracy charged in Count One does not ordinarily constitute a crime of violence under the force clause. *Salinas v. United States*, 522 U.S. 52, 63 (1997); *United States v. McCollum*, 885 F.3d 300 (4th Cir. 2018); *United States v. Naughton,* 621 Fed. Appx. 170 (4th Cir. 2015). Nor does the VICAR assault with a dangerous weapon charged in Count Twenty-Nine constitute a crime of violence under the force clause. As argued *supra* Appellants' convictions on Counts Eight, Fifteen, Eighteen, Twenty-Seven and Twenty-Nine must be reversed because the state law misdemeanor crime of brandishing a firearm under VA. CODE ANN. § 18.2-282 is not a proper VICAR predicate. Those arguments with respect to the constructive amendment of the VICAR assaults charged in the Second Superseding Indictment are referenced and incorporated in this response to the government's appeal.

The government appears to have abandoned their argument that Count Twenty-Nine, the VICAR assault with a dangerous weapon, can serve as a valid predicate for the Section 924(c) offense in Count Thirty. See, Govt Brief p. 12, FN 12. In doing so they acknowledge that the inchoate RICO conspiracy charged in Count One cannot serve as a valid predicate offense for the Section 924(c) offense as to Appellant Lassiter. Accordingly, it appears that the government is no longer appealing the district court's acquittal of Appellant Lassiter on Count Thirty. Rather, the government now argues that special sentencing factors can be used to

transform the inchoate RICO conspiracy charged in Count One into a crime of

violence as to Appellants Simmons and Mitchell.

**1.  The RICO conspiracy charged in Count One is an indivisible offense and under the categorical approach is not a crime of violence.**

It is now settled that the residual clause of Section 924(c)(3)(B) is

unconstitutionally vague and to constitute a crime of violence the offense must have

*as an element* the use, attempted use, or threatened use of physical force. *Davis*,

139 S. Ct. at 2336; *Simms*, 914 F. 3d at 237. It is equally well-settled and has been

the government's long-held position that the statutory text of Section 924(c)

requires an ordinary-case categorical approach to identify which felony offenses

qualify as a crime of violence under Section 924(c)(3)(A). *Id.* Courts have for years

employed the categorical approach, looking to whether the statutory elements of

the offense necessarily require the use, attempted use, or threatened use of physical

force, to determine whether an offense qualifies as a crime of violence under the

force clause. *Id.; Leocal v. Ashcroft*, 543 U.S. 1, 7-10 (2004); *United States v.

Evans*, 848 F.3d 242 (4th Cir. 2017) (applying the elements-based categorical

approach to §924(c)(3)(A)). Under the categorical approach, the courts' analysis

begins and ends with the offense's elements.

In only a narrow range of cases involving divisible statutes is a modified

categorical approach appropriate. *Descamps v. United States*, 570 U.S. 254, 261-

62 (2013); *United States v. Montes-Flores*, 736 F.3d 357 (4th Cir. 2013). An offense is divisible such that the modified categorical approach applies when a statute is comprised of multiple alternative versions of the crime; that is, a statute which encompasses alternative elements. *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016); *Taylor v. United States*, 495 U.S. 575, 602 (1990). In such a case, the modified categorical approach serves the "limited function" of effectuating the categorical approach because the divisible nature of the statute "renders opaque which element played a part in the defendant's conviction." *Descamps*, 570 U.S. at 260.

When confronted with a divisible statute, only limited extra-statutory materials are reviewed to determine the elements of the offense of conviction. The limited class of documents may include; the indictment, plea agreement, transcript of the plea colloquy, or jury instructions. *United States v. Price*, 777 F.3d 700, 705 (4th Cir.), *cert. denied,* 135 S. Ct. 2911 (2015); *United States v. Montes-Flores*, 736 F.3d at 365. The purpose of the modified categorical approach is not to examine the factual behavior which gave rise to the conviction, but to identify the elements of the offense of conviction. It is a tool for implementation of the categorical approach and not an exception to the ordinary-case categorical approach.

Count One of the Second Superseding Indictment charged Appellants with agreeing to participate in the affairs of a RICO enterprise. The government offers

no authority for their argument that the special sentencing factors enumerated after Count One convert the charged RICO conspiracy into new crime which is an aggravated form of the offense. The government did not submit, and the district court did not provide, jury instructions enumerating the completed state murders as elements of Count One. Nor was it suggested by the government before now that the RICO conspiracy as to Appellant Lassiter was a lesser-included offense of the aggravated RICO conspiracy with which Appellants Simmons and Mitchell were charged. The sentencing factors were enumerated outside of Count One and understood to be factors affecting the sentence rather than elements of the offense.

In *Salinas*, the Supreme Court made clear that "[t]here is no requirement of some overt act or specific act" in a RICO conspiracy case, and a defendant need not commit the underlying predicate acts of the substantive offense. *Salinas,* 522 U.S. at 63-65. The Court explained that:

> It suffices that [the defendant] adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues.

*Id.* at 65 (citing *Callanan v. United States*, 364 U.S. 587, 594, 81 S. Ct. 321, 5 L. Ed. 2d 312 (1961)); *United States v. Mouzone*, 687 F.3d 207, 217-18 (4th Cir.

2012), *cert. denied,* 568 U.S. 1110 (2013) (for RICO conspiracy defendant need only *agree* to advance a RICO undertaking, no overt act is required).

At the request of the government, the district court instructed the jury regarding the three elements of the RICO conspiracy charged in Count One that they must find: (1) a conspiracy or agreement existed between two or more persons to participate in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity; (2) the defendants deliberately joined or became a member of the conspiracy or agreement with the knowledge of its purpose; and (3) the defendants knowingly agreed that a conspirator would commit at least two acts of racketeering of the types charged in the indictment. (J.A. Vol. XII, 5248-49.) The jury was further instructed that the essence of a RICO conspiracy was the agreement and no overt act was required. (J.A. Vol. XII, 5249, 5250. 63-65.)

A RICO conspiracy is an indivisible inchoate offense and the categorical approach applies. Count One quite simply is categorically not a crime of violence and cannot serve as a predicate crime of violence for a Section 924(c) offense.

### 2.  Special sentencing factors were not charged as, or found by the jury to be, elements of the RICO conspiracy.

The RICO conspiracy charged in Count One spanned eight pages of the indictment, it identified the enterprise's purpose, objectives, means and methods, listed four types of racketeering activity, and enumerated thirty different overt acts

90

in furtherance of the conspiracy. It was a precise and detailed statement of the charge, all of which was enumerated as a violation of Title 18, United States Code, Section 1962(d). Immediately after Count One, the Second Superseding Indictment included a Notice of Special Sentencing Factors which was not part of Count One.[10] (J.A. Vol. I, 169-178.) The Notice of Special Sentencing Factors placed Appellants Simmons and Mitchell on notice of a possible life sentence on Count One if they were convicted of the VICAR murders, it did not become an element of the offense.

The grand jury did not charge the special sentencing factors as elements of Count One and the government did not submit jury instructions which included the special sentencing factors as elements of the RICO conspiracy. The government and the court were well-aware during trial that the Supreme Court was considering whether the residual clause of Section 924(c)(3)(B) was unconstitutionally void for vagueness. *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). Had the government considered the substantive murders enumerated as special sentencing factors to be elements of the RICO conspiracy they surely would have proposed jury instructions supporting this theory, but they did not. (J.A. Vol. XII, 5248-49.)

---

[10] Had the government intended the special sentencing factors to constitute elements of the offense, in addition to submitting jury instructions supporting this construction, Count One would have included the special sentencing factors within Count One, in violation of 18 U.S.C. § 1962(d), rather than being a separate notice that followed the count. (J.A. Vol. I, 176-178.)

91

Quite the contrary, when the issue arose at the charge conference the government essentially conceded that the RICO conspiracy charged in Count One was not a crime of violence. In discussing the government's proposed instructions and the proposed special verdict forms, the government urged the Court to use special verdict forms that required the jury to identify which of the predicate crimes supported each Section 924(c) offense. The government argued that the jury would need to find only one crime of violence for each 924(c) offense to withstand appeal if the Supreme Court affirmed *Dimaya*. (J.A. Vol. XII, 5202-03.) The court inquired of the government, "if the jury checks RICO conspiracy and not the VICAR murder, -- and the Supreme Court affirms *Dimaya*?" To which the government responded, "then we probably lose that count." (J.A. Vol. XII, 5203.) The government anticipated precisely the legal groundwork that now applies and did not deem the RICO conspiracy as an aggravated form of conspiracy such that Count One would qualify as a crime of violence. Rather they anticipated and advised the district court that if *Dimaya* was affirmed the RICO conspiracy would not serve as a predicate crime of violence for a Section 924(c) offense.

The government's reliance here on the *Apprendi*-line of cases is misplaced. Consistent with *Apprendi v. New Jersey,* 530 U.S. 466 (2000), in federal drug trafficking crimes, as was done here, the drug quantity is charged by the grand jury as an element of the drug trafficking conspiracy charged in Count Two. In Count

92

Two of the Second Superseding Indictment, the grand jury charged that the offense involved 100 grams or more of heroin. The drug quantity was charged as an element of the offense and the district court instructed the jury repeatedly that the drug quantity was an element of the offense. (J.A. Vol. I, 178, Vol. XII, 5273-75.) The district court also instructed that because the indictment charged 100 grams or more of heroin, Count Two "requires the jury to make special findings beyond a reasonable doubt." (J.A. Vol. XII, 5275.) In Instruction 61, the district court explained to the jury the process for making the necessary special findings regarding the threshold drug quantity consistent with the special verdict forms used in this case. (J.A. Vol. XII, 5275-76.) Thereafter the jury found that the drug conspiracy involved less than 100 grams of heroin. (J.A. Vol. XIV, 6314.) This use of a special verdict form in combination with specific instructions to the jury was consistent with controlling precedent. *United States v. Stewart*, 256 F. 3d 231 (4th Cir. 2001); *United States v. Angle*, 254 F.3d 514, 517-18 (4th Cir. 2001) (*en banc*).

Similarly, the Section 924(c) offenses charged in this case all included as an element of the offense whether the firearm were used, carried, brandished or discharged. (J.A. Vol. I, 179-195.) *Alleyne v. United States*, 570 U.S. 99 (2013); *United States v. Strayhorn*, 743 F.3d 917, 926-27 (4th Cir.), *cert. denied*, 134 S. Ct. 2689 (2014). The district court instructed the jury that the manner with which the firearm was employed was an element of the offense and provided detailed

instructions regarding the definitions of use and carry, brandish and discharge. (J.A. Vol. XII, 5305-07, 5313-17.) With respect to Count Thirty, the district court instructed that the government must prove beyond a reasonable doubt two elements: first, that Appellants committed the specified crime of violence, and second that "in furtherance of the commission of that specified crime, the defendant knowingly possessed or brandished or discharged a firearm." (J.A. Vol. XII, 5313.)

On Count One, the district court did not instruct that the completed state law murders were elements of the RICO conspiracy. Rather, the district court in explaining the special verdict form told jurors "with respect to these counts, there are subparts where there are questions that you also have to answer on most of them." The attorneys are "going to be talking to you about this." (J.A. Vol. XII, 5329.)[11]

The district court instructed the jury on Count One that racketeering acts involving murder included all "acts involving murder chargeable under Virginia Code Sections 18.2-32, 18.2-26 and 16.2-22 and the common law of Virginia;" and included "all inchoate forms of murder, including conspiracy to commit murder." (J.A. Vol. XII, 5261.) At the government's request, the district court also instructed

_____

[11]Following closing arguments by counsel, the court did not instruct the jury regarding the verdict forms, but rather stated the forms are long and "they have already been gone over by the attorneys to some extent, and really, they're quite detailed and self-explanatory." (J.A. Vol. XII 5603-04.)

on Count One that Virginia Code Section 18.2 defines conspiracy as the inchoate crime of "one person conspiring, … or combining with another to commit a felony." (J.A. Vol. XII, 5263-64.)

This Court should not consider whether an *Apprendi*-style sentencing factor may ever constitute an element of the offense. The question here is whether in this case when the sentencing factor was outside of the offense charged and the district court did not instruct the jury that the sentencing factor was an element of the offense this Court can substitute a sentencing factor for the missing element of force. The jury instructions proposed by the government and given by the district court did not include an element of force for the RICO conspiracy. (J.A. Vol. XII, 5248-49.) Rather, the jury was instructed that the agreement was the gravamen of the RICO conspiracy charged in Count One and the government was not required to prove that the enterprise was actually established or that any overt act or substantive crime occurred. (J.A. Vol. XII, 5249-50, 5269.)

The government did not charge the special sentencing factors as elements of the RICO conspiracy, the jury was not instructed that the completed crimes were elements of the RICO conspiracy, and they cannot now be substituted for the missing element of force.

**3.    The government's argument that special sentencing factors are elements of an aggravated RICO conspiracy is a plainly veiled attempt at an end-run around the categorical approach.**

95

The district court quite correctly held that "*Dimaya* mandates the finding that the § 924(c)(3)(B) 'residual clause' is void as unconstitutionally vague."[12] (J.A. Vol. XIV, 6363.) In the face of government arguments post-trial for a "conduct-specific" approach the district court also correctly held that "Circuit precedent requires this Court to apply the categorical approach to both prongs of § 924(c)(3)." (J.A. Vol. XIV, 6357.) In reliance on *Salinas v. United States*, 522 U.S. 52 (1997), the district court correctly found that the inchoate RICO conspiracy, which does not require an overt act, is not a crime of violence; despite government arguments to the contrary. The district court also correctly found that the special sentencing factors "do not transform the inchoate RICO conspiracy into a 'crime of violence' because the elevated punishment that such special findings trigger is applicable under the <u>categorical approach</u> if the RICO conspiracy involves <u>an agreement</u> to engage in 'racketeering activity' involving murder – it does not require as an element that the murders actually be committed." (J.A. Vol. XIV, 6364-65.) Quite simply, the district court got it right.

In the wake of *Dimaya*, the government abandoned their well-established position that Section 924(c)(3)(B) required a categorical analysis and began "urging

---

[12] The district court reached this conclusion before this Court held similarly in *United States v. Simms*, 914 F. 3d 229 (4th Cir. 2019) (*en banc*) and substantially before the Supreme Court came to the same conclusion in *United States v. Davis*, 139 S. Ct. 2319 (2019).

lower courts," as they did here,  to "adopt a new 'case specific' method that would look to the defendant's actual conduct in the predicate offense." *Davis*, 139 S. Ct. at 2327. The Court in *Davis* analyzed the various arguments in support of this new "conduct-specific" approach and flatly rejected them. *Id.* The government's appeal here is simply another attempt to make an end-run around the elements-based categorical approach which plainly applies.

In arguing for a "conduct-specific" approach to the crime of violence analysis," the government has at times resorted to arguing policy goals. In contrast to the government's long held view that the categorical approach applied to crimes of violence under Section 924(c), their concern that violent offenders may receive lighter sentences if the categorical approach was not employed spawned the new "conduct-specific" approach. *Davis*, 139 S. Ct. at 2335-36; *Simms*, 914 F.3d at 258-59 (Wynn, J., concurring). These policy-based arguments have been soundly rejected by both the Supreme Court and this Court sitting *en banc*. *Id.*

Nor should policy-based argument prevail here. The murders listed as special sentencing factors were separately charged in Counts Three, Five, Ten, Eleven and Twenty. Each of these substantive VICAR murders also served as a predicate offense for a Section 924(c) offense as charged in Counts Four, Six, Twelve, Thirteen and Twenty-One. Where convicted, Appellants Simmons and Mitchell are serving concurrent mandatory life sentences for the substantive VICAR murders

97

and consecutive life sentences for the applicable Section 924(c) offenses. The government's constrained argument that special sentencing factors should now be substituted for the RICO conspiracy's missing element of force is without authoritative support and unavailing.

While this Court has historically permitted multiple Section 924(c) convictions based on the same predicate crime, typically conspiracy; it is only permissible where there have been multiple separate acts of possession or use of firearms each of which were consummated prior to another act or transaction. *See, United States v. Camps*, 32 F.3d 102, 106 (4th Cir. 1994); *United States v. Carter,* 300 F.3d 415, 424 (4th Cir. 2002).  In contrast to the Fourth Circuit, the majority of circuits have held that a defendant can only be charged with a single distinct Section 924(c) violation based on any predicate crime. See *United States v. Tolliver*, 61 F.3d 1189, 1222 (5th Cir. 1995); *United States v. Anderson*, 59 F.3d 1323, 1334 (D.C. Cir. 1995) (*en banc*); *United States v. Hamilton*, 953 F.2d 1344, 1346 (11th Cir. 1992). The government's argument that special sentencing factors should be substituted for the missing element of force fails to account for the fact that the conduct which was encompassed in the special sentencing factors was already charged in the same indictment. Were the government to succeed with this argument Appellants Simmons and Mitchell would be subjected to multiple

consecutive sentences for multiple Section 924(c) offenses predicated on the same crime of violence, and thus punished twice for the same conduct.

## CONCLUSION

The district court properly held that neither the RICO conspiracy nor the VICAR assault with a dangerous weapon charged in Count Twenty-Nine was a crime of violence, and the court's judgment of acquittal as to all Appellants on Count Thirty of the Second Superseding Indictment should be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully join the United States in requesting oral argument in this case.

Respectfully submitted,

By: */s/ Laura P. Tayman*
      Laura P. Tayman, Esquire
      Virginia State Bar No. 39268
      Counsel for Appellant Simmons
      11815 Fountain Way, Suite 300
      Newport News, VA 23606
      Telephone Number: 757-926-5277
      Email Address: laura@taymanlaw.net

*/s/ Paul G. Beers*
Paul G. Beers (VSB # 26725)
Counsel for Appellant Lassiter
Glenn, Feldmann, Darby & Goodlatte
37 Campbell Avenue, S.W.
P. O. Box 2887
Roanoke, Virginia 24001-2887
Telephone (540) 224-8000
E-mail: pbeers@glennfeldmann.com

*/s/ Maureen L. White*
Maureen L. White (VSB # 31521)
Counsel for Appellant Mitchell
7 S. 1st St.
Richmond, VA 23219
Telephone Number: 804-377-0150
Email: mrnwhite49@gmail.com

*/s/ David Michael Good*
David Michael Good, Esquire
Virginia State Bar No. 44107
Counsel for Appellant Simmons
780 Lynnhaven Parkway, Suite 400
Virginia Beach, VA 23452
Telephone Number: 757-306-1331
E-mail Address: dgood@dgoodlaw.com

100

## CERTIFICATE OF COMPLIANCE

1.　　This brief complies　with the　type-volume limitation　of Fed.R.App.Proc. § 28.1(e)(2) because it contains a total of <u>99</u> pages.

2.　　This brief complies with the typeface using requirements of F.R.A.P. § 32(a)(5) and the type style requirements of Fed.R.App.Proc. § 32(a) because it has been prepared in a proportionately spaced typeface using Microsoft Office, Times New Roman 14 point font text.

<u>/s/　Laura P. Tayman</u>
Laura P. Tayman, Esq.
Counsel for Antonio Simmons

<u>/s/　Paul G. Beers</u>
Paul G. Beers, Esq.
Counsel for Malek Lassiter

<u>/s/　Maureen L. White</u>
Maureen L. White, Esq.
Counsel for Nathaniel Mitchell

<u>/s/ David Michael Good</u>
David Michael Good, Esq.
Counsel for Appellant Simmons